**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

BLACK VOTERS MATTER FUND,⟩
and MEGAN GORDON, on behalf of ⟩
herself and all others similarly situated, ⟩
⟩
⟩
Plaintiffs,⟩    Civil Action No.
⟩
⟩
vs.⟩
⟩
BRAD RAFFENSPERGER, in his ⟩
official capacity as Secretary of State of ⟩
Georgia; DEKALB COUNTY BOARD ⟩
OF REGISTRATION & ELECTIONS ⟩
and all others similarly situated,⟩
⟩
Defendants.⟩
⟩

_____⟩

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR
PRELIMINARY INJUNCTION**

## SUMMARY

American democracy is facing an unprecedented public health crisis. The government and the public, especially healthcare workers, are doing their best to fight the dangerous COVID-19 pandemic. And just as Americans bravely cast ballots in 1918 when the deadly Spanish flu was raging, patriotic voters will keep our democracy moving forward by casting ballots during this election year.

However, because of the pandemic, it is widely expected that a record-breaking number of Georgia voters will be voting by mail this year. The Governor's shelter-in-place orders and the attendant need for social distancing caused by the highly contagious virus has made it unrealistic for most, if not all, voters to cast ballots in-person. In light of this surge, it is critical that all unconstitutional barriers to the mail-in voting procedure be removed as soon as possible.

The stakes are high but this case is simple. This case is about whether election officials can constitutionally require voters to pay for their own postage when casting mail-in absentee ballots (and mailing in absentee ballot applications), especially when voting by mail is the only real option during the ongoing public health crisis caused by COVID-19.

The answer is no. The United States Constitution (through the Twenty-Fourth and Fourteenth Amendments) prohibits the government from imposing a poll tax. *See Harman v. Forssenius*, 380 U.S. 528 (1965); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966). Requiring mail-in absentee voters to pay for their own postage is a poll tax because it forces voters to spend money in order to mail in absentee ballots. *See Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262, 274-79 (Wis. 2014) ("payments to government agencies to obtain documents necessary to voting [is] a de facto poll tax"). This requirement is thus unconstitutional.

This is sufficient for Plaintiffs to prevail as a matter of law and obtain relief for all voters, even if wealthy or middle-class voters can easily afford a 55-cent postage stamp. *See Harper*, 383 U.S. at 668 ($1.50 poll tax unconstitutional even if voters can afford it). But this case is not really about wealthy and middle-class voters. This case is about lower-income and vulnerable voters for whom the postage requirement imposes a serious burden due to the difficulty of obtaining or affording stamps especially during this COVID-19 pandemic. *See* Exhibit A. Court action is necessary to ensure that the most marginalized among us are able to participate in our democracy this year in the face of this public health crisis.

Accordingly, this Court should grant Plaintiffs' motion for a preliminary injunction, which would require Defendant Secretary of State to issue guidance to all counties requiring them to provide postage prepaid envelopes for absentee ballots and absentee ballot applications. Defendants need not learn how to do this from scratch, because state law already requires them to provide postage prepaid envelopes to voters in other contexts. *See* O.C.G.A. § 21-2-233(b); O.C.G.A. § 21-2-234(c).

In addition, Plaintiffs ask that relief be provided in advance of the upcoming May 19 primary and any primary runoff, currently scheduled for July 21, and an expedited briefing schedule that could make that possible. Nonetheless, Plaintiffs are mindful of the current crisis and its impact on voters, election officials, and the judiciary. If such injunctive relief is not granted in time for the May or July elections, Plaintiffs ask that it at least be granted well in advance of the November general election (perhaps no later than June), leaving ample time for election officials to ensure that absentee ballots and applications come with pre-postage paid envelopes for the November general election.

## FACTUAL BACKGROUND

As discussed above, the COVID-19 pandemic will likely result in record-breaking numbers of mail-in absentee ballots being cast. Exhibit A (Albright Decl.)

3

¶ 4. This lawsuit seeks to ensure that mail-in voters are constitutionally protected during this time with minimal effort needed on the part of the State.

**A.    Voting By Mail is the Only Meaningful Way to Vote for Many Georgia Voters During the COVID-19 Pandemic**

Due to the ongoing COVID-19 pandemic, many Georgia voters needlessly risk harm to their health, the health of vulnerable loved ones, and the health of other voters and election workers if they appear in-person at a polling place in Georgia. All levels of government have recognized this danger. For instance, in Georgia, the Governor declared a public health state of emergency on March 16, 2020 and issued a statewide shelter in place order on April 2, 2020. *See* Exhibit F. As the Governor recognized, COVID-19 is a highly contagious virus requiring people to stay at home as much as possible, avoid large crowds, and actively engage in social distancing. *See id.* The order notes that those who are elderly and suffer from chronic illness are at an especially higher risk of death. *See id.* Top scientists in the President's Administration recently estimated that COVID-19 could kill between 100,000 and 240,000 Americans and that this number would be much higher if Americans do not follow strict social distancing guidelines. *See* Exhibit G. The Georgia Department of Public Health has reported cases in all age ranges, with many victims under the age of 60. *See* Exhibit H. This Court has recently extended its order that no jurors or grand jurors be summoned and all jury

trials and grand jury proceedings be continued for an additional 30 days until May 15, 2020. *See* Exhibit I.

The number of confirmed COVID-19 cases in Georgia is growing rapidly. Over the last week, the number of reported COVID-19 cases has nearly doubled. As of the date of filing, there are at least 9,156 confirmed cases of COVID-19 in Georgia. *See* Exhibit H. Just six days ago, on April 1, there were only 4,638 reported cases. *See* Exhibit J.

Under these circumstances, most voters likely will not be voting in person, needlessly exposing themselves to the virus and potentially bringing the virus home to vulnerable loved ones. Even if voters want or need to vote in person during the pandemic, the availability of in-person voting options will likely be curtailed, as poll workers, the vast majority of whom are elderly and thus more vulnerable to COVID-19, are reportedly quitting and precincts are closing across the state. *See* Exhibit E.

For many Georgia voters, therefore, mail-in absentee voting will be the only meaningful way to vote in upcoming elections.

### B. Voting By Mail in Georgia

Georgia allows a voter to cast an absentee ballot through the mail. O.C.G.A. § 21-2-385. Notwithstanding the "absentee" moniker, any registered voter may

vote absentee regardless of whether they have an excuse for not being present on Election Day. O.C.G.A. § 21-2-380.

To vote by absentee ballot, a voter must first submit an absentee ballot application via mail, fax, e-mail, or in-person. *See* O.C.G.A. § 21-2-381. If the application is sent by mail, the voter is responsible for affixing postage. *See* Exhibit B. There do not appear to be any statutes or regulations that require government officials to charge voters postage on absentee ballot applications.

After the absentee ballot application is received by election officials and approved, voters are mailed the absentee ballot itself. Absentee ballots are mailed on or after 49 days before Election Day. O.C.G.A. § 21-2-384(a). The absentee ballot also comes with two envelopes: one for the absentee ballot itself, and a larger one that requires voters to sign an oath printed on the outside of that envelope. O.C.G.A. § 21-2-384(b)-(c). The smaller envelope containing the absentee ballot goes into the larger one, and the larger one is what voters mail in to cast an absentee ballot by mail. *Id.*[1]

---

[1] Strictly speaking, voting early in-person is also considered "absentee" voting, and voters can drop off absentee ballots in-person as well. For the sake of simplicity, references here to "in-person voting" includes voting early in-person and dropping absentee ballots off in-person.

Voters are required to affix their own postage when mailing in the absentee ballot. *See* Exhibit C (2020 Secretary of State Absentee Voting Guide) at 5 ("Delivery can be either U.S. first class mail or hand delivered by the voter. <u>If mailing, you must affix postage to the ballot envelope.</u>" (emphasis in original)). There do not appear to be any statutes or regulations that require government officials to charge voters postage on absentee ballots.

Defendants know how to provide postage prepaid envelopes to voters. That is because state law already requires them do so for voter list maintenance purposes. *See, e.g.*, O.C.G.A. § 21-2-233(b) (requiring officials to send certain voters a "postage prepaid, preaddressed return form" allowing voters to update their address); O.C.G.A. § 21-2-234(c) ("The confirmation notice shall be a postage prepaid, preaddressed return card"). And other states including Kansas, Iowa, and West Virginia, have been able to provide postage prepaid envelopes for mail-in absentee voters without incident. *See* K.S.A. § 25-433; I.C.A. § 53.8; W. Va. Code § 3-3-5.

A poll tax is unconstitutional as a matter of law even if many people can afford it, *see infra* Part I.A., but as Cliff Albright, the Executive Director of Plaintiff Black Voters Matter Fund, explains, the postage requirement is a significant problem for a wide array of vulnerable voters.

7

Many voters, especially lower-income voters, do not have postage stamps because they do not use them, or cannot afford to buy a book of stamps just for elections. Exhibit A. (Albright Decl.) ¶ 7. Many voters do not have Internet access or credit cards to purchase stamps online (to the extent they know about it), and they do not want to needlessly expose themselves to the COVID-19 virus to buy stamps at a post office. *Id.* ¶ 8. Many cannot even travel to a post office or other public place because they do not have cars. Ride-sharing programs or public transportation are especially dangerous in terms of virus transmission, and they do not exist anyway in large parts of rural Georgia. *Id.*

Making matters worse, voters do not even know how much postage is needed. *Id.* ¶ 9. Fifty-five cents may not be enough because ballots can sometimes be long and therefore heavier, and almost no voters Plaintiff works with have stamp scales. So Plaintiff has to encourage the use of extra and potentially unnecessary postage just to make sure their vote is counted. *Id.* Furthermore, many voters like the elderly, those with physical disabilities, and out-of-town voters can only vote by mail, so it is extraordinarily difficult if not impossible for them to vote in person. *See* Exhibit D (Gordon Decl.) ¶ 13. Even for those who are able to vote in-person, taking time off work or childcare to travel to a polling place can still be challenging. *See id.* And of course the COVID-19 public health crisis only

extends these barriers to many more Georgia voters for whom in-person voting is now no longer a meaningful voting option.

Individual Plaintiff Megan Gordon is a registered voter in DeKalb County. She, like other voters, cannot vote in-person because of the COVID pandemic. But she does not want to use her own postage stamps to mail-in absentee ballots or applications because she believes that no one should have to pay money to exercise their right to vote. *See* Exhibit D (Gordon Decl.) ¶¶ 4-8.

## ARGUMENT

A preliminary injunction is warranted if the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable harm in the absence of an injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that an injunction would not disserve the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors weighs in favor of the requested injunction.

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR POLL TAX CLAIM (Count One)

Here, Plaintiffs are substantially likely to succeed on their poll tax claim (Count One). Requiring voters to buy postage in order to vote absentee by-mail

imposes a *de facto* poll tax that unconstitutionally abridges the right to vote, especially when absentee by-mail voting is the only realistic means of voting for many Georgia voters while the COVID-19 public health crisis is ongoing.

### A. Legal Standard: the United States Constitution bans poll taxes as well as *de facto* poll taxes

The Twenty-Fourth Amendment plainly and unambiguously bans poll taxes. It provides: "The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. *See Harman v. Forssenius*, 380 U.S. 528 (1965) (applying amendment). Courts have also construed the Equal Protection Clause of the Fourteenth Amendment as including this prohibition on poll taxes, with respect to all elections. *See Harper v. Va. State Bd. of Elect.*, 383 U.S. 663, 666 (1966) ("We conclude that a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard."). Poll taxes are anathema to our democracy because "[v]oter qualifications have no relation to wealth nor to paying or not paying this or any other tax." *Id.*

Under this legal standard, 1) the government imposes an unconstitutional poll tax when it directly requires voters to spend money to vote; 2) the government also cannot impose *de facto* poll taxes that require voters to obtain a documentary prerequisite to voting if the prerequisite document itself costs money; and 3) a poll tax is an unconstitutional abridgment of the right to vote even if there are alternative ways to vote that are technically "free" but still materially burdensome.

First, the government imposes an unconstitutional poll tax when it directly requires voters to spend money to vote. *See Harper*, 383 U.S. at 666 (government violates prohibition on poll taxes "whenever it makes the affluence of the voter or payment of any fee an electoral standard"). This is unconstitutional regardless of how small the amount, regardless of whether voters can afford it, and regardless of whether voters end up paying the amount. *See id.* at 668 (poll taxes are unconstitutional "whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it."). And obviously, saving the government money is never a legitimate reason to impose a poll tax. *See Harman*, 380 U.S. at 544 ("the poll tax, regardless of the services it performs, was abolished by the Twenty-fourth Amendment" (emphasis added)). Otherwise, all poll taxes would be constitutional.

Second, the government violates the Constitution when it imposes a *de facto* poll tax indirectly, such as imposing a documentary prerequisite to voting, which in turn requires voters to spend money to buy the document. *See Harman*, 380 U.S. at 540-41 ("the Twenty-fourth [amendment] 'nullifies sophisticated as well as simple-minded modes' of impairing the rights guaranteed.'" (citation omitted)). The most common example of a *de facto* poll tax is a "Voter ID" law which requires voters to show photo identification when voting, which then requires voters to purchase photo identification. *See, e.g., Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262, 274-79 (Wis. 2014) (explaining that courts "have characterized payments to government agencies to obtain documents necessary to voting as a de facto poll tax"). Thus, for example, Georgia's Voter ID law was found to impose an impermissible poll tax because photo identification cost money at the time. *See Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1366-67 (N.D. Ga. 2005). But after Georgia made photo identification free, the same court concluded there was no poll tax. *See Common Cause/Georgia v. Billups*, 439 F. Supp. 2d 1294, 1355-56 (N.D. Ga. 2006).

Third, a poll tax is an unconstitutional abridgment of the right to vote even if there are alternative ways to vote that are free but are still materially burdensome. *See Harman*, 380 U.S. at 538, 541 (poll tax is an unconstitutional "abridgment of

the right to vote" even when there exists an alternative option, when the alternative still "imposes a material requirement" on those "who refuse to surrender their constitutional right to vote . . . without paying a poll tax."). The alternative method of voting is considered "material" even if it is not "onerous" and even if the alternative is easier to do than paying a poll tax. *Id.* at 542 (poll tax remains unconstitutional even if alternative method is "somewhat less onerous[] than the poll tax. . . . [T]he poll tax is abolished absolutely as a prerequisite to voting, and no equivalent or milder substitute may be imposed."). Thus, for example, the Supreme Court held that a $1.50 poll tax was unconstitutional even if a voter could avoid paying the tax by obtaining or creating a certificate of residence for free and delivering it in person to local election officials. *See id.* at 541-43. Because obtaining a free certificate of residence was still a material burden, and had to be done on an annual basis, the poll tax unconstitutionally abridged the right to vote. *See id.*

In sum, the government imposes an unconstitutional poll tax not only when it does so directly, but also when it does so indirectly by requiring voters to spend money to satisfy a prerequisite to voting. The poll tax is an unconstitutional abridgment of the right to vote even if alternative methods are available to vote, when such alternative methods are still materially burdensome.

**B.      Application: Defendants violate the Constitution by requiring mail-in absentee voters to buy postage to vote**

Here, the violation is plain. Georgia voters are required to purchase their own postage in order to cast a mail-in absentee ballot. Because voters must purchase a prerequisite to voting (i.e., postage), Defendants have imposed an unconstitutional *de facto* poll tax. The same holds true for absentee ballot applications, which also require postage when mailed.

Georgia's *de facto* poll tax is an unconstitutional abridgment of the right to vote even though there are alternative ways to vote for free. That is because such alternatives are still burdensome for those who do not want to pay the poll tax. *See Harman*, 380 U.S. at 542. Here, of course, voting in person is not just materially burdensome but completely off the table for nearly all Georgia voters because of the ongoing pandemic. Voting by mail is currently the only meaningful option for almost all Georgia voters—but they are, quite literally, being asked to pay to cast their ballots.

Moreover, requiring voters to pay postage to mail in ballots is still unconstitutional as a matter of law even if there were no pandemic. As noted above, many voters like the elderly, disabled, or those out-of-town can only vote by mail, so requiring them to vote in-person not only imposes a "material" burden, but an impossible one. Even for those who are able to vote in-person, taking time

off work or childcare to travel to a polling place still imposes at least a "material" burden, even if voting in-person is not "onerous" for them. *Harman*, 380 U.S. at 541 (poll tax unconstitutional where free alternative method required travel to local election officials on an annual basis). That is why many people vote by mail.

For these reasons, Plaintiffs are likely to succeed on their poll tax claim (Count One).

## II.   PLAINTIFFS ARE ALSO LIKELY TO SUCCEED ON THEIR *ANDERSON-BURDICK* CLAIM (Count Two)

Because Plaintiffs are likely to prevail on the poll tax claim (Count One), it is unnecessary for this Court to assess Plaintiffs' *Anderson-Burdick* claim (Count Two). In any event, Plaintiffs are likely to succeed on that claim as well. Briefly, an *Anderson-Burdick* claim challenges a voting requirement under the First and Fourteenth Amendments. A voting requirement is unconstitutional if its burdens on voting, even if "slight," are not justified by the government's interests. *See generally Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009).

Due to the pandemic, voting by mail is now the only meaningful option for the vast majority of Georgia voters for exercising their right to vote. Under these circumstances, the state's imposition of a postage requirement effectively imposes

an unavoidable monetary burden on the franchise. Even if that burden is "slight" (which it is not, *see* Exhibit D), the government's interest in saving money does not justify it, regardless of how small the amount. *See Harman*, 380 U.S. at 544 ("the poll tax, regardless of the services it performs, was abolished by the Twenty-fourth Amendment"). And the burdens on Defendants are minimal because they already know how to prepare prepaid postage, as state law already requires Defendants to do so for voter list maintenance purposes. *See* O.C.G.A. § 21-2-233(b); O.C.G.A. § 21-2-234(c); *see Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339-40 (N.D. Ga. 2018) ("minimal burden" on Defendants where other statutes already require similar procedure (citing *Zinermon v. Burch*, 494 U.S. 113, 137 (1990)). Other states like Kansas, Iowa, and West Virginia have all been able to provide prepaid postage for mail-in voters apparently without incident. *See* K.S.A. § 25-433; I.C.A. § 53.8; W. Va. Code § 3-3-5. Plaintiffs are thus likely to succeed on their *Anderson-Burdick* claim as well.

## III.   THE REMAINING PRELIMINARY INJUNCTION FACTORS TILT DECIDEDLY IN PLAINTIFFS' FAVOR

Requiring voters to needlessly expose themselves to the deadly COVID-19 pandemic to avoid paying a poll tax is both unconstitutional and unconscionable.

The remaining preliminary injunction factors thus weigh strongly in favor of granting Plaintiffs' requested relief this year.

When there is "an abridgment to the voters' constitutional right to vote, irreparable harm is presumed." *Touchston v. McDermott*, 234 F.3d 1133, 1158-59 (11th Cir. 2000). The balance of hardships also weighs in Plaintiffs' favor. This pandemic is forcing unprecedented numbers of Georgia voters to a mail-in voting process that essentially charges all of them money to vote. More pressing, many marginalized voters do not have postage stamps and cannot afford buying a book of stamps online or are unable to because they do not have Internet access or a credit card. Voters also cannot be expected to go to a post office or grocery store to buy stamps in-person in the middle of a pandemic. Making matters worse, the amount of postage is also unclear because 55 cents may be insufficient if the ballot is too long and heavy, and only the few voters that actually own stamp scales can know with any certainty. And emailing absentee ballot applications is not an option for the many lower-income Georgians (not to mention many others) who lack Internet access, a smartphone, a computer, a printer, and/or a scanner. *See supra* Factual Background.

Defendants' potential burden pales in comparison to these circumstances. Defendants already know how to provide pre-paid postage envelopes because they

are legally required to do so in other circumstances. *See* O.C.G.A. § 21-2-233(b);

O.C.G.A. § 21-2-234(c); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339-40 (N.D.

Ga. 2018) ("minimal burden" on Defendants where other statutes already require

similar procedure (citing *Zinermon v. Burch*, 494 U.S. 113, 137 (1990)). Other

states like Kansas, Iowa, and West Virginia already do this. *See* K.S.A. § 25-433;

I.C.A. § 53.8; W. Va. Code § 3-3-5. And "there is no contest between denial of

access to the ballot and a state's administrative burden." *Jones v. Gov. of Fla.*, 950

F.3d 795, 829-30 (11th Cir. 2020) (citation omitted).

Should briefing on this motion be expedited, this Court can potentially grant

relief that would prevent any voter from being subjected to an unconstitutional poll

taxes as early as the May primary and/or the July primary runoff.[2] At a minimum,

this motion has been filed to allow plenty of time for Defendants to take needed

action impelled by an injunction well before the November elections. Though the

government often argues that its interest in enforcing statutes weighs strongly

against a preliminary injunction, here Plaintiffs have not found a single statute or

---

[2] By way of reference, on March 27, 2020, the Governor of Michigan signed an
emergency order requiring election officials to provide prepaid postage for all
mail-in ballots with respect to the May 5, 2020 elections. *See* Exhibit K (press
release and executive order).

*. . . footnote continues on next page*

18

even regulation that would need to be enjoined.[3] Lastly, the public interest weighs in favor of an injunction because "cautious protection of . . . franchise-related rights is without question in the public interest." *Id.* (quoting *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005)). This is especially important in an election year taking place during a pandemic, in which mail in absentee voting will be the only realistic means for many, if not most, Georgia voters to participate in our democracy.

## CONCLUSION

Voters should not have to choose between needlessly exposing themselves to a deadly pandemic and spending money for the right to vote. Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted this 8th day of April, 2020.

<u>**Sean Young**</u>
Attorney Bar Number: 790399
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208

---

[3] Even if an injunction required a statute or regulation to be enjoined, it would still be warranted. *See Jones*, 950 F.3d at 829 ("The State's broad interest in enforcing its statutes, standing alone, would be applicable any time a statute's constitutionality is challenged and a preliminary injunction issued against its enforcement. The State's argument in this case, if it carried the day, would prove too much—hardly any preliminary injunction could ever issue.").

Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

Sophia Lin Lakin*
Dale E. Ho*
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-519-7836
Email: slakin@aclu.org
dho@aclu.org

Attorneys for Plaintiffs
*Pro hac vice application forthcoming

## CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Ga. Local Civil Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with N.D. Ga. Local Civil Rule 5.1(C) in Times New Roman 14-point typeface.

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system. I have asked a process server to formally serve Defendants these motion papers. As a courtesy, I have emailed these papers, including the complaint, to the General Counsel of the Secretary of State's Office, as well as the county attorneys for DeKalb County.

**Sean Young**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org