IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BLACK VOTERS MATTER FUND, ET　　:
AL.,　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　PLAINTIFFS,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　:
vs.　　　　　　　　　　　　　　　　　　:　　DOCKET NUMBER
　　　　　　　　　　　　　　　　　　　　:　　1:20-CV-1489-AT
BRAD RAFFENSPERGER, IN HIS　　　 :
OFFICIAL CAPACITY AS SECRETARY　:
OF STATE OF GEORGIA, ET AL.,　　:
　　　　　　　　　　　　　　　　　　　　:
　　　　　DEFENDANTS.　　　　　　　　 :

**TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

**BEFORE THE HONORABLE AMY TOTENBERG**

**UNITED STATES DISTRICT JUDGE**

**APRIL 14, 2020**

**4:59 P.M.**

*MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

*TRANSCRIPT PRODUCED BY:*

*OFFICIAL COURT REPORTER:*　　　　*SHANNON R. WELCH, RMR, CRR*
　　　　　　　　　　　　　　　　　　*2394 UNITED STATES COURTHOUSE*
　　　　　　　　　　　　　　　　　　*75 TED TURNER DRIVE, SOUTHWEST*
　　　　　　　　　　　　　　　　　　*ATLANTA, GEORGIA　30303*
　　　　　　　　　　　　　　　　　　*(404) 215-1383*

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

**A P P E A R A N C E S   O F   C O U N S E L**

**FOR THE PLAINTIFFS:**

        SEAN YOUNG
        SOPHIA LIN LAKIN
        AMERICAN CIVIL LIBERTIES UNION FOUNDATION

**FOR THE DEFENDANT BRAD RAFFENSPERGER IN HIS OFFICIAL CAPACITY AS SECRETARY OF STATE OF GEORGIA:**

        CHARLENE S. MCGOWAN
        GEORGIA DEPARTMENT OF LAW

        VINCENT R. RUSSO, JR.
        JOSHUA B. BELLINFANTE
        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD LLC

**FOR THE DEFENDANT DEKALB COUNTY BOARD OF REGISTRATION & ELECTIONS:**

        IRENE B. VANDER ELS
        SHELLEY DRISKELL MOMO
        LAURA JOHNSON
        DEKALB COUNTY DEPARTMENT OF LAW

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; April 14, 2020.)**

COURTROOM DEPUTY CLERK:  Good afternoon, Judge.

THE COURT:  Good afternoon.  Are we missing anyone?

COURTROOM DEPUTY CLERK:  I'm not really sure who all we have got on.  Would you like me to call the case and see who is here?

THE COURT:  Well, why don't we give ourselves the exact minute of 5:00, and then we'll do that.  All right?

COURTROOM DEPUTY CLERK:  Okay.

MS. VANDER ELS:  Hello.  This is Irene Vander Els.

THE COURT:  Hello.  This is Judge Totenberg.  We're just waiting for the moment of 5:00, and then we'll go over and make sure everyone is here.

COURTROOM DEPUTY CLERK:  Judge, I do believe we have someone representing every entity on the phone right now.

THE COURT:  Great.  All right.  Then go ahead and call the case.

COURTROOM DEPUTY CLERK:  Okay.  Good afternoon, everyone.  We're here for the telephone conference in the Black Voters Matter Fund vs. Raffensperger, Civil Action Number 20-CV-1489.

Beginning with plaintiffs, would counsel please identify themselves for the record.

MR. YOUNG:  Sean Young, ACLU of Georgia for

plaintiffs.

COURTROOM DEPUTY CLERK:  Thank you.

MS. LAKIN:  You also have Sophia Lakin with the ACLU for the plaintiffs.

COURTROOM DEPUTY CLERK:  Thank you, ma'am.

Anyone else?

Okay.  Secretary of State?

MS. McGOWAN:  This is Charlene McGowan with the Attorney General's Office.

COURTROOM DEPUTY CLERK:  Okay.

MR. BELINFANTE:  This is Josh Belinfante, outside counsel for the state.

COURTROOM DEPUTY CLERK:  Thank you.  Anyone else?

Dekalb County?

MS. VANDER ELS:  This is Irene Vander Els from Dekalb County Law Department on behalf of the County Board of Registration & Elections.

COURTROOM DEPUTY CLERK:  Thank you.  I heard --

MS. JOHNSON:  Laura Johnson from Dekalb County.  I'm also on the phone for the Board of Elections.

COURTROOM DEPUTY CLERK:  Great.  Thank you very much.

MS. MOMO:  And Shelley Momo for the Dekalb County Board of Registration & Elections.

COURTROOM DEPUTY CLERK:  Thank you, ma'am.

THE COURT:  Are there some other people who have

joined?

MR. RUSSO:  This is Vincent Russo.

COURTROOM DEPUTY CLERK:  Mr. Russo, thank you.

THE COURT:  Thank you, Mr. Russo.

COURTROOM DEPUTY CLERK:  Anyone else?

I think that has got it, Judge.

THE COURT:  Okay.  I want to just make sure that Nate is on the phone.

LAW CLERK:  Yes.  This is Nate.  I am here.

THE COURT:  Thank you.  All right.  Very good.

Thank you-all for making yourselves so quickly available.  I'm most appreciative.  I had thought of doing this before.  But I got -- when I saw the article today in the paper about no stamp, no problem in the AJC, it kind of caused me greater concern about confusion.

And I just said, well, really at this point I need to sort of have an actual conversation with you-all so that we can make sure that we're moving forward in a way that makes sense and that preserves all options for everybody.

So I guess the first question I had, which was for the -- I assume for the state is because in another -- in a preceding article I saw other information regarding when was the anticipated date about -- the anticipated date for production of the absentee ballot.

Maybe you could clarify for me when you are

thinking -- at this point projecting that the absentee ballots will be printed.

MR. RUSSO:  Your Honor, this is Vincent Russo.  I don't have the date of when the absentee ballots will be printed.  I do know, however, that the absentee ballots go out or start going out 49 days prior to the date of the election.  I believe the 49th day prior to June 9 is -- it might be the 25th.  I know it is coming up within the next ten days or so.

THE COURT:  Okay.  And then it continues as applications are received?

MR. RUSSO:  Yes, ma'am.

THE COURT:  Okay.  And then I understood that there were some applications that had the wrong return address and were going to have to be mailed again?

MR. RUSSO:  That I do not --

THE COURT:  You don't --

MR. RUSSO:  I don't know.  We just got retained early yesterday -- late yesterday.  So some of these issues -- my apologies -- but I don't have good answers for you yet.

THE COURT:  All right.  Ms. McGowan, do you know that -- anything about that?

MS. McGOWAN:  Your Honor, I do not know.  But I am -- I am happy to look into it and get an answer to you as soon as possible.

THE COURT:  All right.  I mean, I think the question

regarding the applications is this -- I mean about -- beyond the applications, the ballots, is they are -- they do weigh different amounts.  They haven't been -- I don't -- as far as I could determine at least from the admittedly total external source of comments made to the AJC was that they hadn't been printed yet and that there was a contractor in Texas or something that was being used.

And, obviously, any -- you know, to the extent that we know about it makes a difference because we don't -- I would not want to be precluded from having -- if you are going to use that in some way to relay information about postage, it would seem like we don't want -- we want that information to be consistent with whatever comes out of this case.

So I don't want the state to have to be doing anything twice ever.  And I don't know that I'm going to rule that way either.  But I'm just trying to preserve all options.

So I think it is something that the state should determine rapidly as to whether or not -- you know, what is the D date for actual printing of the -- of the ballots.  And, of course, there are a lot of different types of ballots as I know.

How -- I, again, know that, Mr. Russo, you are relatively new to this.  But in case Ms. McGowan knows, how is the state projecting the volume that will be necessary for different jurisdictions?

MS. McGOWAN:  Your Honor, we're in the process of putting that together.  We have some initial estimates.  But they are working on getting you a detailed report, as you requested in your scheduling order --

THE COURT:  Okay.

MS. McGOWAN:  -- which we will be prepared to provide by Friday and hopefully sooner.

THE COURT:  All right.  I'm not sure I did ask this before.  But I'm wondering whether the -- does the state -- because things have moved so much, does the state plan to provide any type of written or public information clarification to voters that if they voted before that this is an additional ballot, that this has additional information on it, additional races to be voted on?

MS. McGOWAN:  Yes.  I believe they have communicated that people that have already voted in the PPP their votes will be counted.  And then this next vote will be a combined -- the June 9th primary will be a combined ballot with the -- you know, the presidential preference primary, as well as the general state primary.

THE COURT:  Well, maybe you can point that out to me, as well, in whatever brief that is filed where that information is provided.  All right?

MS. McGOWAN:  Certainly.

THE COURT:  Okay.  Because I'm not -- if you don't

know that, you might not know until -- I mean, I have in front of me the ballot form that my husband received -- the absentee ballot application form.

So just going to the immediate postage issue that kind of first triggered the phone call, I assume -- but maybe this is an incorrect assumption -- that the state is not relying on the United States Post Office to have consistent delivery of mail even for their -- to the various counties and their voting office -- and their voting offices based on there not being any stamps there.

I don't think -- that wasn't the plan, was it?  That that was a default?

MR. RUSSO:  Your Honor, this is Vincent Russo.  I'm not sure I'm understanding the question.

THE COURT:  Okay.  All right.  Well, let me rephrase it then.  Okay?

Right now when I read the instructions, I have to put a stamp on the application.  And this article in the AJC says the postal service will often or, in fact, deliver mail, even if it doesn't have a stamp.  But your plan doesn't rely on that as a default, does it -- the state's plan?  That it will somehow be delivered without a stamp?

MR. RUSSO:  The state's -- the state's plan is it does not have -- if I'm understanding you correctly, the state's plan -- doesn't have a plan regarding the return of the

ballot with postage on it from, you know, the -- you know, anyone other than the voter.  The voter, of course, can receive postage from a third party.  And the SEB has issued a regulation on that previously that it won't be deemed to be a gift or, you know, providing any kind of compensation to a voter to vote.  But the state's plan hasn't changed in terms of postage for mail coming back or going back to the counties.

THE COURT:  Okay.  All right.

MR. BELINFANTE:  Your Honor, this is Josh Belinfante. If I may?

THE COURT:  Yes.

MR. BELINFANTE:  I may have understood your question a little bit differently.  And forgive me because, again, as Mr. Russo said, we just recently have been retained on this.  I don't want to waive any potential argument though that speaks to a lack of injury because of what the post office does.

So while not perhaps part of -- as Mr. Russo explained the plan, we don't -- you know, this is something that we think is relevant and the Court should consider.  But we will be making those arguments at the appropriate time.

THE COURT:  All right.  Well, all I was really trying to get at was this is -- I don't know, you know, exactly who these interviews were done with.  I don't know anything about this article other than what it says today in the AJC.  And I don't know how consistently either that the post office does

anything so -- or what post office does which thing.

So that is the only thing I want to say.  That if it is, in fact, something that anyone is relying on, I just want to say there are all sorts of a range of issues that are raised by whatever statement here was given by the postal service and spokesman here, Mr. Badie.  Because there are a lot of different post offices who will be handling this mail.  And so it is not exactly fully reliable it seems to me.

But -- and also it expressly excludes the question of how are the absentee applications dealt with.  I don't know what you -- and this, again, goes to the issue of what is going to be delivered and the weight.  And I'm not positive when I look at this absentee ballot application that it would clearly indicate that it was a -- basically going to a -- relating to the Government and a Government process when I end up looking at the way it looks when I fold up the form itself.  And all of that only relates to the question of the -- right now to my concerns regarding the reliability of the postal office's representations and what they are saying.

So I just want to -- I wanted to bring that to your attention without just spending a ridiculous amount of time trying to send you questions about it.

So are you thinking -- again, knowing now that private counsel are just newly retained but having Ms. McGowan here as well and having Dekalb County's counsel, are you-all

thinking that you would want to provide any live testimony?

I'm just trying to think about obviously the mechanics of doing this and how we would proceed. And do you have -- if you don't know now, do you have some sort of time line for when you will know?

Let me ask plaintiffs, who have had the case longer, to first respond for themselves about that.

MR. YOUNG: Plaintiffs don't -- we don't specifically insist on live testimony for a preliminary injunction hearing. And while, of course, we would not waive the right to seek it, we are really willing to work with defendants with something that is reasonable. You know, sure, this Friday they might provide some declarations talking about their burdens. But in voting cases, we typically do challenge those. But we're not going to be unreasonable. And I don't anticipate pushing for depositions, for instance, next week.

THE COURT: Well, I guess my -- whether depositions or not, I'm just trying to figure out -- and then I think that whether you think that you yourselves would be wanting to put somebody on the -- to provide live testimony, even if it is by televideo or just telephone.

MR. YOUNG: Oh, forgive me, Your Honor.

THE COURT: What is your anticipation at this point for your own part of the case or if you were calling them on cross-examination?

MR. YOUNG:  Forgive me.  No, not on my side of the case.

THE COURT:  All right.

MR. RUSSO:  Your Honor, this is Vincent Russo.  I think we're still trying to determine whether we would want to have live testimony.  I mean, at this juncture, we're trying to pull together the information that you requested in the order, in addition to other information that would be relevant to the -- to our response to the preliminary injunction motion and have the necessary declarations for that.  It may be that, you know, there are issues that require --

I apologize if you hear a screaming baby in the background.

THE COURT:  That is all right.  I understand.

MR. RUSSO:  -- that there may be issues that we think live testimony may benefit the Court.  And, you know, we're willing to make sure we have witnesses there if it would benefit you.  But we haven't --

THE COURT:  Well, you know, it may be wherever they are.  It is just simply we -- the more places there are, the more technology we have to use.  And I was on my actual first, for the court, video conference today.  It was very bumpy, and I hope we move to a different technology.

But it is -- so, you know, I want everyone to be able to present what they need to present at the hearing.  But I

recognize that we may be doing it at multiple locations.

Have the -- there seemed to be some service issues. Have those been resolved?

MR. YOUNG:  This is Sean for the plaintiff, if I may, Your Honor.  I think technically we have some outstanding issues with that.  But, really, the dispute boils down to when do we want the responsive pleading deadline to be.  None of the parties, at least as far as I'm aware, believe that service should impact the preliminary injunction timing.

And so we've initiated conversations about that.  We just want to figure out when the responsive pleading deadline is and have every confidence we'll reach agreement on that and not waste this Court's time on service issues.

THE COURT:  All right.  Do defendants want to say anything in response to that?

MR. RUSSO:  Your Honor, this is -- I'll defer to Charlene on that -- to Ms. McGowan on that.

MS. McGOWAN:  Your Honor, as Mr. Young mentioned, we're going to have discussions about resolving the service issues and, you know, responsive pleadings deadlines.  And I agree with Mr. Young that we don't feel that should hold up the preliminary injunction phase and that we'll just, you know, work out an agreed-upon deadline for when defendants or the Secretary of State's responsive pleadings will be due.

THE COURT:  Anyone have anything further to say on

behalf of Dekalb County as to that?

MS. VANDER ELS:  Your Honor, this is Irene Vander Els.  The county was served on April 9 via personal service. So we have no service issue.

THE COURT:  All right.  If the state would just remind me -- and I know we have talked about this probably in some other context.  But how will the -- how does the state or the locality know as to which -- what ballots should be mailed to which individuals relative to what they had voted on and where they are living, i.e., at this point that they may have cast a vote already in the presidential primary.

MR. RUSSO:  Your Honor, this is Vincent Russo again. Yeah.  The state prepares ballot combinations that are based on, you know, where an individual resides.  And those combinations then determine, you know, how the ballot gets built and what races are on the ballot down to the local level.

The -- in terms of knowing whether somebody has voted in the presidential preference primary already or not, of course, they have received those ballots.  Although the counting -- my understanding is that the counting of the ballots has not occurred.

There is a -- the state and the counties know who has received the ballots.  And my understanding is that they have figured out a way to make sure that somebody isn't going to get two -- you know, get to vote in the presidential preference

primary twice.  I mean, nobody has voted in the -- in the general primary election.

THE COURT:  Right.

MR. RUSSO:  Those primary election ballots were rebuilt to add the presidential preference primary to them. But there is essentially four -- I guess five different ballots because you have the nonpartisan ballot also.  And then there's, you know, the presidential -- the primary election -- the presidential preference primary election on it for both parties and then the -- the primary election -- general primary election that does not have that presidential preference primary race on it.

And those -- those individuals who have already voted in the presidential preference primary -- they have been put in the system as having, you know, the state or I guess the counties know that they have already voted.  And those individuals, when they request the primary election ballot, whether it is, you know, if they go in person or if they request it by mail, there is the ballot that gets pulled up. So that person will not have the PPP on it.  And I guess at this point I don't know if that would matter.

THE COURT:  I'm not sure it would matter.  I just --

MR. RUSSO:  Yeah.

THE COURT:  Yeah.  But ultimately -- but it really was -- nevertheless, it is a different ballot.

And so are you -- Ms. McGowan, you have absolutely no information at this juncture about when you are -- when the state thought that the ballot was going to be printed?

MS. McGOWAN:  I have actually been trying to communicate with them while we have been on this call.  And I had a hunch, but I didn't want to say it without having some confirmation.

But I think it is actually already in process.  I know they have received about 300,000 of the applications back already.  And I think this week or next is when they are going to start actually being sent out.

So I think that -- I know the ballot design has already been completed.  And so I think they will be ready to be mailed very soon and probably already many have been printed.

THE COURT:  So are they printing the envelopes as well?

MS. McGOWAN:  Yes, Your Honor.

THE COURT:  Did the state do anything to cost out how much it was going to be to provide -- I mean, the calculations I've asked for but -- for next Friday.  But just in light of all this, I'm just trying to preserve the possibility of relief without too much of a burden.

What is involved in printing these envelopes with postage versus without?  Have you -- since receiving the

lawsuit, have you looked at that?

MS. McGOWAN:  Yeah.  I have had some initial discussions with them, Your Honor.  And from what -- so usually this is handled at the county level.  For this particular situation where the Secretary of State took it upon themselves without obligation, they have decided to mail out applications -- the absentee ballots to every single registered voter and then the Secretary of State --

THE COURT:  So the application goes to every voter?  It is sent out to everyone who sends an application in?  You're not --

MS. McGOWAN:  I'm sorry, Your Honor.  The application was sent to every registered voter.  And then for whoever requests an absentee ballot, the Secretary of State's office will be sending those out with the envelope.

And so they are working out a cost estimate for me of what that would cost with -- I have an estimate without providing prepaid postage for the ballots to be returned.  But I don't have an estimate yet for what it would cost for them to have prepaid envelopes.

Part of the issue is that it would have to be very county-specific.  If they were going to -- I think the issue right now that we're sorting out and maybe need guidance from the Court when you take up our briefing is is it counties or the state that bear the responsibility for the cost.

Because the June primary is going to look very different from the November general election because of the special circumstances that exist right now.

MR. RUSSO:  Your Honor, this is Vincent --

THE COURT:  The special circumstances meaning the COVID-19 or the special circumstances meaning the volume of primaries or what?

MS. McGOWAN:  The COVID-19 situation that is prompting the Secretary of State's office to -- you know, to provide this option for everyone to be mailed an absentee ballot.

THE COURT:  Was that Mr. Russo or somebody else who said something?

MR. RUSSO:  Yes, ma'am.  I was just -- this is Vincent Russo, Your Honor.  I was just going to clarify that point that Ms. McGowan had made and also add that the logistics behind the postage for returning the absentee ballots or -- or applications, for that matter, you know, the state is mailing them out.  If the county is paying for the prepaid postage, the state has to be able to put that on the envelope -- the -- I don't want to call it a bar code because I don't want to confuse the other -- we're here about bar codes and elections these days -- but, you know, the electronic stamp that goes on so that the mail service knows who to bill.

And so, you know, the state would need to have 159 --

you know, presumably 159 different bar codes to put on all of the envelopes or the applications, if there is going to be prepaid postage being paid from the counties.

THE COURT:  Well, unless the state just simply duns them at the end or agrees to take some -- pay for some portion of it.  I mean, there are a variety of ways that can be done.

MR. RUSSO:  Yes.  And I was just explaining the logistics.  Ms. McGowan had mentioned the logistics behind it. I think that is probably part of it.

THE COURT:  Well, let me talk about logistics about the application.  I mean, obviously, the gateway is that you do an application.  And presumably if you have -- actually have -- have a connection to technology, you are in a less serious position as to being able to fill out an application than if you don't.

But is there -- have you considered or will you consider -- I mean, there was particular pleadings -- parts of the pleadings that talk about low income communities and rural communities and who has -- I know you can't guess who has access to technology and who has not.

But I mean, just -- I'm just throwing this out because I think it is something that you-all could discuss between the parties.  If you were thinking about this proactively, you could think about ways in which you could make other -- make stamps or other notice available to people as to

ways they could get their -- they can submit these.  I don't --

MR. YOUNG:  Your Honor --

THE COURT:  Yes.

MR. YOUNG:  I apologize.

THE COURT:  Who is speaking?

MR. YOUNG:  This is Mr. Young on behalf of plaintiffs.  After we filed the lawsuit, Ms. McGowan and I had a conversation.  And she very correctly pointed out that our requests for relief, at least with respect to the applications, were a little less than clear.  And so I wanted to clarify a little bit because I think that informs this discussion.  And I did send them in writing what we were really looking for.

I think there's two components.  The first is we want the absentee ballot applications that is downloadable online to itself include the prepaid postage stamp.  And I discovered, frankly, just today that the state already does that with voter registration forms.  I was not sure before whether you could just do that on an online application.  So that is what we're asking for.

The second piece is we believe all voters should be able to ask the counties to provide an absentee ballot application, which I think they do now, but that that application come with prepaid postage.

THE COURT:  So the application --

MR. YOUNG:  And, of course, we're happy to -- sorry.

THE COURT:  So I guess what I'm trying to -- they receive this application.  But you are saying that the county should send a new one to them?  I'm a little less than clear on what you are saying.

MR. YOUNG:  Yes.  Sorry.  For the timing piece in terms of what has already happened for the June election, I'm not prepared to say that plaintiffs are insisting that everything be redone at all.  So that's a conversation I'm happy to have with defendants about what is reasonable --

THE COURT:  All right.

MR. YOUNG:  -- in terms of timing.

THE COURT:  Okay.  All right.

MS. McGOWAN:  I will add --

THE COURT:  Yes.  Go ahead, Ms. McGowan.

MS. McGOWAN:  Your Honor, I just will add that the state has already invested $3 million in sending the applications to every Georgia voter.  And, you know, they are already receiving -- they have already received over 300,000 requests from voters for absentee ballots, which is far outpacing the last general election.  And so I think at this point it is going to be extraordinarily difficult to address any issues with the applications.

MR. YOUNG:  The plaintiffs are happy to have that conversation with defendants.

THE COURT:  All right.

MR. YOUNG:  If I can make one just small point of factual correction.  I don't think it is ultimately material. The applications that were sent out by the Secretary of State only went out to so-called active registered voters, not the, quote-unquote, inactive ones who have every right to vote.  I just wanted to make that small correction.

And the second factual point --

THE COURT:  And how many people fall in that inactive category?  Do you know?

MR. YOUNG:  Forgive me.  I do not know.

THE COURT:  Okay.

MR. RUSSO:  Your Honor, this is Vincent Russo.  I don't have that exact number either.  But, you know, of course, the state has already sent mail to those individuals at the address on file and either had it returned or the person never -- it was never returned.

But that is one of the no contact, less maintenance process is, you know, the state -- the state -- the reasons why the individual would be on -- the voter would be on the inactive list, to begin with.  So the state would be spending money to send an application to an address for somebody when it had already been -- you know, prior communications were returned as undeliverable, for example.

And so that is -- I'm not sure that the inactive versus active piece is exactly as Mr. Young is saying.

MR. YOUNG: Yes. Let me just clarify. We are not arguing that the Secretary of State immediately send out applications to all inactive voters. I only mentioned that just as a point of factual correction.

THE COURT: All right. Well, I think having any discussion you can all have before we get to a hearing would be useful, A, to narrow issues; B, if there is any, you know, ways that you can resolve certain issues at least or creatively be brainstorming mutually about it would be positive and in the public interest.

You know, it is hard too because I know that the private counsel just joined to really pursue things further. I very much appreciate Ms. McGowan providing me the information she has. But one thing to look at is there even -- I know you have spent the $3 million on sending this out -- but if there are sources for being able to assist people with stamps because that is an issue. Or it is something that you obviously could be -- particularly for the application -- because I know they don't want to spend another $3 million -- is to think about how that could be done or what sort of public information even on the Secretary of State's page, on the county's page.

MS. McGOWAN: Yeah. We will certainly be looking at that with our client. And we will be prepared to provide you with some thorough information from knowledgeable witnesses about, you know, all of the logistical details and cost details

about, you know, every aspect about the elections going forward.

And Your Honor mentioned asking if we wanted to have live witnesses. Do you feel like it would be helpful to the Court to have somebody available? We are certainly planning to submit declarations into evidence. But --

THE COURT: I really don't know without seeing what you have here.

MS. McGOWAN: Okay.

THE COURT: I think having somebody available at least to ask a question to is great, no matter what. I mean, I think in the last hearing we had in the Curling case -- I mean there were questions that one didn't think one was going to ask. And it was very helpful.

So I don't know -- you know, I think if you have somebody from the county so I can understand exactly how things are functioning from that perspective as well. So -- and I assume that the representative of Black Voters Matter Fund would be there as well or be available. I don't mean to be in the court but would be available.

MR. YOUNG: Yes.

THE COURT: I mean, I think the thing about it is I do understand that loyal voters can be in a very distinctive way. Even thinking about, for instance, having stamps available, putting aside the poll tax argument, you don't know

where people are actually getting their food and are they traveling and if they are older is somebody bringing it to them and what you are asking as to people.

So it is kind of a complicated matter.  But I also know that -- that people who are under 50 often don't have postage stamps on hand.  It's true.

MR. RUSSO:  Your Honor, this is Vincent Russo.  I had one -- I wanted to ask one thing on a clarification.  And we appreciate you having this call and suggesting also that the parties have discussions leading up to the hearing.

Do you envision those discussions should be focused really on this primary election or for, you know, the November election also?

THE COURT:  Well, first things first is the primary. I mean, I think -- obviously, you can -- if you can do something globally, that is great.  But there are a lot of -- there are a lot of races in this primary also.

But, you know, we don't even know what the COVID-19 situation is going to be in November, I realize.  But we don't want to wait -- whatever you do now put in the template for the future.  I hope that we aren't quite in the same situation but -- very much so.  But I don't know.  And, you know, clearly --

MR. RUSSO:  Understood.  Thank you.

THE COURT:  Are there any other issues from the

plaintiffs' perspective that would be helpful to address at this juncture?

MR. YOUNG:  I think the only issue -- I don't want to belabor this point.  I think we just want to reiterate our position, at least for now, that anything short of the envelopes actually being prepaid and telling voters they don't need to put a stamp on it is not going to be adequate, no matter how many press releases or public statements anyone makes.  And I think for obvious reasons we just want to reiterate that position.

THE COURT:  Well, I understand that.  And that is really -- I just wanted to be sure that maybe -- I don't know that -- if this is Texas, they are always there for -- at 4:40 in Texas.  It was pointed -- I think that is where everything is being printed.  But I think that it is something to be -- not let the time -- for the state not to let the time slip away in terms of the printing so that you still have an option right now that you may not -- that you won't have later on.

And that is obviously for the counties as well.  And I don't know how you manage that.  But that is obviously a political interest.  But the point is not to let it slip away -- the time slip away while -- if they are just in the middle or in the beginning of the printing process.

There are other ways of putting stamps on.  But that is -- that involves actual human effort, other than technology

solution.

Anything from Dekalb County's representatives?

MS. VANDER ELS:  No, Your Honor.  I don't think we have any questions at this time.  We appreciate the opportunity to hear from the Court.

THE COURT:  Anything further from the state -- Secretary of State's office?

MR. BELINFANTE:  Your Honor, this is Josh Belinfante. Given kind of, I think, the issues you have raised, the issues that the plaintiffs' counsel has raised, and, candidly, as we worked through -- Your Honor has already raised the issue of what is this going to cost in the budget.

As you would imagine, there are folks within the Secretary of State's office.  But there's also people that speak to the budget in other offices.  And, candidly, right now they are tough to get ahold of.

I want to comply with the deadlines set by the Court. I don't know if either the Court or if plaintiffs would entertain us possibly having until Monday to file so that we can get those affidavits in place.  I think that would be helpful to us as we try to, you know, fully get the briefs to the Court that I think would be most beneficial.

THE COURT:  Well, you are talking about Monday morning or Monday evening I guess is the question?  Because they have to write a response brief.

MR. BELINFANTE:  I think Monday by noon would be fine, with every intent to do it before that.  But if we could get a hard deadline for Monday at noon, that would be tremendously helpful.

THE COURT:  Mr. Young, can you-all live with that?

MR. YOUNG:  Yeah, we can live with that.

THE COURT:  Okay.  Monday at noon.  That is fine.

MR. BELINFANTE:  Thank you, Judge.

MS. McGOWAN:  Thank you, Your Honor.

MR. YOUNG:  Thank you, Your Honor.

THE COURT:  All right.  Well, great.  I hope that you can -- anything else you can work out is great.  Anything that is going to be -- is going to educate the judge here before we walk in to things so that we can handle this smoothly would be wonderful.

And as you are talking, you know, I think we -- we do need by Wednesday to know what the technology -- you know, what is the -- what are the technology needs here, how we are proceeding.  So that is my other just pragmatic concern.

So when you know more about your witness situation and how many -- also even just thinking that you want somebody from budget to be available to you but they are not going to be sitting by your side, we just need to understand how many ports are we dealing with.

And this might seem silly since all of us have been

30

on Zoom conferences. But the Court is not using Zoom right now. Apparently, they are negotiating with Zoom a contract of some sort, which may or may not come through.

So if we had to continue to use the platform we used today, I would have to say we would have to use phone conference. Because it was unbearable.

MR. YOUNG: Absolutely.

THE COURT: All right.

MR. RUSSO: We'll let you know as soon as we know.

THE COURT: All right. Very good. Well, please feel free if things start -- if there is any way that I can be helpful to email Mr. Martin that you would like to have another conference with me.

We are going to try to be the same as possible if we proceed this way as long as we try to preserve as many options as possible. Because I don't want to be heavy-handed here and at the same time in a public emergency. But also these are really important issues too.

All right. Well, it sounds like we've concluded. Be well, everyone. Take care of yourselves and your family, first and foremost. And thank you very much.

MR. BELINFANTE: You as well.

MR. RUSSO: Thank you, Your Honor.

MS. McGOWAN: Thank you, Your Honor.

MS. LAKIN: Thank you, Your Honor.

THE COURT:  We're adjourned then.  Bye-bye.

**(The proceedings were thereby concluded at 5:45**

**P.M.)**

32

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 31 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the 16th day of April, 2020.


_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT