## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| BLACK VOTERS MATTER FUND, and MEGAN GORDON, on behalf of herself and all others similarly situated, | |
| *Plaintiffs*, | CIVIL ACTION |
| v. | FILE NO. 1:20-cv-01489-AT |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia; DEKALB COUNTY BOARD OF REGISTRATION & ELECTIONS, | |
| *Defendants*. | |

## RESPONSE OF SECRETARY OF STATE BRAD RAFFENSPERGER IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Secretary of State Brad Raffensperger (the "Secretary") submits this response to Plaintiffs' Motion for Preliminary Injunction ("Motion") [Doc. 2] in accordance with this Court's Order [Doc. 9] and direction during the April 14, 2020 status conference.

## INTRODUCTION

To mitigate the risk of harm to Georgia primary voters during the COVID-19 outbreak, the Secretary approved an unprecedented plan to mail

(1) absentee ballot request forms to Georgia's active voter roll; and (2) absentee ballot packets to all voters who request one. He also postponed the general primary date to June 9th, the last possible date it could be held in compliance with state and federal law. These extraordinary measures, taken to protect the safety of voters, have already cost the State over $3 million at time when the State is facing overwhelming emergency medical costs and record budget shortfalls.

After these extraordinary measures were put into place, Plaintiffs alleged that a decades old and uncontroversial practice—not providing pre-paid postage to voters who mail absentee ballot requests or mail absentee ballots—is suddenly unconstitutional. No court in the country has reached that conclusion, and this Court should not be the first. Incidental costs to voting, such as postage, gas, time, or bus or rideshare fares, are neither poll taxes nor material burdens for voters who want to vote. As importantly, Georgia voters have numerous options to avoid paying postage, including (1) voting in person; (2) dropping off an absentee ballot at any county election office (or other places where secure drop boxes may be placed); (3) having third parties pay the cost of postage; and (4) utilizing the United States Post Office's ("USPS's") policy of delivering election mail that does not contain sufficient postage.

To be sure, this lawsuit does not turn on the pandemic. This lawsuit is about a new desire to change an old policy and have the State pay postage for voters who *choose* to mail an absentee ballot instead of voting in person or personally delivering their absentee ballot to county elections officials. The Complaint makes this clear: it raises a per se challenge that applies with or without the existence of a public health emergency. *See* [Doc. 1 at ¶¶ 30, 39, 42, 45.] That Plaintiffs seek permanent declaratory and injunctive relief further proves the point.  [Doc. 1 at 19.]  Therefore, the public health emergency should be considered by this Court, but there should be no illusion that Plaintiffs request temporary relief that will conclude with the end of shelter-in-place.[1]

This Court has previously been unwilling to "dictate how the [government] should properly administer elections … the 'constitution leaves to states broad power to regulate the conduct of federal and state elections.'" *Ga. Shift v. Gwinnett Cty.,* No. 1:19-cv-01135-AT, 2020 WL 864938 *5 (N.D.Ga. Feb. 12, 2020) (citation omitted). *See also Powell v. Power*, 436 F.2d

---

[1] This remains true even after the Second Supplemental Brief in Support of Plaintiffs' Motion.  [Doc. 44.]  While Plaintiffs withdrew the request that the State provide postage for absentee ballot request and absentee return envelopes, Plaintiffs appear to still seek a mandatory injunction for the June primary and certainly do for any potential runoff elections in August and the general election in November.  [*Id.*]

84, 86 (2d Cir. 1970) ("Absent a constitutional or other unlawful infraction of that authority, the states are charged with making reasonable policy decisions to effectuate orderly elections."). Respectfully, this Court should apply the same deference again so that elected State policymakers can engage in the type of balancing of interests—which now necessitate responding to a pandemic and pending economic recession—that are best handled at the State level.

## STATEMENT OF FACTS

1. The Law Governing Absentee Ballots

Under "normal circumstances, absentee ballot request forms are handled by county elections officials." (SOS Aff. ¶ 7.)[2] Not more than 180 days before the date of an election, a voter may make a request for an absentee ballot "by mail, by facsimile transmission, by electronic transmission, or in person in the registrar's or absentee ballot clerk's office." O.C.G.A. § 21-2-381(a)(1)(A). While a voter may return a completed absentee ballot request form by email or facsimile without cost, if the voter chooses to mail the absentee ballot request, it is the voter's responsibility to insure that the absentee ballot request has sufficient postage to be delivered. (SOS Aff.

---

[2] The Declaration of Kevin Rayburn is attached hereto as Exhibit A. Defendants refer to the Affidavit of Kevin Rayburn as "SOS Aff."

¶ 7(a).)  Third parties may provide the postage if it is not in exchange for a particular vote. Ga. Comp. R. & Regs. 183-1-19-.01.

After confirming the person requesting the absentee ballot is an eligible Georgia voter and verifying the voter's signature, the county elections office mails an absentee voter packet to the voter, which includes an absentee ballot, a security envelope, and a pre-addressed envelope to return the absentee ballot to the county election office (an "Absentee Ballot Packet"). (SOS Aff. ¶ 7(b)); *see also* O.C.G.A. § 21-2-381(b)(2). The county elections office has historically paid the cost of mailing the Absentee Ballot Packet to the voter. (SOS Aff. ¶ 7(b).)

After voting using the absentee ballot, a voter must seal it in the security envelope, place the security envelope in the pre-addressed return envelope, and sign the oath on the back of the return envelope.  O.C.G.A. § 21-2-385; SOS Aff. ¶ 7(b). The voter then mails the absentee ballot to the county election office using postage provided either by the voter or a third party. *Id.; see also* Ga. Comp. R. & Regs. 183-1-19-.01.  The voter may also deliver the voted-absentee ballot—either personally or in some limited circumstances through specified third parties—to the county elections office

or, as recently approved by the State Election Board, to a secured absentee

ballot drop box.[3] *Id.*

2. <u>Adapting To A Pandemic.</u>

On March 14, 2020, Governor Brian Kemp issued Executive Order

03.14.20.01, which declared a Public Health State of Emergency in Georgia

due to COVID-19.[4]  That same day, Secretary Raffensperger announced that

he was postponing the presidential preference primary from March 24 to May

19 to coincide with the then-scheduled general primary election (the "General

Primary"). (SOS Aff. ¶ 8.) On March 23, 2020, Governor Kemp issued another

executive order imposing a limited shelter-in-place requirement for

populations that were particularly susceptible to the COVID-19 virus.[5] The

following day, the Secretary announced the unprecedented step of mailing

every voter on Georgia's active voter roll a personalized absentee ballot

request form. (SOS Aff. ¶ 8(a).) The decision alleviated the need for all of

Georgia's active 6.9 million voters to request an absentee ballot request form,

---

[3] The State Election Board voted on Wednesday, April 15, 2020, to allow the secured boxes.  A true and accurate copy of the rule is attached as "Exhibit B."

[4] A true and accurate copy of the Executive Order is attached as "Exhibit C."

[5] A true and accurate copy of Executive Order 03.23.20.01 is attached as "Exhibit D."

and preparing and mailing the document cost the State over $3 million in direct costs. (*Id.*)

Also in response to the COVID-19 virus, the Secretary procured a vendor to handle the preparing, packaging, and mailing of Absentee Ballot Packets to voters that request an absentee ballot.  (SOS Aff. ¶ 8(d).) This decision saved Georgia counties millions of dollars and "took a great deal of work off their hands so that they can focus on preparing for and holding their own elections amidst the current challenges." (SOS Aff. ¶ 8(d).)

Voters who choose to vote by absentee ballot in the General Primary need only to sign and complete the absentee ballot request form the Secretary mailed them.  (SOS Aff. ¶ 8(b).) Voters can either mail the completed form to his or her county election office utilizing the pre-addressed document, physically return the form to their county elections office, or electronically return the completed form to their county elections office via email or fax.[6] (*Id.*) Voters who chose to mail their absentee ballot request forms would continue to be responsible for obtaining postage directly or through third party groups. (*Id.*) Eligible voters who request an absentee ballot will receive them by mail at the Secretary's cost. (SOS Aff. ¶ __.)

---

[6] The form sent by the Secretary includes an email address for each individual voter's county election office.  (SOS Aff. ¶ 8(b).)

As of April 16, 2020, over 75 counties' absentee ballot return envelopes have been printed and delivered to the Secretary's mail vendor, and the process continues. (SOS Aff. ¶ 8(d).) The mail vendor is expected to begin mailing the Absentee Ballot Packets on April 21, 2020.  (Id.)

3. <u>The Cost of the Pandemic.</u>

The Secretary's decision to mail all active voters an absentee ballot application cost the Secretary over $3 million. (SOS Aff. ¶ 8(a).)  The total projected cost of the mailing efforts this year—is projected to exceed $5.4 million, but additional printing and insertion costs of $0.78 per ballot mail will apply.  (SOS Aff. ¶ 9.)  One-time federal funding was critical to achieving this policy goal.

For context, the Secretary's annual election budget for Fiscal Year 2020 was $6,118,907.[7] (SOS Aff. ¶ 5.)  The General Assembly has not yet passed a Fiscal Year 2021 budget (the 2021 Budget), which will fund state government from July 1, 2020, through June 30, 2021. (*Id.* ¶ 4.)  However, there is no reason to believe that the Secretary will have additional funds in the 2021 Budget to cover the cost of Plaintiffs' proposed relief.  In fact, as with all of state government, cuts are far more likely.  Georgia is a balanced budget

---

[7] This does not include the cost of new voting equipment, which is  funded by a bond authorized by the General Assembly in 2019.

state, which means that it is constitutionally prohibited from engaging in deficit spending.  (OPB Aff. ¶ 6.)[8] One of the anticipated impacts of the pandemic is a tremendous drop-off in state revenues: people are buying less, which means sales tax revenue will likely fall dramatically. *See* OPB Aff. ¶ 8. At the same time, job losses will cause a sharp fall in income tax revenue; they will also strain public assistance programs, as many more Georgians will qualify for Medicaid and other social programs due to their economic plight. (*Id.*) "Put simply, the State will be required to provide much more with far less." (*Id.*)

The State is also spending more to fight the pandemic by purchasing, among other things, pandemic-related equipment like masks and gloves to temporary hospital beds.  For example, the State is spending $21.5 million to add 200 hospital beds at the Georgia World Congress Center.[9]  Similar efforts (albeit at a smaller scale) are underway in Albany, Rome, Macon, and

---

[8] The affidavit of Office of Planning and Budget Deputy Director Stephanie Beck is referred to as the "OPB Aff."  The affidavit is attached as "Exhibit E."
[9] WABE News, *Coronavirus Updates: 200-Bed Surge Hospital Nears Opening At World Congress Center*, (Apr. 17, 2020), https://www.wabe.org/coronavirus-updates-200-bed-surge-hospital-nears-opening-in-atlanta-exhibit-hall/.

Gainesville. (*Id.*)  States are also competing to replenish their supply of

personal protective equipment ("PPE"), the price of which has skyrocketed.[10]

For context, media reports the following costs for critical personal

protective equipment necessitated by the pandemic:

- Vinyl Gloves: $0.06 per pair
- Latex Gloves: $0.08 per pair
- Nitryl Gloves: $0.10 per pair
- KN95 Masks: $4.00 each
- Hand Sanitizer: $4.48 for an eight ounce bottle
- Isolation gowns: $5.00 each[11]

Because Georgia is a balanced budget state, "budget priorities frequently

compete in a zero-sum environment: every dollar spent on healthcare, for

example, is a dollar that cannot be spent on education, elections, or other

priorities."  (OPB Aff. ¶ 6.)  The same is true in reverse. Every stamp that the

Secretary is required to pay for will likely have to utilize some newly

appropriated funds, because the Secretary's current budget does not have

funds for such anticipated costs.  Any new or additional state appropriation

---

[10] Daniella Diaz, Geneva Sands and Cristina Alesci, *Protective equipment costs increase over 1,000% amid competition and surge in demand*, CNN (Apr. 16, 2020), https://www.cnn.com/2020/04/16/politics/ppe-price-costs-rising-economy-personal-protective-equipment/index.html.

[11] James M. Berklin, *Analysis: PPE Costs Increase over 1,000% during COVID-19 Crisis*, McKnight's Long Term Care news, https://www.mcknights.com/news/analysis-ppe-costs-increase-over-1000-during-covid-19-crisis/.

will necessarily mean that fewer funds will be put toward fighting the pandemic and dealing with the resultant after-effects.  Plaintiffs have numerous options to deliver their ballots, those on the frontline of this pandemic need protective equipment and have few available alternatives.

<u>The Cost of Plaintiffs' Requested Relief</u>.

For the June (potential August) and November elections, it is difficult to estimate the cost of Plaintiffs' requested relief for several reasons: (1) the State does not yet know how many voters will request and/or return an absentee ballot; (2) the State cannot predict the number of runoffs that may result from the General Primary; and (3) the State does not yet have voter turnout estimates for the 2020 General Election. However, it is logical that voter turnout will be at least as high as the 2016 presidential election. There, Georgians cast 4,165,405 ballots for President, with 207,716 of those voting in the presidential election doing so by mail.[12]

Plaintiffs, who bear the burden of persuasion and of proof, have not provided any evidence or estimates to quantify the cost of their proposed initial or supplemental relief.  The Secretary's preliminary estimates of cost are as follows:

---

[12] A true and accurate copy of the 2016 election information is attached as "Exhibit F," and it is available online through the Secretary's website.

a. *Stamps*

Plaintiffs' first proposal, that the Secretary include stamps with every outgoing June primary Absentee Ballot Packet, [Doc. 44 at 4], is simply not possible because of how far along the printer and mail vendor are in getting the Absentee Ballot Packets to Georgia voters. (**SOS Aff.**) The Secretary also lacks the personnel to manually mail voters requesting (and mailing) absentee ballots a stamp. (**SOS Aff.**) As this Court is aware, the Secretary's resources are devoted to implementing new voting equipment, new election security methods, and fulfilling ongoing constitutional, statutory, and judicial obligations. Pulling state employees from these critical tasks to mail postage is simply not feasible.[13] In addition to the logistical impossibility of Plaintiffs' request, the cost of mail will be at least $1.10 in postage (a stamp and the cost of the stamp to mail the stamp) plus the cost of the mailing envelope.

b. *Sticker Labels*

Plaintiffs' second revised proposal is for the Secretary to provide "sticker labels" using business reply mail services.  To the Secretary's knowledge, utilizing business reply mail services will cost between $1.40 and

---

[13] Given the timing of the Plaintiffs' supplemental brief, the Secretary has not been able to determine the cost of hiring temporary workers to put a stamp in envelopes.

$0.643 per piece of mail, depending on how the Secretary utilizes business reply mail.  (SOS Aff. ¶ 13.) Any of these types of costs, however, will certainly be in addition to the cost of envelopes, a one-sheet instruction, cost to insert the stamp and instruction, ink jet address for the voter, data work, postal sort, handling, and delivery for insertion at the post office.  **(SOS Aff.)** Because it requires communication with third party vendors, the Secretary has not had time to determine the additional costs associated with Plaintiffs' April 17, 2020 filing.

The Secretary's rough estimate is that the cost of providing mail for absentee ballot request forms and absentee ballot return envelopes can range from $450,00 to $4.2 million depending on turnout and the cost of mail. *See* SOS Aff. ¶ 17.

      c.  *Online Absentee Ballot Envelopes*

Plaintiffs' next proposal, making prepaid envelopes available online, will still cost $1.40 to $0.643 per mailing unit, as the process requires the use of business reply mail.  (SOS Aff. ¶ 13.) It is unknown what additional costs, such as web design and potential hosting fees, may also apply.

Substantively, Plaintiffs acknowledge that such relief would exacerbate the very harm that provides the basis of their complaint; namely, that

"[m]any voters do not have Internet access." [Doc. 1 at 12 (¶ 33).][14] In addition to the lack of authority requiring the Secretary to expend limited state resources in the manner proffered by Plaintiffs, the Secretary is also at a loss to understand how Plaintiffs arrive at a point where the alleged injury can be remedied by a solution that utilizes the process giving rise to the alleged harm. [Doc. 1 at 12 (¶ 33).][15]

### d. *Increase Opportunities for Drop Off Absentee Ballots*

Next, Plaintiffs ask this Court to order the Defendants to place a secured absentee drop box at "any Post Office location in Georgia." This is equally unworkable. First, there appear to be at least 602 post offices in Georgia.[16] It is unknown how many post office drop off locations are scattered across the State, or whether Plaintiffs intend the Defendants to place drop boxes at each of these locations as well. Either way, the cost of procuring and placing boxes that comply with the State Election Board rule is unknown, but certainly significant. (SOS Aff.)

---

[14] As discussed more fully below, if an individual has the means to pay for Internet access, they surely have the means to purchase stamps (even online). This demonstrates the purported burden on the voter is, at best, minimal.

[16] United States Postal Service, information available at https://webpmt.usps.gov/pmt011.cfm

Moreover, it is unclear whether the Plaintiffs expect counties or the State to place the additional drop boxes. If the State, then the State will have additional costs of collecting and mailing the absentee ballots to county election officials for tabulation. The same mail rates will apply as discussed above. Also, the State does not know if it or Georgia's counties can simply enter federal property, place a drop off box and secured video cameras, and collect absentee ballots from the box.

This proposal shares some of the same problems with previous ones, because Plaintiffs' claim that many voters "cannot even travel to a post office or other public place because they do not have cars, and there is no ride-sharing programs or public transportation." [Doc. 1 at 12 (¶ 34).] Presumably, however, if voters can drive to a post office (or just get to a mailbox), they can drop the election mail into the post office box. The USPS has previously issued specific guidance that normal procedures for short-paid and unpaid mail should not be followed when processing absentee ballot materials: absentee ballots are delivered to the election office and not

returned to the voter even if there is insufficient or no postage.[17] Postage will be collected from the election office at a later date. *Id.*

## STANDARD OF REVIEW

Plaintiffs seeking a preliminary injunction must satisfy a stout burden that exceeds the normal, preponderance of evidence standard.  "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant *clearly established* the 'burden of persuasion.'" *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (brackets in original) (emphasis added).  If a plaintiff seeks a mandatory injunction, e.g., one that seeks to "to force another party to act, rather than simply to maintain the status quo … the burden on the moving party increases." *Exhibitors Poster Exch. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir.1971).[18]  Mandatory injunctions are "particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).  Last, in election cases, the burden imposed on plaintiffs is higher still.

---

[17] *Postal Bulletin 22391 2014 Election and Political Mail Update*, United States Postal Service (June 12, 2014), https://about.usps.com/postal-bulletin/2014/pb22391/html/front_cvr.htm.

[18] In *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206, 1210 (11th Cir. 1981), the Eleventh Circuit adopted as precedent the decisions of the Fifth Circuit adopted prior to October 1, 1981.

*Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

Plaintiffs must at least "clearly" convince this Court of that (1) there is a substantial likelihood of success on the merits of the complaint; (2) absent the preliminary injunction, the plaintiffs will suffer an irreparable injury; (3) the threatened injury outweighs the harm to the Defendants; and (4) granting the injunction would not be adverse to the public interest. *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-4391-SCJ (N.D.Ga. Dec. 27, 2019) (Slip Op. at 10) (denying plaintiffs' motion for preliminary injunction).[19] Plaintiffs fail to satisfy these burdens.

## ARGUMENT AND CITATION TO AUTHORITY

Before consideration of the merits of Plaintiffs' Motion, the Court must consider threshold jurisdictional issues and affirmative defenses that warrant dismissal of at least Count II of the Complaint.  These defenses—standing, failure to state a claim, federalism, and ripeness—will be fully briefed in the Secretary's Motion to Dismiss, which the Secretary intends to file before this Court's hearing on Plaintiffs' Motion. With respect to the

---

[19] The *Fair Fight Action, Inc.* decision is attached as "Exhibit G."

merits of Plaintiffs' Motion, it does not satisfy Plaintiffs' immense burden to obtain a mandatory injunction for elections that are months away.

## I.   Plaintiffs Failed To Establish That They Are Likely To Succeed On The Merits.

### A.   Plaintiffs fail to state a claim for a violation of the Twenty-Fourth Amendment in Count I.

No court has ever held that the purchase of postage is a poll tax, under either the Twenty-Fourth Amendment or Equal Protection clause of the Fourteenth Amendment.[20] The few courts to consider the issue have rejected the same arguments Plaintiffs raise here and held that postage is an indirect cost associated with voting that does not deprive the voter of the right to vote. This just makes sense: a stamp is no different (and likely cheaper) than the cost of gasoline, ride-share fare, public transportation, taxi fare, or most other

---

[20] Plaintiffs' Motion does not address Equal Protection as alleged in Count I of the Complaint. Nonetheless, Plaintiffs' Equal Protection claim in Count I also fails because Plaintiffs have not pleaded the necessary elements of such a claim. Plaintiffs must show Defendants acted with a discriminatory intent or purpose and prove an actual discriminatory impact. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977); *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). The Complaint lacks any factual allegations showing intentionally discriminatory conduct by Defendants. Moreover, evidence of non-discriminatory intent is found where there is a strong state policy in favor of the challenged practice for non-discriminatory reasons, which exists here given the fiscal impact of prepaid postage. *See United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

means of casting a ballot.  Accordingly, Plaintiffs are not likely to succeed on
the merits of their *per se* poll tax claim.

The Twenty-Fourth Amendment prohibits a state from denying the
right of citizen to vote in a federal election "by reason of failure to pay any
poll tax or other tax." U.S. Const. amend. XXIV. A "poll tax" is defined as "a
fixed tax levied on each person within a jurisdiction." Black's Law Dictionary
1498 (8th ed. 2004). Poll taxes "are laid upon persons…to raise money for the
support of government or some more specific end." *Coronado v. Napolitano*,
No. CV-07-1089-PHX-SMM, 2008 WL 191987, at *5 (D. Ariz. Jan. 22, 2008).[21]

The Twenty-Fourth Amendment has been utilized sparingly in
challenges to state poll taxes since the Supreme Court relied on the newly
ratified amendment to strike down Virginia's poll tax in *Harman v.
Forssenius*, 380 U.S. 528 (1965). Although Virginia removed its poll tax as an
absolute prerequisite for voting in federal elections following ratification of
the amendment, it substituted a provision whereby voters could qualify
either by paying the customary poll tax or by filing a certificate of residence.

---

[21] As will be addressed in the Secretary's Motion to Dismiss, the Secretary
does not impose any postage fee, the USPS does.  Any revenue generated by
postage goes to the USPS.  By definition, therefore, stamps are not poll taxes.
Moreover, any costs associated with a voter's *choice* to utilize the mail service
are not mandated by the Secretary, meaning any alleged harm is not caused
by the Secretary.

*Id.* at 540. The Supreme Court noted that although the strict poll tax requirement had been removed, the alternative option of obtaining a certificate of residence was still a "cumbersome procedure" that had to be filed six months before the election. *Id.* at 541-42.  Accordingly, the Supreme Court held that the option for voters to either pay a poll tax or go through an onerous process for every federal election violated the Twenty-Fourth Amendment's ban on poll taxes. *Id.* at 538. Virginia's scheme, therefore, "unquestionably erects a *real obstacle to voting* in federal elections for those who assert their constitutional exemption from the poll tax." *Id.* at 541-42 (emphasis added). A year later, the Supreme Court addressed a challenge to Virginia's poll tax remaining as a precondition to voting in state elections in *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), although on Equal Protection grounds.

Here, Plaintiffs do not allege that the State of Georgia has imposed an actual tax on voters as a condition of voting like in *Harman* and *Harper*. Nor can they; no reasonable argument can be made that the Secretary's failure to affix pre-paid postage on absentee ballot return envelopes is a tax that must be paid to vote.

Recognizing this, Plaintiffs argue that postage is a "de facto poll tax" because voters must purchase a stamp as "a prerequisite to voting." [Doc. 2-1,

at 14.] Plaintiffs' "de facto poll tax" argument, however, fails because voters are not required to purchase a stamp as a "condition to obtaining a ballot." *See Harper*, 383 U.S. at 668. Instead, a stamp is *only* necessary if a voter rejects one of the numerous other methods of voting in person or delivering absentee ballots. Plaintiffs have put forth no evidence that a single voter will be unable to vote in 2020 because of lack of access to postage.  This is for good reason: the Secretary imposes no requirement to vote absentee and sets no preconditions on how voters choose to return their absentee ballots. Put simply, voters have plenty of options that do not require postage.

Plaintiffs fail to cite a single case that supports their argument that postage is a "de facto poll tax." Indeed, the few courts that have addressed this issue have rejected the claim outright.  In a recent decision, the first federal court to hear a similar challenge held that the Ohio Secretary of State did ***not*** impose a poll tax by failing to provide postage pre-paid envelopes for voters to return mail-in ballots. *See League of Women Voters of Ohio v. LaRose*, No. 2:20-cv-01638-MHW-EPD (S.D. Ohio Apr. 3, 2020) (Slip Op. at 25).[22] Like Plaintiffs, the *LaRose* plaintiffs challenged the state's decision to implement a vote-by-mail campaign due to COVID-19, and similarly argued

---

[22] This order, which has not yet been published, is attached as Exhibit H.

that requiring voters to supply their own postage was an unconstitutional poll tax. The court rejected that argument, finding that "to the extent obtaining a stamp is a 'restriction on the right to vote,' it is "the type of 'evenhanded restriction[] that protect[s] the integrity and reliability of the electoral process itself' that satisfies *Harper*." *Id.* (citations omitted). *See also Bruce v. City of Colorado Springs,* 971 P.2d 679, 685 (Colo. App. 1998) (deciding a requirement that voters "affix a stamp to their ballots" is reasonable and not an unconstitutional poll tax).

Other courts have similarly held that indirect costs associated with voting are not unconstitutional poll taxes, such as in the Voter ID context. *See Veasey v. Abbott*, 796 F.3d 487, 268 (5th Cir. 2015) (holding that "indirect costs on voters" having to obtain the required identification "does not constitute a poll tax" because it does not "impose a material requirement solely upon those who refused to pay a poll tax"); *Gonzalez v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012) ("Although obtaining the identification required under [state law] may have a cost, it is neither a poll tax itself (that is, it is not a fee imposed on voters as a prerequisite for voting), nor is it a burden imposed on voters who refuse to pay a poll tax."); *Common Cause/Georgia v. Billups*, 439 F. Supp. 2d 1294, 1335 (N.D. Ga. 2006) (denying preliminary injunction against Georgia's Voter ID law because the costs associated with

obtaining an ID did not constitute an unconstitutional poll tax); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 827 ("the imposition of tangential burdens does not transform a regulation into a poll tax").

Thus, Plaintiffs are simply wrong in stating that Voter ID laws are a "common example of a de facto poll tax" [Doc. 2-1 at 12], and neither of the cases they cite support this argument. In *Billups*, the district court initially enjoined Georgia's Voter ID law because it required voters without the required identification to pay a fee to the State (from $20 to $30) to obtain an ID. *See Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1369-70 (N.D. Ga. 2005). But the court ultimately upheld the constitutionality of Georgia's Voter ID law when it was amended to remove the fee, even though the plaintiffs still argued that there were other costs voters would incur in obtaining the ID. *Common Cause*, 439 F. Supp. 2d at 1335. The Wisconsin Supreme Court reached a similar conclusion in in *Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262 (Wis. 2014).

Here, there is no requirement that a stamp be purchased as a condition of voting. Rather, postage is the kind of "tangential burden" associated with voting that does not rise to the level of a poll tax. *See Ind. Democratic Party*, 458 F. Supp. 2d at 827. There are other available options for voting, all of which have associated incidental costs (such as transportation costs, time

away from work, child care, and parking) that do not rise to the level of the kind of invidiously discriminatory poll tax struck down in *Harman*.[23] For these reasons, Plaintiffs are not likely to succeed on the merits of their poll tax claim.

### B. Count II: *Anderson/Burdick* Analysis of Plaintiffs' fundamental right to vote claim.

Plaintiffs also fail to show a likelihood of the merits on Count II, which alleges an impermissible burden on the right to vote under the First and Fourteenth Amendments to the United States Constitution. [Doc. 1 at 18.] Unlike Count I, Count II is not a *per se* claim.  Nevertheless, Plaintiffs frame the issue in near absolutist terms: "requiring voters to spend money in order to vote by mail is at least a 'slight' burden to all voters (and a severe one for some others) … the government has no legitimate interest in forcing voters to pay for postage." (*Id.*) Rhetoric aside, Plaintiffs acknowledge Count II requires this Court to conduct an *Anderson/Burdick* analysis, which weighs

---

[23] Further, even if the Court finds that buying a stamp is a poll tax, which it is not, *Harman's* discussion of burdensome alternative is inapplicable here. In *Harman*, the alternative to paying the poll tax was a burdensome process to prove residence.  *See generally Harman*, 380 U.S. 528.   Here, there are many alternatives to buying a stamp, including placing an absentee ballot envelope in a mailbox without a stamp or going to vote in person – the alternatives here are not a burdensome procedure to undertake before the voter can vote.

the burden on voting against the cost to the State to implement Plaintiffs' requested relief. [Doc. 2-1 at 16.]  Here, the burdens on the State are truly significant, even more so during this public health emergency.  They far outweigh any minimal harm articulated by Plaintiffs' evidence.

This Court has recently articulated the *Anderson/Burdick* analysis:

> When deciding whether a state election law violates the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden and consider the extent to which the State's concerns make the burden necessary. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).
>
> A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059; *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1318. 'And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden.' *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1318-19; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009). The more a challenged law burdens the right to vote, the stricter the scrutiny is to be applied. *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319; *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014).

*Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1336 (N.D. Ga. 2019)

(parenthetical quotations omitted).

Another court in this district recently denied a different election-related preliminary injunction using *Anderson/Burdick* analysis.  *Fair Fight Action*, No. 1:18-CV-5391-SCJ (N.D. Ga. Dec. 27, 2019) (Slip Op.). There, Judge Jones wrote that if an "election law imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions.'"  *Id.* (citing *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

Importantly, the *Anderson/Burdick* analysis does not impose on states any burden of proof or evidentiary showing; the burden remains with the Plaintiffs.  *Billups*, 554 F.3d at 1353; *see also Democratic Party of Hawaii v. Nago*, 833 F.3d 1119, 1123 (9th Cir. 2016).

1. <u>Plaintiffs Have Not Demonstrated Any Burden To Voting.</u>

As to the first question under *Anderson/Burdick*, Plaintiffs have failed to show an unconstitutional burden on their right to vote for two reasons. First, the affidavits provided by the Plaintiffs do not show that anyone will actually be unable to vote in the June primary (or any other election), nor do they show any meaningful burden. To the contrary, most of Plaintiffs'

witnesses concede that they already have stamps at home and will have no

trouble mailing a return absentee ballot envelope, even amid the shelter-in-

place order. For example:

> "I always have postage stamps." [Doc. 16 ¶ 12.]

> "I've already mailed in my absentee ballot application and will vote by absentee ballot by mail….I have postage stamps." [Doc. 12 ¶¶ 9, 11, 15.]

> "My sister and I recently mailed in our absentee ballot applications using our own stamps." [Doc. 14 ¶¶ 12, 13.]

> "We have stamps to use for the upcoming elections." [Doc. 25 ¶ 9.]

> "I purchased a book of postage stamps last month from the post office." [Doc. 27 ¶ 8.]

> "Usually I get my stamps at the post office…Fortunately I got some before quarantine…" [Doc. 38 ¶ 9.]

> "There is no financial hardship to me to vote by mail as opposed to alternatives." [Doc. 31 at 2.]

Moreover, witnesses without stamps at home were able to purchase

them other ways without visiting a post office. [Doc. 17 ¶ 10 ("I ordered the

stamps online")]; [Doc. 30 ¶ 8 ("I think my grocery store sells stamps, so I

might purchase them there.")]. This reflects the numerous ways to purchase

stamps over the internet and through retail delivery. As social distancing

restrictions are lifted, it will be even easier to obtain postage at the post office

and other retail locations.

Of the 15 affidavits filed by Plaintiffs, only one witness claimed to lack the means to obtain postage because she is disabled. [Doc. 24]) However, voters who are physically disabled may receive assistance with absentee voting from a family member or caregiver. *See* O.C.G.A. 21-2-385. Further, State Election Board rules also permit third parties to provide postage to voters for the purpose of mailing a ballot, regardless of whether the voter is disabled. Ga. Comp. R. & Regs. 183-1-19-.01. In fact, two of Plaintiffs' witnesses testified that they have distributed postage stamps to assist voters in prior elections. [Doc. 12 ¶¶ 15, 16; Doc. 16 ¶ 4.]

Under these circumstances, *Billups* is on point. There, the plaintiffs could not "locate a single voter who would bear a significant burden[, which] 'provides significant support for a conclusion that [the challenged law] does not unduly burden the right to vote." 554 F.3d at 1354 (addressing photo identification law).

## 2.   Alternatively, Any Burden On Voting Is Slight.

The State has found no authority—and Plaintiffs have cited none— holding that allowing the use of mail without pre-paid postage is a material burden on voting. This should end the inquiry, as the burden of persuasion remains on the Plaintiffs. *Billups*, 554 F.3d at 1353. The *LaRose* court recently concluded that any burden imposed by requiring voters to pay for the

cost of mailing an absentee ballot is, at worst, "minimal." *LaRose*, Case No. 2:20-1638 (S.D.Ohio Apr. 3, 2020) (Slip Op. at 17).  The "requirement that voters affix a stamp to their ballot application is no more than a minimal burden as stamps are available at multiple locations that remain open during the Governor's stay-at-home order, including grocery stores.  Those who do not wish to leave their homes to purchase stamps can purchase them online." *Id.* The same analysis applies here, especially given that the class representative actually possesses stamps (as do virtually all of the 15 declarants), and the other declarants all have a means to obtain stamps. Thus, if there is any burden at all, it is quite minimal and, indeed, no different that it has been for decades.

> 3.  <u>The State's Interests Are Important.</u>

Only if this Court finds that Plaintiffs have provided competent evidence of an actual burden does it consider the next question under the *Anderson/Burdick* test: the government's interest. Here, because the requirement that voters find their own postage applies to all voters in a non-discriminatory manner, the policy must be upheld so long as it satisfies an "important" goal: "the State need not establish a compelling interest to tip the constitutional scales in its direction." *Burdick*, 504 U.S. at 434, 439.  This is also true because of the "minimal" nature of the Plaintiffs' alleged burden.

*See Timmons*, 520 U.S. at 358; *De La Fuente v. Padilla*, 930 F.3d 1101, 1105 (9th Cir. 2019) (citing *Timmons*), cert. denied, 140 S. Ct. 676, 205 L. Ed. 2d 440 (2019).

As demonstrated above, a purpose of the State's longstanding decision not to pay the cost of return mail is financial.  Courts have recognized that fiscal concerns are legitimate state interests when applying the *Anderson/Burdick* analysis: "Fiscal responsibility, even if only incrementally served, is undeniably a legitimate and reasonable legislative purpose." *Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016); *see also Wilson v. Birnberg*, 667 F.3d 591, 601 (5th Cir. 2012).  These concerns are heightened now. As shown above, the State's realistic budget projections are dire.[24]  The dual pinch of declining revenue and growing expenditures has removed any room for error, much less new funding for unanticipated costs associated with decades old statutes. This is uniquely felt in the Secretary's Office, which has already increased expenditures to assist with the

---

[24] Even today, the Atlanta Journal and Constitution warned that "the state could face at least a $4 billion shortfall over the next 15 months without more federal aid, likely meaning layoffs and furloughs across the government in the coming year."  James Salzer, *Report: Georgia Budget Shortfall May Top $4 Billion Over The Next 15 Months*, Atlanta J. & Const. (Apr. 20, 2020), https://www.ajc.com/news/state--regional-govt--politics/report-budget-shortfall-may-top-billion-over-next-months/bCh9sdsuYVJupfCivsTDbJ/.

deployment of new voting equipment and training, as well as the cost ($36,000 per month) of storing voting equipment it cannot use again due to court-imposed obligations in other litigation. Plaintiffs have introduced no evidence to the contrary.

Beyond the fiscal impact, overloading the voter with alternative means and information could likely lead to voter confusion. Some voters may think a stamp is necessary for their ballot to be delivered; others will look for some form of postage on the Internet; more still may call their county election officials.  The best way to avoid voter confusion is to conduct this election like all prior elections.  Voters can return absentee ballot request forms directly, in the mail, by electronic means, or by fax.  They can return absentee ballots in person or by mail.  The pandemic is causing enough confusion; dramatic changes to election law should not be another.

## II.   Plaintiffs Will Not Suffer Irreparable Injury Absent A Preliminary Injunction.

To succeed under the second factor, Plaintiffs must show "a substantial likelihood of irreparable injury" absent a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Even if Plaintiffs establish a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief

improper. *See Snook v. Trust Co. of G. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990). As the Eleventh Circuit has emphasized the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *NE Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

Here, Plaintiffs' fundamental right to vote will not be irreparably harmed absent injunctive relief. The State of Georgia has a no-excuse absentee voting system, and voters are welcome to deliver their absentee ballot to the elections officials if they do not want to mail their absentee ballot.  O.C.G.A. §§ 21-2-380, 21-2-385.  Additionally, to provide additional options to voters delivering their absentee ballot to their county elections office, the State Election Board has promulgated a new rule that authorizes counties to use secure drop-boxes. *See Ex. B.*  Third parties may provide postage to any voter and assist disabled voters in returning their absentee ballots. Ga. Comp. R. & Regs. 183-1-19-.01. Finally, voters can vote in person on the voting machines on election day or during early voting.  Plaintiffs' subjective fears about the duration of the pandemic fail to establish that their right to vote will be irreparably injured.

**III.    Balancing the Equities and Public Interest.**

32

This Court has previously considered the remaining two factors—balancing the equities and public interest—together in election cases. See Curling v. Kemp, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). It makes sense to do so again. In the light of the ongoing pandemic and the State's other election obligations, the balancing of the equities and the public interests involved clearly favor Defendants. Plaintiffs claim that the State is forcing individuals to choose between exposure to COVID-19 and paying a poll tax. [Doc. 2-1 at 17-19.]  This is a false choice.

First, as shown above, the longstanding policy of requiring voters to obtain postage—directly or indirectly through third parties—is not a poll tax. *See, e.g., LaRose*, Slip Op. at 25.  Second, as also discussed above, any purported burden on Plaintiffs is minimal, particularly given the numerous means Plaintiffs have to deliver their absentee ballots without coming within six feet of other persons.

These minimal burdens pale in comparison to the burdens Plaintiffs seek to impose on the State. From a financial perspective, it costs more for the State to provide postage to a voter than it does for a voter to mail in the ballot. Also, a multitude of factors compel the conclusion that now is not the time to add additional burden to state coffers. This is to say nothing about

the likely increased voter confusion and disparities that Plaintiffs' proffered relief will cause.

The temporal nearness of the June (potential August runoff) and November elections is also an important consideration, particularly given how long Georgia has required voters to pay their own postage (or secure it through third parties).  Binding precedent requires this Court to "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and its own institutional procedures" including, in particular, the "imminence of the election." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). Federal courts have long admonished "that federal judicial bodies not upend the orderly progression of state electoral processes at the eleventh hour." *Perry v. Judd*, 471 F. App'x 219, 220–21 (4th Cir. 2012); *see also Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (deciding that imminent elections "might justify a court in withholding the granting of immediately effective relief . . . ."); *Lair v. Bullock*, 697 F.3d 1200, 1214 (9th Cir. 2012); *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016); *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014).  And as this Court has recently noted, there is "a public interest in the Court promoting certainty with elections and not entering orders that create 'voter confusion and consequent incentive to remain away from the polls.'" *Gwinnett Cty. NAACP*

34

*v. Gwinnett Cty. Bd. of Registration & Elections*, No. 1:20-CV-00912-SDG, 2020 WL 1031897, at *9 (N.D. Ga. Mar. 3, 2020) (quoting *Purcell*, 549 U.S. at 5).

Similarly, the fact that Plaintiffs waited decades to challenge the requirement that voters be responsible for returning their absentee ballot request forms and absentee ballots weighs strongly against them. *See, e.g., Fulani v. Hogsett,* 917 F.2d 1028, 1031 (7th Cir.1990); *Kay v. Austin,* 621 F.2d 809, 813 (6th Cir. 1980) (applying laches where candidate waited to file suit until two weeks after he knew he would not be listed on ballot); *Liddy v. Lamone,* 398 Md. 233, 919 A.2d 1276 (2007) (concluding that trial court erred in failing to apply equitable doctrine of laches to bar plaintiff's challenge to candidate's qualifications, filed too close to election). In short, "[t]here is no constitutional right to procrastinate." *Dobson v. Dunlap*, 576 F. Supp. 2d 181, 183 (D. Me. 2008). As shown, the public health emergency does not change this analysis.

## **CONCLUSION**

For these reasons, the Secretary requests that this Court DENY Plaintiffs' Motion.

Respectfully submitted this 20th day of April, 2020.

<u>/s/ Vincent R. Russo</u>
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

Christopher M. Carr
Attorney General
Ga. Bar No. 112505
Annette Cowart
Deputy Attorney General
Ga. Bar No. 191199
Russell Willard
Sr. Asst. Attorney General
Ga. Bar No. 760280
Charlene McGowan
Asst. Attorney General
Ga. Bar No. 697316

Georgia Department of Law
40 Capitol Square SW

Atlanta, GA 30334
cmcgowan@law.ga.gov
Tel: 404-656-3389
Fax: 404-651-9325

Counsel for State Defendant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing RESPONSE OF SECRETARY OF STATE BRAD RAFFENSPERGER IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Vincent R. Russo*
Vincent R. Russo

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I electronically filed the foregoing

**RESPONSE OF SECRETARY OF STATE BRAD RAFFENSPERGER**

**IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY**

**INJUNCTION** with the Clerk of Court using the CM/ECF system, which

will automatically send counsel of record e-mail notification of such filing.

This 20th day of January, 2020.

*/s/ Vincent Russo*
Vincent R. Russo