IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| BLACK VOTERS MATTER FUND, *et al.*,<br><br>    Plaintiffs,<br><br>vs.<br><br>BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, *et al.*,<br><br>    Defendants. | Civil Action No. 1:20-cv-1489-AT |

**PLAINTIFFS' REPLY BRIEF
IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**

1

The government explicitly requires all voters to use their own postage if they vote by mail, and postage costs money. This is a poll tax. And although the pandemic is not a necessary part of the merits of Plaintiffs' claim, the pandemic's danger makes preliminary injunctive relief all the more urgent.

The Secretary's opposition brief raises three main counterarguments. First, the Secretary argues that postage is not a poll tax because postage is "incidental," "indirect," and "tangential" to voting, like buying gas when going to the polls. But here, the government explicitly requires postage. *See* Doc. 2-4 at 5 ("If mailing, you must affix postage to the ballot envelope."); Doc. 54-3 at 5 ("APPLY FIRST-CLASS MAIL POSTAGE HERE"). Spending money on postage the government explicitly requires is not "incidental" to spending money on postage that the government explicitly requires. It does not get any more direct than that. Part I.

Second, the Secretary argues that voters have no poll tax claim because there are alternative workarounds that are basically effortless. They are not. The alternatives involve ignoring the pandemic, miraculously overcoming physical disabilities, relying on charity, and just blatantly ignoring the poll tax. The Constitution forbids the Secretary from asking voters to choose between paying a poll tax and picking one of these burdensome, if not absurd, workarounds. Part II.

Lastly, the Secretary all but confirms that injunctive relief is logistically feasible, which is unsurprising because it only took a couple of weeks to print June absentee ballot envelopes and packets starting on March 30. Instead, the Secretary invokes the budget and the pandemic. But the government is more than capable of raising tax revenues from other sources to help fight the pandemic—the government just can't do it with poll taxes. Part III.

## ARGUMENT

As discussed in Plaintiffs' opening brief, Defendants have imposed an unconstitutional poll tax. The Secretary responds with three main counterarguments, none of which are meritorious.

## I. BUYING POSTAGE IS NOT "INCIDENTAL" BECAUSE THE GOVERNMENT EXPLICITLY REQUIRES POSTAGE

Postage is a poll tax because postage is expressly required by the Secretary when voting by mail, and voters have to buy it. *See* Doc. 2-4 at 5 ("If mailing, <u>you must affix postage to the ballot envelope</u>."); Doc. 54-3 at 5 ("APPLY FIRST-CLASS MAIL POSTAGE HERE").

The Secretary argues that the cost of buying postage is merely "incidental," "indirect," or "tangential" to voting, like having to buy an indeterminate amount of

gas when driving to a polling station. *See* D.Br. at 22-23.[1] But spending money on postage the government explicitly requires is not "incidental" to spending money on postage that the government explicitly requires. Gas, on the other hand, is not a poll tax because the government does not require that voters display a canister of gasoline when they cast a ballot. Here, the incidental costs to obtaining postage, such as travel, time, the Internet, or COVID-19 exposure, are serious, and they support injunctive relief as soon as possible. But on the merits, these incidental costs are not the "poll taxes" that give rise to Plaintiffs' claim. Postage is.

The Secretary half-heartedly points to two cases which held that requiring postage stamps to vote does not impose a poll tax. *See League of Women Voters of Ohio v. LaRose,* No. 2:20-cv-01638-MHW-EPD (S.D. Ohio Apr. 3, 2020) (Slip Op. at 25), Doc. 51-8; *Bruce v. City of Colorado Springs*, 971 P.2d 679, 685 (Colo. App. 1998). D.Br. at 21-22, 33. Plaintiffs understand why the Secretary's reliance on these cases is so hesitant. In *LaRose,* the court said that stamps are not a poll tax because they "protect the integrity and reliability of the electoral process itself." (Slip Op. at 25 (citation omitted)). It's hard to parse the court's reasoning and the Secretary does not even try, but the court seemed to say that stamps have something to do with a voter's qualifications and that stamps confirm identity like

---

[1] References to the Secretary's opposition brief, Doc. 51, are denoted as "D.Br."

4

signatures. *Id.* But "[v]oter qualifications have no relation to wealth," *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966), including the ability to buy postage stamps. Also, stamps are not signatures and they don't confirm identity. As for *Bruce*, the court dismissed the poll tax claim because there was no invidious intent, 971 P.2d at 685, but intent is not necessary for a poll tax claim.

Scoffing at the cost of postage, the Secretary says that it is "cheap" so it cannot really be a poll tax. D.Br. at 18-19. (Of course, when the government is the one to pay, somehow it is suddenly financially burdensome. D.Br. at 8-11.) The Secretary crows that "Plaintiffs have put forth no evidence that a single voter will be unable to vote in 2020 because of lack of access to postage." *Id.* at 21. Actually, Plaintiffs have. *See* Bryant Decl., Doc. 24. But this is a red herring anyway because even a one-cent poll tax is unconstitutional. *See Harper*, 383 U.S. at 668 ($1.50 poll tax unconstitutional regardless of whether the voter "has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it").

Because Plaintiffs' poll tax claim does not depend on ability to pay, the burdens of obtaining a postage stamp in the midst of a deadly pandemic make it urgent that a preliminary injunction be entered under the remaining preliminary injunction factors. Ten dollars for a book of stamps can be more than half a voter's monthly food stamps, Bryant Decl. ¶ 7, Doc. 24, a meal for two, Kite Decl. ¶ 8, or

one hour of work, Farbo Decl. ¶ 15, Doc. 16. The pandemic makes it dangerous for anyone to buy stamps at a Post Office, Walbert Decl. ¶ 1, Doc. 26; Burke Decl. ¶ 8, Doc. 30; and shelter-in-place rules can make it impossible, Bryant Decl. ¶ 5, Doc. 24; Walker Decl. ¶ 8, Doc. 27; Mahmood Decl. ¶ 5, Doc. 33. Some voters have difficulty travelling to the Post Office because of physical disabilities or poverty. Bryant Decl. ¶ 6, Doc. 24; Wille Decl. ¶ 13, Doc. 53. The few voters who know that stamps can be ordered online must pay extra shipping costs, Wille Decl. ¶ 14, Doc. 53, and stamps may not arrive in the mail for up to two weeks, Kirslis Supp. Decl., Doc. 48; Wille Decl. ¶ 15, Doc. 53.

The Secretary bemoans that Plaintiffs' proposed June remedy may result in the Secretary paying $0.643 to $1.40 in postage, D.Br. at 12-13, "cost[ing] more for the State to provide postage to a voter than it does for a voter to mail in the ballot," *id.* at 33. But as it turns out, voters pay as much as the government does. Unlike the Secretary, who can calculate postage costs down to the $0.001 level, voters almost never have stamp scales and often end up using two to three stamps—$1.10 to $1.65 in postage—because absentee ballots vary by weight. Reid Decl. ¶ 10, Doc. 38; Winn Decl. ¶ 9, Doc. 12; C. Robinson Decl. ¶ 7, Doc. 45; Solomon Decl. at 2, Doc. 31. The government provides no help, asking on the

envelope, "Have you provided sufficient postage?" Doc. 54-3 at 7. The voter has no clue.

## II. ALTERNATIVES TO VOTING BY MAIL DO NOT DEFEAT PLAINTIFFS' POLL TAX CLAIM

The Secretary next argues that Plaintiffs have no poll tax claim because "there are many alternatives to buying a stamp, . . . [and they] are not a burdensome procedure to undertake before the voter can vote." D.Br. at 24 n.23. But the alternatives to buying a stamp do not have to be "burdensome" (or "cumbersome," or "onerous," *id.* at 20) in order for the poll tax to unconstitutionally abridge the right to vote. "Any material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity subverts the effectiveness of the Twenty-fourth Amendment and must fall under its ban." *Harman v. Forssenius*, 380 U.S. 528, 542 (1965).

A requirement is "material" "even if it could be said that it is no more onerous, or even somewhat less onerous, than the poll tax." *Id.* Thus, for example, an alternative workaround is materially burdensome when "[f]or many, it would probably seem far preferable to mail in the poll tax payment." *Id.* Not even an "equivalent or milder substitute" to a poll tax "may be imposed." *Id.*

The Secretary's proposed alternatives are materially burdensome because they are as onerous as buying postage, though "material" is an understatement. The Secretary encourages voters to pursue three alternative workarounds: (a) voting in-person;[2] (b) relying on the charity of third parties; and (c) ignoring the poll tax requirement altogether. D.Br. at 2. Rather than expose themselves to COVID-19, beg for charity, or risk prosecution for voter fraud, "[f]or many, it would probably seem far preferable to [make] the poll tax payment," *Harman*, 380 U.S. at 542, thus funneling everyone into paying the poll tax. So while the Secretary says repeatedly that voting by mail is a mere "choice," D.Br. at 2, 3, 4, 11, 14 n.14, 19 n. 21, 21, 23, it is the very "choice" between paying a poll tax and undergoing these "material" burdens that the Constitution says voters should not have to make.

**Voting in person.** First, the Secretary encourages voters who do not want to pay for postage to just leave the house and vote in-person. But by and large, people vote by mail precisely because voting in person is burdensome if not impossible. This year, the pandemic makes voting in person dangerous for all Georgia voters, especially the elderly and those with underlying conditions. *See, e.g.,* Winn Decl. ¶ 3, Doc.12 (age); Mooney Decl. ¶ 4, Doc. 13 (spinal cord surgery); Kirslis Decl. ¶

---

[2] The Secretary proposes both voting in person and dropping a ballot at a drop box or the county office as two alternatives; Plaintiffs treat them as one for purposes of this brief because both involve travel out of the house.

3, Doc. 17 (asthma); Burke Decl. ¶ 5, Doc. 30 (high-risk family members); Reid Decl. ¶ 7, Doc. 38 (age); C. Robinson Decl. ¶ 4 , Doc. 45 (sarcoidosis of the lung); P. Robinson Decl. ¶ 4, Doc. 46 (compromised immunity from chemotherapy); *see also* Exhibit L. And pandemic or no pandemic, voting in person is onerous or impossible for voters who are elderly, Reid Decl. ¶ 5, Doc. 38, physically disabled, Mooney Decl. ¶ 12, Doc. 13, out of town, Mahmood Decl. ¶ 4-5, Doc. 33, in jail, Bryant Decl. ¶ 10-12, Doc. 24, or who lack transportation, *id.* ¶ 6, Kendrick Decl. ¶ 5, Doc. 56.

The Secretary prefers to think about wealthier able-bodied voters, arguing that "a stamp is no different (and likely cheaper) than the cost of gasoline, ride-share fare, public transportation, taxi fare, or most other means of casting a ballot." D.Br. at 18-19. But travel is still "material" even when it "is no more onerous . . . than the poll tax" (and certainly when travel is *more* onerous), and even when travel is an "equivalent substitute" for postage. *Harman*, 380 U.S. at 542.

**Relying on charity.** The Secretary suggests voters can just ask other people to donate money to them. D.Br. at 2, 5, 7, 28, 32, 33, 34. This blithe argument fails as a matter of law. A poll tax is unconstitutional even when a voter has the money sitting in their pocket, *see Harper*, 383 U.S. at 668; it is just as unconstitutional when the voter scrounges up the money from other people.

**Ignoring the poll tax.** Lastly, the Secretary says mail-in voters can avoid using postage just by not using postage. The Secretary passively cites a USPS webpage which promises that USPS will deliver election mail without postage and just bill the State. D.Br. at 15-16, n.16. The Secretary does not even vouch for this alleged policy, perhaps for good reason, since there is already evidence in the record that the alleged USPS policy is being ignored in parts of rural Georgia. Bryant Decl. ¶ 10-12, Doc. 24. Nor does the Secretary explain how long this secret process will take, a critical fact given that Georgia requires that all mail-in ballots to arrive by Election Day. O.C.G.A. § 21-2-386(a)(1)(F).

Even if the USPS policy actually exists, this workaround is still unacceptable. The Secretary's instructions printed on the envelope explicitly tells voters to affix postage, yet the Secretary's legal brief winks that they don't have to. But forcing voters to risk disenfranchisement based on the Secretary's mixed messages is a burden that not even a lawyer can carry. *See, e.g.*, *Harman*, 380 U.S. at 541 (alternative was "burdensome" when it was "not entirely clear"). Worse, voters who disobey the instructions on the envelope risk voter fraud prosecution, because the Secretary now ominously warns that stamps "protect the integrity and reliability of the electoral process itself" (somehow, Plaintiffs aren't sure). D.Br. at 21 (citation omitted). Plaintiffs are unaware of any other regime where voters who

defy the government's instructions are rewarded, while voters who follow the government's instructions are punished. This proposed workaround is not just challenging, it is downright bizarre.

### III. SAVING THE GOVERNMENT MONEY IS NEVER A LEGITIMATE JUSTIFICATION FOR A POLL TAX

Finally, the Secretary argues that cost concerns justify the imposition of a poll tax this year because of: (a) the pandemic; (b) feasibility; and (c) equities.

The premise of the Secretary's cost argument is shaky at the outset. In one part of the brief, the Secretary encourages voters to just ignore the poll tax because the USPS will supposedly bill the State for postage anyway. D.Br. at 2, 15-16. And yet if every mail-in voter followed the Secretary's advice, the USPS would bill the State for everyone's postage, which would cost just as much as the elimination of a poll tax. This internal contradiction undermines the reliability of the Secretary's dire prognostications and the seriousness of the Secretary's cost concerns. For this reason alone the Secretary's alleged cost concerns should be dismissed.

**The pandemic.** First, the Secretary argues that eliminating the poll tax now would result in financial implosion and an unstoppable COVID-19 plague. D.Br. at 8-11. He warns that "now is not the time to add additional burden to state coffers." *Id.* at 33. He then implies that every 55-cent poll tax that a voter selfishly refuses to

11

donate to the government can buy another pair of gloves that can save a doctor's life. *Id.* at 10-11. The connection seems strained, but it is also irrelevant, because illegal poll tax revenue is not the only way to fight the COVID-19 pandemic. Though the Secretary insists that elected officials simply cannot think of a (politically popular) way to raise revenues other than imposing illegal poll taxes, the Secretary provides no indication that any such alternatives to imposing poll taxes has ever been seriously considered.

**Feasibility.** With respect to June, the Secretary does not address Plaintiffs' principal request for legal assurance that the facilitation of stamp distribution for voting is permissible. Cash-strapped organizations could use some assurance since they are the ones doing the stamp distribution that the Secretary will not deign to do himself. The Secretary's website contains plenty of lawyer-approved statements about all kinds of voting laws, so it is unclear why similar statements cannot be made about third party donations, perhaps in the FAQ.[3]

The Secretary also claims that Plaintiffs' three proposed alternative remedies for June are not feasible. As for the first alternative, stamp or sticker label distribution, the Secretary asserts that extra staff time is needed, which is not the same thing as "logistically impossib[le]." D.Br. at 12-13. Plaintiffs do not diminish

---

[3] https://sos.ga.gov/index.php/elections/faq.

the labor of hardworking election officials, but voters across Georgia who must find a way to vote during this pandemic are also strained. And the Secretary fails to consider the extra staff time (and money) that organizations like Black Voters Matter Fund are putting in to respond to the poll tax. If this Court orders Defendants to distribute stamps or sticker labels for the June election, Plaintiffs will forgo the online and drop box options, which Plaintiffs agree are inferior. But if this Court finds that partial June relief makes it materially more difficult to enter full relief for August and November (and it should not), Plaintiffs seek the latter.

As for August and November, the Secretary identifies no logistical obstacle to providing pre-paid postage absentee ballot envelopes or applications. This is expected, since it only took a couple of weeks, starting on March 30, to print absentee ballots and envelopes from scratch in preparation for June. *See* Doc. 40; Doc. 52 at 9:19-10:10. And the Secretary does not suggest that it is time-consuming to set up a pre-paid postage mechanism with the United States Postal Service, as the Secretary already knows how to do it. *See, e.g.*, Exhibit M.

The Secretary's ace in the hole is the budget. He baldly claims that it is impossible to comply with the Constitution so long as the General Assembly does not budget for it. Period. That means no relief for June (because it is not in the FY20 budget) and no relief for August and November (unless they budget for it in

FY21). D.Br. at 8-9. Apparently, unconstitutional poll taxes will never be eliminated unless and until the General Assembly feels like it. The Secretary cites no cases for this groundbreaking constitutional theory. The legislature doesn't decide when the State must comply with the Constitution, the Constitution decides when the State must comply with the Constitution (which is now). And as noted above, there are ways to raise tax revenue that are not unconstitutional.

On cue, the Secretary ritualistically waves the talismanic assertion that *Purcell* automatically prohibits all injunctions close to an election (which it doesn't). D.Br. at 17, 33, 34. The Secretary does not bother to explain how *Purcell* applies to the facts of this case or explain how one (June), three (August) or six months (November) is too close to an election or why. His silence speaks volumes.

Defendant DeKalb County Board of Registration & Elections ("DeKalb") argues, on the other hand, that Plaintiffs have moved too early, suggesting that there is plenty of time to impose an injunction for August and November. Perhaps. But Plaintiffs need to decide as soon as possible whether resources should be marshaled in anticipation of August and November. And, candidly, Plaintiffs would prefer not to take any chances when the Secretary routinely argues (as is his right) that there is never enough time to implement any injunction before any election no matter how long the time and how far away the election. Even putting

aside the Secretary's litigation strategy, it is the Secretary's own concerns about the impact of COVID-19 that commend maximizing the amount of time for election officials have to cure constitutional defects. DeKalb can always move later to modify any injunction if necessary.

**The equities.** The Secretary next asserts that cost justifications outweigh the voters' "minimal" burdens. For the reasons set forth in Part I., the voters' burdens are not "minimal," especially during the pandemic. And for the reasons set forth in Part II., the alternative workarounds are no better, if not far worse.

Voters' burdens outweigh the State's. As noted above, there are alternatives to raising tax revenue that do not involve poll taxes. And raising money never justifies poll taxes anyway. *See Harman*, 380 U.S. at 544 ("the poll tax, regardless of the services it performs, was abolished by the Twenty-fourth Amendment"). And to the extent that for purported budgetary concerns are relevant, and they aren't, the General Assembly will have time to "budget" for the elimination of a poll tax before FY21 if this Court enters an injunction for August and November as soon as possible.

In some ways, though, the General Assembly is a red herring. The General Assembly has never passed a statute requiring the Secretary to impose poll taxes on mail-in voting. Nor has the Secretary of State proposed a regulation to impose

poll taxes that would have allowed an opportunity for the public to point out the constitutional flaws. At some point, the Secretary of State's Office decided to charge voters for postage, so any costs incurred are of the Secretary's own doing. Voters should not be punished now that the chickens have come home to roost at a time when the pandemic has suddenly exposed this gaping unconstitutional wound.

The Secretary turns the tables back on Plaintiffs, scolding them for "wait[ing] decades" to bring this lawsuit. D.Br. at 35. Plaintiff Black Voters Matter Fund was founded in 2016, so they are not sure how they would have filed this lawsuit decades ago. Plaintiff Megan Gordon is 29 years old and pleads guilty to not filing this lawsuit as a baby. Time and space aside, it is not unreasonable for Plaintiffs to now devote their limited resources, in light of a pandemic they did not foresee, to challenge a longstanding poll tax whose unconstitutional impact will reach historically unprecedented levels because of the pandemic.

## CONCLUSION

For these reasons, Plaintiffs' motion for a preliminary injunction, as modified by Plaintiffs' first and second supplemental briefs, Docs. 8, 44, should be granted.

Respectfully submitted this 22nd day of April, 2020.

**Sean Young**
Attorney Bar Number: 790399
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

Sophia Lin Lakin
Dale E. Ho
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: 212-519-7836
Email: slakin@aclu.org
dho@aclu.org

Attorneys for Plaintiffs

## CERTIFICATE OF COMPLIANCE

Pursuant to N.D. Ga. Local Civil Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with N.D. Ga. Local Civil Rule 5.1(C) in Times New Roman 14-point typeface.

**<u>Sean Young</u>**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system.

**<u>Sean Young</u>**
Attorney Bar Number: 790399
Attorney for Plaintiffs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 30357
Telephone: (678) 981-5295
Email: syoung@acluga.org