IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| BLACK VOTERS MATTER FUND, MEGAN GORDON, and PENELOPE REID, on behalf of herself and all others similarly situated, | : : : : : | |
| Plaintiffs, | : : | |
| v. | : : | |
| BRAD RAFFENSPERGER, in his official capacity as Secretary of State of Georgia, and DEKALB COUNTY BOARD OF REGISTRATION & ELECTIONS, and all others similarly situated, | : : : : : : : : | CIVIL ACTION NO. 1:20-cv-01489-AT |
| Defendants. | : : | |

## ORDER AND OPINION

## Table of Contents

I. Background ........................................................................................5

    A.    Georgia's Absentee Ballot Procedure .........................................5

    B.    The COVID-19 Outbreak and Georgia's Initial Response .......... 9

    C.    Summary of Testimony..........................................................13

        1.    Cliff Albright ..................................................................13

        2.    Kevin Rayburn.................................................................15

    D.    Evidence of Impacts on Voters ................................................17

        1.    Plaintiffs........................................................................17

        2.    Initial Voter Affidavits ...................................................................19

        3.    Post-June 2020 Election Voter Affidavits .................................... 24

     E.    Plaintiffs' Proffered Expert Evidence ......................................................27

        1.    Dr. Reingold ........................................................................ 28

        2.    Dr. Barreto .......................................................................... 30

II.   Standing..............................................................................................................32

III.  Legal Standard for Preliminary Injunction ..................................................... 51

IV.   Discussion: Poll Taxes....................................................................................53

     A.    Twenty-Fourth Amendment — Poll Taxes for Federal Elections ...........53

     B.    Equal Protection Clause — Poll Taxes for State Elections ......................55

     C.    Postage Cases ........................................................................................ 56

     D.    "De Facto" Poll Taxes ............................................................................. 59

     E.    Application of the Law to the Facts ........................................................ 65

V.    Discussion: *Anderson–Burdick*....................................................................70

     A.    COVID-19 Cases ......................................................................................71

        1.    Wisconsin ............................................................................72

        2.    Alabama ..............................................................................76

        3.    Texas ...................................................................................79

        4.    Ohio ....................................................................................81

     B.    Natural Disaster Cases .......................................................................... 83

     C.    Application of the Law to the Facts ........................................................ 85

VI.   Conclusion ...................................................................................................... 90

Plaintiffs Black Voters Matter Fund Megan Gordon and Penelope Reid filed this putative class action against Brad Raffensperger, the Georgia Secretary of State ("Secretary") and the DeKalb County Board of Registration & Elections ("DeKalb BOR") (on behalf of all similarly situated county boards of elections) (collectively, including the proposed defendant class, "Defendants") alleging that Defendants have unconstitutionally infringed the rights of Georgians to vote by requiring voters to pay for their own postage to submit absentee ballot applications and absentee ballots. Plaintiffs contend that the postage requirement is a poll tax in violation of the Twenty-Fourth and Fourteenth Amendments and an unjustifiable burden on the right to vote in violation of the First and Fourteenth Amendments. Plaintiffs seek relief, in the form of (a) a declaratory judgment that the requirement that voters affix their own postage to mail-in absentee ballots and mail-in absentee ballot applications is unconstitutional; and (b) a preliminary and permanent injunction prohibiting Defendants from requiring that voters affix their own postage for absentee ballots and applications and mandating that Defendants provide prepaid postage returnable envelopes for absentee ballots or postage.

The Court previously held a hearing on Plaintiffs' Motion on April 24, 2020. (Doc. 69.) The Court denied the Motion for Preliminary Injunction as to the June 2020 election only, and later as to the August 2020 election in response to Plaintiffs' Motion for Temporary Restraining Order (Docs. 83, 93.) The Court has kept the issue of the November 2020 election under advisement, and the

parties have filed a number of supplemental briefs and filings, which the Court has reviewed.

Currently pending before the Court are the following motions:

- Plaintiffs' Motion for a Preliminary Injunction as to the November 2020 General Election [Doc. 2]; [1]

- The Secretary's Motion to Dismiss Plaintiffs' Amended Complaint [Doc. 90];

The DeKalb Defendants have also filed a Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 104). In addition to incorporating the Secretary's arguments, the DeKalb Defendants also raise issues of immunity that the Court need not reach in connection with the instant Motion for Preliminary Injunction. Accordingly, the Court will address that motion to dismiss at a later time. For similar reasons, because the Court finds that Plaintiffs have alleged standing, the Court need not reach Plaintiffs' Motion to Certify Plaintiff and Defendant Classes (Doc. 110) at this time.

This is one of many challenges to Georgia's election procedures, both before and after the pandemic, pending in this district.[2] This case addresses an extremely narrow question of whether the state may require voters to affix postage to absentee ballot applications and absentee ballots, or whether the state

---

[1] Plaintiffs' Motion to Supplement [Doc. 136] is **GRANTED**.

[2] *See, e.g., The New Georgia Project et al v. Raffensperger et al*, Civil Action No. 1:20-cv-01986-ELR (N.D. Ga. May 8, 2020); *Anderson et al. v. Raffensperger et al.*, Civil Action No. 1:20-cv-03263-MLB (N.D. Ga. Aug. 6, 2020); *Fair Fight Action Inc. v. Raffensperger*, Civil Action No. 1:18-cv-5391-SCJ (N.D. Ga. Nov. 27, 2018); *Curling et al v. Raffensperger*, Civil Action No. 1:17-cv-2989-AT  (N.D. Ga. Oct. 15, 2019) (Amended Complaints, Docs. 627, 628).

must prepay for such postage. It is by no means the final word on Georgia's absentee balloting procedures, election procedures or Georgia's response in the electoral sphere to the challenges posed by the pandemic. There may be evidence that leads another court to different conclusions as to the overall legality of the absentee ballot process or specific features of that process — or their implementation within the state. But for the reasons that follow, the Motion for Preliminary Injunction is **DENIED**.

## I.    Background

### A.    Georgia's Absentee Ballot Procedure

Georgia law permits voters to cast an absentee ballot by mail. *See generally* O.C.G.A. § 21-2-380 *et seq.*[3]  In order to vote by absentee ballot, a voter must first submit an application "either by mail, by facsimile transmission, by electronic transmission, or in person in the registrar's or absentee ballot clerk's office." O.C.G.A. § 21-2-381(a)(1)(A). Upon receipt of a timely absentee ballot application, the relevant election official determines the voter's eligibility. *Id.* § 381(b)(1).

In the next step of the process, state law requires that local election officials "prepare, obtain, and deliver . . . an adequate supply of official absentee ballots to the board of registrars or absentee ballot clerk for use in the primary or election

---

[3] Georgia law considers any voter who does not "cast[] a ballot in a primary, election, or runoff other than in person at the polls on the day of such primary, election, or runoff" to be an absentee voter, which includes early voters. O.C.G.A. § 21-2-380(a). Under Georgia law, a voter does not need to provide a reason to vote by absentee ballot. *Id.* § 380(b).

or as soon as possible prior to a runoff." O.C.G.A. § 21-2-384(a)(1). Then, the relevant election official provides eligible voters with the absentee ballots. Specifically, Georgia law requires that such official "shall mail or issue official absentee ballots to all eligible applicants not more than 49 days but not less than 45 days prior to any presidential preference primary, general primary other than a municipal general primary, general election other than a municipal general election, or special primary or special election in which there is a candidate for a federal office on the ballot." *Id*. § 384(a)(2).

Registered voters who submitted absentee ballot applications requesting to vote by mail are supposed to receive three things by mail prior to election day: (a) the ballot itself, (b) a small "secrecy" envelope for placing the ballot in, and (c) a larger envelope for mailing the envelope containing the ballot. O.C.G.A. § 21-2-384(b), § 21-2-385(a).  Prior to election day, the voter must "vote his or her absentee ballot, then fold the ballot and enclose and securely seal the same in the [smaller] envelope on which is printed 'Official Absentee Ballot.'" O.C.G.A. § 21-2-385(a).  Next, this smaller "envelope shall then be placed in the second [larger] one, on which is printed the form of the oath of the elector; the name and oath of the person assisting, if any; and other required identifying information." *Id*.  "The elector shall then fill out, subscribe, and swear to the oath printed on such envelope. Such envelope shall then be securely sealed and the elector shall then personally mail or personally deliver same to the board of registrars or absentee

ballot clerk." *Id.* The backside of the mailing envelope filed by the Defendants

with the Court asks three questions in bold on the top sealing portion:

> **STOP**
>
> **Have you signed the oath?**
>
> **Have you placed your ballot in the white envelope and sealed it?**
>
> **Have you affixed sufficient postage?**

(Docs. 54, 55.)

The outer, larger absentee ballot return envelope has a large logo

indicating it is "Official Election Mail Authorized by the U.S. Postal Service."

(Doc. 54-3 at 3.) The Secretary contends that the USPS has a policy of delivering

official election mail regardless of whether the mail has sufficient postage:

> The USPS has previously issued specific guidance that normal procedures for short-paid and unpaid mail should not be followed when processing absentee ballot materials: absentee ballots are delivered to the election office and not returned to the voter even if there is insufficient or no postage. Postage will be collected from the election office at a later date.

(Sec'y Resp. Br. at 15–16, Doc. 51, citing *Postal Bulletin 22391 2014 Election and Political Mail Update, United States Postal Service* (June 12, 2014), https://about.usps.com/postal-bulletin/2014/pb22391/html/front_cvr.htm) (footnotes omitted).[4]

---

[4] The postal bulletin also states that "the balloting materials for all types of ballots, whether disseminated in hardcopy or electronically, must indicate in a prominent location the proper amount of First-Class Mail® postage that must be paid. . . . Alternatively, the marking 'Apply First-Class Mail postage here' could be printed in the upper right corner of the address side of the envelope used by the voter to return the ballot to election officials. . . . Additionally,

As explained above, the statute requires that absentee ballot applications may be submitted "by mail," O.C.G.A. § 21-2-381(a)(1)(A), and that absentee ballot applications shall be "personally mail[ed] or personally deliver[ed]" by the voter. O.C.G.A. § 21-2-385(a). However, no portion of the Georgia Code addresses who must pay for postage for absentee ballot applications and absentee ballots.[5] Absentee ballot application forms do not contain prepaid postage, and therefore the voter must pay postage to return the application. (Aff. Rayburn ¶ 8.b.) A "voter could return the completed form electronically to the county email address supplied on the absentee ballot request form that was mailed out." (Aff. Rayburn ¶ 8.b.) However, this option applies only to the absentee ballot application, not to the ballot itself.

Other Georgia voting statutes are more explicit about postage. For example, O.C.G.A. § 21-2-233(b) provides that if the Secretary of State receives information from the United States Postal Service about a change of address indicating a voter has moved to a different address in the same county she is registered in, the Secretary is required to change the list of voters to reflect the new address and send a form by forwardable mail to the voter's old address (and

---

balloting materials must indicate, in a prominent location, the specific amount of First-Class Mail postage required for the return of the ballot to election officials. The marking requirements will not apply to balloting materials that meet one of the following exceptions: The balloting materials are qualified under the special exemption for military and overseas voting; the ballot is returned under Business Reply Mail® service; **return postage is guaranteed through a postage due account; or postage on the ballot is prepaid by stamps, meter, or Permit Reply Mail**. . . ." (emphasis added).

[5] O.C.G.A. § 21-2-389 provides that the postage for sending the ballot itself to the voter "shall be paid by the county or municipality." However, the Secretary of State apparently paid for postage on all outgoing absentee ballots issued to voters for the June 9, 2020 primary.

optionally to the new address) containing "postage prepaid, preaddressed return form by which the elector may verify or correct the address information." *See also* O.C.G.A. § 21-2-234(c) (requiring voter inactivity list confirmation notice to be a "postage prepaid, preaddressed return card."). Plaintiffs also submitted evidence that postage appears to be provided by the Secretary in some instances not addressed by any specific statutory provision.  (*See* Doc. 52-2 at 1-2) (voter registration application form along with prepaid envelope for such application).

Voters who do not have stamps may request and receive stamps from others for the purpose of voting. The State Election Board has interpreted O.C.G.A. § 21-2-570's ban on gifts for registering as a voter to permit furnishing of postage by a third party for submitting an absentee ballot or absentee ballot application. Ga. R. & Reg. 183-1-19-.01.

### B.    The COVID-19 Outbreak and Georgia's Initial Response

The entire world is currently embroiled in a global pandemic unlike any seen in recent history. On or around February 17, 2020, the State of Georgia recorded its first confirmed case of the highly contagious viral disease known as COVID-19. *COVID-19 Daily Status Report*, Ga. Dep't of Pub. Health, https://dph.georgia.gov/covid-19-daily-status-report (last accessed Aug. 7, 2020). Since then, the number of confirmed cases has surged to over 200,000, and that number continues to rise daily. *Id.* In recognition of this public health emergency, on March 14, 2020, Gov. Brian Kemp issued Executive Order No. 03.14.20.01, declaring a Public Health State of Emergency in Georgia. (Mot.

Prelim. Inj. ("Motion"), Ex. F at 1.)[6] Later, on April 2, 2020, Gov. Kemp issued a statewide, shelter-in-place order, entitled Executive Order to Ensure a Safe & Healthy Georgia (the "Order"). The Order required that "all residents and visitors of the State of Georgia are required to shelter in place within their homes or places of residence, meaning remaining in their place of residence and taking every possible precaution to limit social interaction to prevent the spread or infection of COVID-19" unless subject to an exception. *Id.* The Order noted that "[t]he Centers for Disease Control and Prevention has determined that older adults, people of any age who have serious underlying medical conditions, and certain other groups may be at higher risk for more serious complications from COVID-19." *Id.*

In light of this public health emergency, Secretary of State Raffensperger announced on March 14, 2020 that he was delaying the Presidential Preference Primary Election, which was originally scheduled for March 24, 2020, and for which early voting had already begun, to coincide with the later Statewide General Primary on May 19, 2020. *Secretary of State Raffensperger postpones the Presidential Preference Primary,* Ga. Sec'y of State (Mar. 14, 2020), https://sos.ga.gov/index.php/elections/secretary_of_state_raffensperger_postp ones_the_presidential_preference_primary. Later, on Thursday, April 9, 2020,

---

[6] On March 13, 2020, President Donald Trump issued a "Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak." 85 Fed. Reg. 15337 (March 13, 2020), *available at* https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

Secretary Raffensperger announced that, based on his authority under O.C.G.A. § 21-2-50.1, he was postponing the now-combined primary election until June 9, 2020. *See Raffensperger Announces Postponement of Primary Election Until June 9*, Ga. Sec'y of State (Apr. 9, 2020), https://sos.ga.gov/ index.php/elections/raffensperger_announces_postponement_of_primary_elec tion_until_june_9. Secretary Raffensperger further provided that "[a]bsentee ballot applications for the upcoming primary election will continue to be accepted and processed by counties even if the application said May 19." *Id.*

The Secretary of State took the additional step of mailing absentee ballot applications to every registered, active voter. (Transcript of Telephone Conference Proceedings held on April 14, 2020 before Judge Totenberg ("Tr."), at 18:2–15, 23:1–6, Doc. 39; Affidavit of Kevin Rayburn ¶ 8.a, Doc. 51-1.) Counsel for the Secretary indicated that absentee ballots would be sent out to eligible voters who submitted applications 49 days prior to the election and would continue to be sent out as received. (Tr. 6:3–11.)

The absentee ballot applications which were sent by the Secretary of State did not contain prepaid postage, and therefore voters were required to provide postage to return the application if mailed to their local board of elections office. (Aff. Rayburn ¶ 8.b.) "Alternatively, the voter could return the completed form electronically to the county email address supplied on the absentee ballot request form that was mailed out." (Aff. Rayburn ¶ 8.b.) Defendants likewise do not intend to send out absentee ballots with prepaid postage. (Aff. Rayburn ¶ 8.e.)

("As in every prior election, the voter is responsible for obtaining postage directly or through a third party or the voter can return the sealed and signed envelope directly to their county elections office.").

On April 15, 2020 "the State Election Board passed an emergency rule that authorizes counties to establish secured absentee ballot drop boxes where voters may drop off completed absentee ballots to a secured location without using a stamp." Ga. St. Election Bd., Emer. R. 183-1-14-0.8-.14, (Doc. 130-2.) Most counties took advantage of this rule to set up at least one drop box, and many set up several. (Doc. 130-3.) However, at least 62 counties did not. (Doc. 130-4.)

Governor Kemp renewed the Public Health State of Emergency on April 30, and again on May 28, June 29, and July 31, 2020. Ga. Exec. Order No. 07.31.20.01, *available at* https://gov.georgia.gov/document/2020-executive-order/07312001/download. However, Kemp did not extend the Statewide Shelter in Place Order, and therefore it expired on April 30, 2020 at 11:59 pm.[7] Over 1.2 million Georgians voted in person in the June 2020 election. *See Special Election Set for U.S. House of Representatives District 5*, Ga. Sec'y of State, https://sos.ga.gov/index.php/elections/special_election_set_for_us_house_of_ representatives_district_5 (last visited Aug. 3, 2020). Over 1.1 million voted by absentee. *Id.*

---

[7] *See* Bluestein, *Kemp to lift statewide shelter-in-place for most Georgians on Friday*, Atl. J.-Const. (Apr. 30, 2020), https://www.ajc.com/blog/politics/breaking-kemp-lift-statewide-shelter-place-for-most-georgians-friday/JdXpKK1srCbzlPZc2y3XuJ/.

### C.    Summary of Testimony

At the April 24, 2020 video hearing, the Court heard testimony from a total of two witnesses, one per side.  The Court summarizes their testimony as follows.

### 1.    Cliff Albright

Plaintiffs' witness was Cliff Albright, the Cofounder and Executive Director of Plaintiff Black Voters Matter Fund ("BVMF"). (Tr. of Apr. 28, 2020 hearing at 32:17-18, Doc. 75.) Mr. Albright testified that the organization was founded in 2016, but that it began operations in earnest in 2017. The organization's "mission is to help build power primarily in predominantly black communities." (*Id.* at 32:18-19.) BVMF does not have members in the ordinary sense, but rather works with a variety of "partner" organizations to provide voter support for the members of those organizations, phone banking, texting, social media, and in-person voter education and engagement, and provides grants to such organizations. (*Id.* at 40–41, 48–49.) These organizations range from individual churches to specific NAACP chapters.  (*Id.* at 62:14-20.)

Mr. Albright testified that BVMF has a geographic focus on the rural south. The organization assists with voter registration and advocates for increased voting opportunities such as more polling places. Additionally, the organization has assisted in arranging rides for voters who are unable to get to the polls on their own. Mr. Albright testified that in rural communities, some voters may have to travel as many as ten miles or more to get to a polling place. However, he testified that BVMF has ceased assisting with voter transportation during the

COVID-19 pandemic, as community organizers "shouldn't have to put themselves at risk." (*Id.* at 35:10-15). Mr. Albright testified that postage is a real impediment for the population he advocates for. He explained that many families do not have postage at their home and have limited options for purchasing postage. (*Id.* at 39:21-24.) These families do not have internet or even credit cards to purchase postage remotely.

Mr. Albright testified that "if a group wanted to go out and buy 100 stamps, then . . . we provide many grants to our local partners so they can do things like that, in addition to other things that they usually do for voter mobilization." (*Id.* at 42.) Mr. Albright does not intend to advise voters to submit their absentee ballots without postage, as he is concerned that advising voters to disregard the clear instructions on the ballot will confuse voters and undermine BVMF's credibility within the community. (*Id.* at 47:13-21.) He also expressed concern that there could be no guarantee that the postal service's policy will actually be carried out county by county. (*Id.*)

Mr. Albright submitted a supplemental declaration after the hearing. (Doc. 77-1.) In it, he expressed his expectation that 50% of BVMF's Georgia-related budget ($400,000) would have to be diverted toward responding to the postage requirement. (Albright Supp. Decl. ¶ 1, 37.) Absent this requirement, he explained that those funds would be used for "voter education and helping voters overcome the other steps of voting by mail." (*Id.* ¶ 2.)

BVMF has "two principal operations" — voter education and grants. (*Id.* ¶ 6.) BVMF only has three staff members in Georgia, and Mr. Albright finds it more efficient and respectful to provide funding to local organizations than to "swoop[] in" and duplicate those organizations' work. (*Id.* ¶ 15.) Before the pandemic, BVMF focused its operations on in person voting. (*Id.* ¶ 18.) Now, it has pivoted to voting by mail, and several grant recipients are exploring using grant money to directly purchase and distribute postage. (*Id.* ¶ 25.) However, Mr. Albright is still planning for the "not-unlikely possibility" that BVMF will have to distribute stamps itself. (*Id.* ¶ 39.) Additionally, he anticipates BVMF having to redirect time and money related to text messaging, phone banking, radio ads, and social media ads to focus on the postage requirement. (*Id.* ¶¶ 44, 49, 51, 54.)

### 2.    Kevin Rayburn

Defendants' sole witness was Kevin Rayburn, the Deputy Elections Director and Deputy Elections Director for the Georgia Secretary of State. Mr. Rayburn explained the process for absentee voters to request and submit their ballots by mail and the steps that the Secretary of State has taken to secure voting during COVID-19 pandemic, including mailing absentee ballot applications to all active registered voters, which totaled 6.8 million, at a cost of over $3 million. (*Id.* at 68:22-24, 90:3-7.) Furthermore, the State is providing municipalities with sanitizing products for polling places and grants for some measure of funding for the purchase of secure drop boxes and associated electronic security if local election boards determine they wish to implement or

acquire such. (*Id.* at 69.) Mr. Rayburn outlined the option for voters to drop completed ballots in secure drop boxes in counties purchasing this equipment. Each county board of elections has the option of establishing one or more drop boxes which must be on county or municipal property with video security of the box. (*Id.* at 67:7-11.) Boxes must be attached to a fixture or the ground with appropriate signage and labeling. Ballots must be removed each day, as well as simultaneously with the polls closing at 7 pm. (*Id.* at 67:12-15.) The county election boards must publicize the locations of the boxes on their websites. (116:15-19.)

Mr. Rayburn explained the procedures related to sending mail with return postage prepaid under the USPS's Business Reply Mail program in the event the Court were to require prepaid postage on return envelopes for all mail-in ballots. Accounts must be pre-funded, and according to Mr. Rayburn, mail must be addressed to the return address associated with the BRM account. Mr. Rayburn testified that the Secretary of State's office is capable of sorting and delivering voter registration applications it receives to the various counties over the course of the year, but does not have the staff to sort and deliver absentee ballots to the counties for elections.[8] If absentee ballots and applications were to be sent with

---

[8] Mr. Rayburn acknowledged that some election-related forms already contain prepaid postage. For example, the confirmation notice to move voters from active to inactive status must be sent by the secretary with return postage prepaid under the National Voter Registration Act, 52 U.S.C. §§ 20501 *et seq.* (formerly 42 U.S.C. §§ 1973gg *et seq*.). Furthermore, the recently passed Georgia HB 316 (2019−20) requires that the final notice of inactivity status also be sent with

return postage prepaid, Mr. Rayburn testified that each county would potentially have to set up its own Business Reply Mail account at an initial cost of roughly $1,000 and pre-fund it. (*Id.* at 99:14-17.)  He estimated the cost of providing prepaid postage for Plaintiffs' requested relief at between $450,000 to $4.2 million, depending on voter participation. (Aff. Rayburn ¶ 17.)

Finally, Mr. Rayburn testified that the number of absentee ballot applications received as of the hearing was over "760,000 and still coming in strong," that the state has already "started mailing out absentee ballots on April 21st," and that as of the hearing date, "approximately 220,000 have gone out." (Tr. at 84, 87.) As noted above, over 1.1 million people voted by mail in the June 2020 primary election.

### D.    Evidence of Impacts on Voters

Plaintiffs offered declaration testimony in connection with the Motion for Preliminary Injunction and supplemented with additional declarations following the June 2020 primary.

### 1.    Plaintiffs

Plaintiff Megan Gordon, a resident of DeKalb County, is opposed to paying for postage associated with absentee mail-in voting.  (Gordon Decl., Doc. 2-5.) Although Gordon currently has two postage stamps, she attests that she is unwilling to put postage on mail-in absentee ballots and applications because she

---

return postage prepaid. The Secretary of State has additionally provided for prepaid postage for "a small portion" of voter registration applications. (Tr. at 71:24-72:5, 73, Doc. 75.)

believes Georgians should not have to spend money to vote.  Gordon is also unsure how much postage is needed to mail an absentee because she does not have a postage scale.

Gordon does not want to vote in person because of the dangers stemming from the COVID-19 pandemic.  If she has the virus, she does not want to endanger others' lives, especially the elderly and those with chronic illness or compromised immunity.  If she does not have the virus, she does not want to contract it, which would also increase the risk of harm to her own health and to others.

Gordon is experienced in voter engagement work, especially among lower-income populations.  From her experience in civic engagement, Gordon has learned that many voters, especially lower-income voters, do not have postage stamps because people are increasingly relying on online transactions. It is also her experience that many people in rural areas and lower-income people do not have Internet access or credit cards, making it impossible for them to purchase stamps online.  In Gordon's experience, many voters cannot afford $10 to buy a book of stamps.  She believes this is especially true while many people are out of work as a result of the COVID-19 pandemic.  According to Gordon, voter education becomes more difficult the more steps are required of voters – and requiring voters to provide their own postage further complicates an already confusing process.

Plaintiff Penelope Reid lives in Gwinnett County. (Reid Decl., Doc. 38.) She grew up in a political family and preferred to vote in person, but since 2014 or 2016, she has had to vote absentee because of knee problems. She is also unsure how much postage to apply for a ballot and does not have a postage scale. She usually purchases stamps from the post office, but does not think she would be able to do that safely now because of the pandemic. She does have stamps left from before the pandemic, which she was able to use to vote, but she is starting to run out of stamps now and she is not sure how she will get more. (Reid Supp. Decl., Doc. 124-7.)

### 2.    Initial Voter Affidavits

On April 10, the Court entered an Order permitting Plaintiffs the opportunity to submit declarations from voters in connection with to the preliminary injunction hearing to substantiate Plaintiffs' claims. Plaintiffs thereafter submitted declarations from 26 Georgia voters on a rolling basis from April 13 to April 23.

Of these 26 declarations, 15 are from voters who are at a higher risk of developing severe symptoms from COVID-19 (or live with someone who is high risk) because of age or an underlying medical condition or compromised immunity. (*See* Reid Decl.; Solomon Decl.; Burke Decl.; Walker Decl.; Walbert Decl.; Kite Decl.; Bryant Decl.; Winn Decl.; Bacot Decl.; Taylor Decl.; Billingsley Decl.' Kendrick Decl.; Kirslis Decl.; P. Robinson Decl.; C. Robinson.) Nine voters say they do not currently have stamps. (*See* Mahmood Decl.; Burke Decl.;

Walbert Decl.; Stewart Decl.)   Four voters attest that it would be a financial hardship for them to purchase postage stamps for the sole purpose of voting by mail.  (*See* Kite Decl.; Bryant Decl.; Evans Decl.; Wille Decl.)  But one of these voters, Savanah Kite, currently has stamps.  (*See* Kite Decl., Doc. 25.)  Twelve of the 26 declarants, already possess stamps or have purchased them online, and do not profess any financial burden in affording postage. Nearly every voter who offered a declaration indicated that they do not know how much postage to affix on an absentee ballot because they do not own a postage scale.

Three declarants, Delinda Bryant, Anna Wille, and Jerald Luster, state that they do not have a means of reliable transportation to go out to purchase postage stamps.  (*See* Bryant Decl.; Wille Decl.; Luster Decl.) Luster, however, was able to purchase stamps online.  (Luster Decl., Doc. 60.)

Delinda Bryant, a 63 year old Dougherty County voter, was unsure whether she will be able to vote because she did not have any stamps and the $10 cost for a book of stamps would be a hardship.  (Bryant Decl., Doc. 24.)  Bryant, who suffered a stroke in 2007, barely receives enough money in disability and retirement payments to afford to pay her mortgage, utilities, and food.  She receives $16 in Supplemental Nutrition Assistance Program benefits.  Although she owns a car, she cannot drive because she cannot afford to pay for a needed transmission repair.   Bryant also attests that she does not think she can get stamps because everything seems to be closed because the coronavirus has severely impacted Dougherty County, an original hotspot of the virus in Georgia.

Bryan also attests that based on her participation with civic engagement and a voter organization in 2018, she knows that members of her community have difficulty with voting by mail.  Bryant attests that her community has a lot of poverty and illiteracy and further, that a number of elderly people she has worked with do not have Internet.[9]

Voting is important to Richard Evans, an African American DeKalb County resident, who has been homeless for over two years.  (Evans Decl., Doc. 65.) Evans has always previously voted in person, never by mail.  Although he is homeless, Evans is employed, has a phone with email access and a car.  Evans is able to submit his ballot application by email, but he does not have stamps for mailing in his voted absentee ballot.  For Evans, a $10 book of stamps is half a tank of gas, enough for two days, traveling to work and other places. Ten dollars is also the cost of two meals.  While he would not go hungry, it would be a hardship to use this money for postage instead of necessities like gas and food.

Marilyn Winn, is an African American, soon to be 69 years old, who is at greater risk from COVID-19 because of her age.  (Winn Decl., Doc. 12.)  Winn attests that she would prefer to vote in person.  She does not trust the mail system because it has historically been less reliable or non-functional in communities of color.  Winn will, however, vote by mail in upcoming primary because of the pandemic, though she hopes to vote in person for future elections.

---

[9] As will be discussed below, Ms. Bryant ended up having to vote in person in the June 2020 election.

Having never voted by mail, Winn finds the process to be complicated. She has already mailed in her ballot application. She used 2 stamps because the application was printed on card stock and she had no idea how much postage was necessary and she does not own a postage scale. While Winn has postage stamps, she uses them to mail clemency letters on behalf of incarcerated women and every stamp she uses for voting is one less stamp she has for this work. She does not think any voter should have to buy their own postage – she will do it but should not have to. Winn attests that the pandemic could affect her economically. She is the executive director of a small nonprofit of five staff. Funding will likely go down as donors give less. Winn is very fearful of her staff losing their jobs. Winn currently has the money to spend $10 for a book of stamps, but it is not an insignificant amount of money where there is a real possibility she may lose her job this year.

Katie Vinson Kendrick is a 71 year old resident of Peach County. (Kendrick Decl., Doc. 56.) She usually votes in person but is at a higher risk of complications from the COVID-19 virus because of her underlying conditions, including prior cancer and diabetes. Kendrick runs a nonprofit with a focus on community engagement in Crawford, Macon, Peach, and Taylor counties. (Kendrick Decl., Doc. 56.) Her organization plans "get out the vote" efforts, "get out the census," voter registration, and voter education activities. One focus of her nonprofit now is helping residents vote absentee during the pandemic. Kendrick attests that Peach is a rural county without many options for public

transportation.  During the pandemic, ride share would be dangerous for voting in person.  Voting by mail is the only option that currently makes sense.  According to Kendrick, there are a lot of people in Peach County who would have a hard time paying $10 for a book of stamps.  She avers that it is even more difficult to obtain stamps in Peach County because of the pandemic.  She is concerned about voters being able to return their ballots and her organization is struggling to figure out how to make stamps available to everyone.  Kendrick herself has stamps at home, but not a scale, so she is not sure how many to use.  She does not know anyone or any business that has a postage scale.

Two voters, Mahmood and Wayman Stewart, are currently out of town and voting by mail is their only option.  (Stewart Decl., Doc. 64) (attesting that he is out of state caring for a sick relative, and will either have to buy postage online or at a post office with a self-serve kiosk to avoid or minimize COVID-19 exposure); (*see also* Mahmood Decl., Doc. 33.)  Ahmed Mahmood is a third year medical student who maintains residency in Cobb County, but is currently doing clinical rotations in Broward County, Florida.  (Mahmood Decl., Doc. 33.)  As a result, he is unable to vote in person in the June 9 primary elections in Georgia unless he were to take the 10-hour road trip or risk exposure to COVID 19 on a flight to Atlanta.  Mahmood attests that he does not have access to stamps, and that the process of obtaining postage for an absentee ballot is more difficult now because of the COVID-19 pandemic.  He is isolating himself in compliance with the State of Florida and Broward County stay at home orders and only leaves the house for

essentials.  Mahmood has access to the Internet but does not address whether he can afford to purchase stamps online.

At the April 24 hearing, the Secretary presented evidence that several of the voters who submitted affidavits were able to successfully vote absentee. (Sec'y's Hrg. Ex. 1-7, Doc. 70.)

### 3.    Post-June 2020 Election Voter Affidavits

The Court previously "expressed concern about ruling on the important questions presented by Plaintiffs' Motion for Preliminary Injunction before  the June 2020 Primary play[ed] out." (Ord. of May 15, 2020 at 3, Doc. 101.) The Court is cognizant of Justice Stevens's suggestion in his *Purcell* concurrence that, where feasible, courts may consider allowing "election[s] to proceed without enjoining the statutory provisions at issue"  to provide "a better record on which to judge their constitutionality . . . on the basis of historical facts rather than speculation." *Purcell v. Gonzalez*, 549 U.S. 1, 6 (2006) (Stevens, J., concurring). At the May 12, 2020 teleconference on Plaintiffs' request for a temporary restraining order, the Court explained that before reaching Plaintiffs' claims, it "would rather also have some evidence in the June election" before reaching the merits of Plaintiffs' constitutional claims. (Tr. of May 12, 2020 Conf. at 12:4–5, Doc. 95). Plaintiffs heeded the Court's advice and on June 30 submitted

supplemental evidence from voters recounting their voting experience in the June 2020 primary election.[10]

Delinda Bryant had previously submitted testimony that she was concerned about her ability to obtain a stamp to vote by mail. *See supra.* Bryant was not able to vote absentee because "[g]etting that stamp was just too hard for [her] in terms of the cost of the stamp and being able to go out to the post office to get the stamp." (Bryant Supp. Decl. ¶ 2, Doc. 124-1.) Instead, she voted in person, forcing her to be exposed to the virus. (*Id.* ¶ 8.)

Several other voters expressed concern about their ability to obtain stamps to vote. Christine Legnon wanted to vote absentee, but did not have stamps, so she voted in person. (*E.g.* Legnon Decl ¶ 4–5, Doc. 124-2.) She ended up waiting four hours and 20 minutes to vote, and during that time she was concerned that poll workers were not enforcing social distancing. (*Id.* ¶¶ 9, 11.) Pablo Bassols never received his absentee ballot, but even if he had, he did not have any stamps at home. (Bassols Decl. ¶¶ 4, 5, 10, Doc. 124-8.) Al Lewis is disabled and was able to vote absentee, but relies on a home health aide to purchase stamps and would have a difficult time obtaining them otherwise. (Lewis Decl. ¶¶ 3, 10, 11, Doc. 124-28.)

---

[10] The Secretary's arguments that these affidavits are improperly before the Court because the Court has already ruled on Plaintiffs' Motion for Preliminary Injunction as to the prior elections and that Plaintiffs should have renewed the motion or that the supplemental voter affidavits should have been attached to the original motion (filed long before the conduct described in the voter affidavits even occurred) are baseless and overruled. (*See generally* Doc. 129.)

Fantasia Smith did not apply for an absentee ballot because she did not "have stamps at home." (Smith Decl. ¶ 3, Doc 124-6.) She does not indicate in her declaration that she could not afford the postage or that obtaining postage would have been burdensome in light of the pandemic. When Smith attempted to vote in person during the June 9 primary, she was not permitted to vote due to an address discrepancy after waiting in line on election day for three hours. (*Id.* ¶ 8.)

Several voters who applied for absentee ballots did not receive them in time to vote. (Bassols Decl. ¶ 5, Doc. 124-8; Kuttig Decl. ¶ 7, Doc. 124-9; Moore Decl. ¶ 13-14, Doc. 124-10; Burke Supp. Decl. ¶ 4, Doc. 124-11; Waddoups Decl. ¶ 4, Doc. 124-13; Jackson Decl. ¶ 11, Doc. 124-14; I. Hudson Decl. ¶ 3, Doc. 124-15; Parikh Decl. ¶ 7, Doc. 124-17; Aguillard Decl. ¶ 9, Doc. 124-19; K. Hudson Decl. ¶ 15, Doc. 124-20; Kennedy Decl. ¶ 8, Doc. 124-21; Thomas Decl. ¶ 7, Doc. 124-29.) Other voters who voted in person faced unreasonable wait times, (Bryant Supp. Decl. ¶ 8, Doc. 124-1; Legnon Decl. ¶ 11, Doc. 124-2; Junior Decl. ¶ 7, Doc. 124-3; Smith Decl. ¶ 8, Doc. 124-6; Bassols Decl. ¶ 9, Doc. 124-8; Wise Decl. ¶ 6, Doc. 124-12; Jackson Decl. ¶ 18, Doc. 124-14; I. Hudson Decl. ¶ 6, Doc. 124-15; Enriquez Decl. ¶ 8, Doc. 124-16;  Parikh Decl. ¶ 9, Doc. 124-17; Pruitt Decl. ¶ 7. Doc. 124-18), or felt unnecessarily exposed to the virus (Burke Supp. Decl. ¶ 11, Doc. 124-11; Bassols Decl. ¶ 4, Doc. 124-8.) One voter described the situation inside a polling location as a "nightmare," noting that "there was no way they could fit so many people and maintain six feet apart." (Jackson Decl. ¶ 15, Doc. 124-14.)

26

The Secretary responds that "[f]ourteen of the declarations attached to the Supplemental brief do not even mention stamps or postage," (Resp. to Supp. Br. at 10, Doc. 129, citing Docs. 124-3, 124-11, 124-12, 124-13, 124-14, 124-15, 124-17, 124-19, 124-20, 124-21, 124-24, 124-25, 124-26, 124-27), and that of the "remaining fifteen declarations . . . not a single one claimed that an inability to obtain or afford stamps prevented them from going to the polls or casting a ballot in the June 2020 Primary Election." (*Id.*, citing Docs. 124-1, 124-2, 124-4, 124-5, 124-6, 124-7, 124-8, 124-9, 124-10, 124-16, 124-18, 124-22, 124-23, 124-28, 124-29.)

### E.   Plaintiffs' Proffered Expert Evidence

Plaintiffs have submitted, among other evidence, the declaration of Dr. Arthur L. Reingold (Doc. 57-1) and the Report of Dr. Matthew A. Barreto (Doc. 124-35). Mindful of the fact that this is the preliminary injunction stage and that Defendants have not had a full opportunity to conduct depositions, employ rebuttal experts, and potentially seek exclusion of the evidence under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court considers these materials only to the extent "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).

### 1.   Dr. Reingold

Dr. Reingold is the "Division Head of Epidemiology and Biostatistics at the University of California, Berkeley, School of Public Health "and has "worked on the prevention and control of infectious diseases in both the United States, including eight years at the US Centers for Disease Control and Prevention ('CDC')." (Decl. Reingold ¶ 1, Doc. 57-1.) Dr. Reingold provided background on the COVID-19 as follows:

> SARS-CoV-2 is a novel coronavirus that causes Coronavirus Disease 2019 (COVID-19).  The virus is a respiratory virus with patients typically presenting with acute respiratory signs and symptoms, which can escalate in some patients to respiratory failure and other serious, life-threatening complications.
>
> . . .
>
> Due to the respiratory impacts of the disease, individuals may need to be put on oxygen, and in severe cases, patients may need to be intubated and put on a ventilator. People of every age can and have contracted COVID-19, including severe cases, but geriatric patients are at the greatest risk of severe cases, long-term impairment, and death. Likewise, those with immunologic conditions and with other pre-existing conditions, such as hypertension, certain heart conditions, lung diseases (e.g., asthma, COPD), diabetes mellitus, obesity, and chronic kidney disease, are at high risk of a life-threatening COVID-19 illness. Information available to date shows that, if infected with the SARS-CoV-2 virus, racial and ethnic minority populations, especially African-Americans, are at a substantially elevated risk of developing life-threatening COVID-19 illnesses and to die of COVID-19.

(*Id*. ¶ 7.) Dr. Reingold also described how COVID-19 spreads. He explained that the virus "is readily spread through respiratory transmission" including "droplet transmission; that is, when an infected individual speaks, coughs, sneezes, and the like, they expel droplets which can transmit the virus to others in their

proximity." (*Id.* ¶ 8.) At the time of his declaration (April 21, 2020), he stated that it "was not yet determined . . . whether the virus is aerosolized, such that tiny droplets containing the virus remain in the air and can be inhaled by others who come into contact with that air." (*Id.*) He also noted that "[t]he virus is also known to be spread through the touching of contaminated surfaces." (*Id.*)

According to Dr. Reingold, "the only ways to limit [the virus's] spread are self-isolation, social distancing [i.e., maintaining six feet of distance], frequent handwashing, and disinfecting surfaces." (*Id.*)[11] Dr. Reingold opined, therefore, that voting in person at a polling location imposed a risk of virus transmission:

> Polling locations are a prime area for increased transmission of SARS-CoV-2 due to the close proximity of a large number of individuals — voters, observers, poll workers — in a limited space. A polling location also has a large number of common surfaces that multiple people touch: the doors, the poll books to sign in, pens, voting booths, and voting machines. Due to the transmission of the virus via contaminated environmental surfaces, polling locations are highly likely to cause increased infection.

(*Id.* ¶ 17.)[12] He thus concludes that widespread vote-by-mail or absentee balloting would be a much safer option for public health in light of COVID-19." (*Id.*)

---

[11] The CDC has also recommended wearing masks to slow the spread of COVID-19. *Use of Masks to Help Slow the Spread of COVID-19*, CDC.gov (June 28, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html.

[12] The Court recognizes that scientific assessment of how COVID-19 spreads has developed over the last several months, and the current understanding focuses more on the dangers that dwell in the immediate area that an infected individual has occupied, due to potential aerosolization of respiratory droplets, as opposed to surface contact, though surface contact still remains an issue. In that context, polling booth areas, used serially by one voter after the next, as well as voting lines, would still pose serious potential infection risks for voters.  *See* CDC Recommendations, *Considerations for Election Polling Locations and Voters*, (August 10, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

### 2.   Dr. Barreto

Dr. Barreto earned a Ph.D. in Political Science in 2005 and since 2015 has been "a Professor of Political Science and Chicana/o Studies at the University of California, Los Angeles ('UCLA'), and the faculty director of the UCLA Voting Rights Project, a joint program of the Division of Social Sciences, School of Public Affairs, and School of Law." (Barreto Decl. ¶¶ 1, 2, 4, Doc. 124-35.)

Dr. Barreto was retained by Plaintiffs "to evaluate whether there are burdens that voters in Georgia would possibly face if required to obtain and pay for postage on their absentee ballots (vote-by-mail)." (*Id.* ¶ 9.) He began his analysis by conducting a comprehensive literature review and demographic analysis of Georgia. (*Id.*) He then "conducted an analysis of the statewide voter file for Georgia, geocoding each voter's address and matching it against the nearest postal facility or location that sells stamps." (*Id.*) The purpose of this analysis was "to determine what share of voters reside in 'postal deserts' using similar methodology developed by the U.S. Department of Agriculture to identify 'food deserts.' (*Id.*) (footnote omitted).

Dr. Barreto concluded that "the requirement that voters purchase their own postage stamps" ("Postage Requirement") "presents a burden on voters . . . especially . . . low-income and minority voters and those in rural geographies." (*Id.* ¶ 11.) He concluded "that millions of Georgia voters are in at-risk categories of being burdened" by the Postage Requirement based on several factors:

a. the decline in mail familiarity and usage;

b. high levels of poverty, low wages or inability to meet self-sufficiency;

c. no or limited access to a personal vehicle or reliable transportation;

d. language barriers for voters coupled with inadequate service at post office locations for non-English speakers;

e. limited access to computer and internet to purchase stamps online;

f. high rates of being unbanked;

g. population with many high risk factors for COVID-19;

(*Id.* ¶ 12.) He concluded that "40% of voters (2.78 million) in Georgia have low-access to postal services, and 15% of all voters (1.04 million), face severe isolation from a postal retailer," which he describes as "living in a 'postal desert,'" a condition "highest for Latino[] (17%) and Black[] (28%)" voters, as compared to White voters (8%), a difference that he found statistically significant in regression analysis. (*Id.* ¶¶ 13, 81.) These data were based on a definition of "postal desert" as follows: those voters who "1) live more than 0.5 miles away from a postal service in an urban area or 10 miles away from a postal service in a rural area and 2) live in a census tract with a poverty rate above 20%." (*Id.* ¶ 74.)

Even for those voters who are able to make it to stores that may sell postage, Dr. Barreto identified several issues facing those voters, such as disparities in price, payment method, and availability (*id.* ¶ 86, 89–90, 92), and most notably COVID-19 exposure (*id.* ¶ 94 *et seq*.).

Dr. Barreto identified several burdens to purchasing stamps online as an alternative. First, to make any online purchase, a person needs an internet connection and a credit card or bank account. (*Id.* ¶ 42.) A person also needs literacy in English, Spanish, or Chinese, as well as computer literacy necessary to obtain an email address. (*Id.*) Next, a person needs $7.90, which is the minimum purchase price for the smallest book of stamps (12), taking into account added fees. (*Id.* ¶ 43.)

The Secretary contends that Dr. Barreto does not discuss the fact that the USPS will purportedly deliver election mail without postage, which the Secretary argues renders the report "entirely irrelevant and unpersuasive." (Resp. to Supp. Br. at 11, Doc. 129.)

## II. Standing

Defendants challenge Plaintiffs' standing to pursue the requested relief. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Plaintiffs must demonstrate three elements to establish standing under Article III. First, Plaintiffs must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a "concrete and particularized" injury. *United States v. Hays*, 515 U.S. 737, 742-43 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)); *Common Cause/Georgia v. Billups*, 554 F.3d 1340,1349 (11th Cir. 2009) (quoting *Fla. State Conference of NAACP v.*

*Browning*, 522 F.3d 1153, 1159 (11th Cir. 2008)).  Second, the injury must have been caused by Defendant's actions.  *Hays*, 515 U.S. at 742-43; *Billups*, 554 F.3d at 1349.  Third, Plaintiffs' injury, or threat of injury, must likely be redressed by this Court decision.  *Hays*, 515 U.S. at 743; *Billups*, 554 F.3d at 1349.  A plaintiff must demonstrate standing "for each claim he seeks to press and for each form of relief that is sought."  *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008)).

As the Supreme Court explained many decades ago, "the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. at 498–99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  The court's jurisdiction therefore "can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'" *Warth v. Seldin*, 422 U.S. at 499 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973)).  The question of whether the Plaintiffs ultimately will prevail on the merits of their asserted claims is not the question before the Court in assessing standing. *Id.* at 500-501 ("Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted.") (internal citation omitted); *Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262,

1280 (11th Cir. 2001) ("A finding that plaintiff has standing simply means that the plaintiff is entitled to 'walk through the courthouse door' and raise his grievance before a federal court; it is a threshold determination that is conceptually distinct from whether the plaintiff is entitled to prevail on the merits . . . we cannot read the Court's jurisprudence as conflating the standing inquiry with resolution of the merits of the plaintiff's attack on race-conscious governmental decision-making.").

The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S.Ct. at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)). The Eleventh Circuit recently held in *Jacobson v. Florida Sec'y of State* that although "[v]oters have no judicially enforceable interest in the *outcome* of an election," they do "have an interest in their ability to vote and in their vote being given the same weight as any other." 957 F.3d 1193, 1202 (11th Cir. 2020) (emphasis in original). "A plaintiff need not have the franchise wholly denied to suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009). "Each provision of a[n election] code, 'whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects — at least to some

degree — the individual's right to vote and his right to associate with others for political ends.' " *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)); *see also id.* at 434 ("There is no doubt that the Hawaii election laws, *like all election regulations*, have an impact on the right to vote." (emphasis added)).

At the pleading stage, the plaintiff is only required to provide "general factual allegations of injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[H]owever, those allegations must nevertheless contain sufficient detail for the Court to determine that plaintiffs 'have made factual averments sufficient, if true, to demonstrate injury in fact.'" *Summers*, 555 U.S. at 493 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("extreme generality" of allegations insufficient to demonstrate standing)). In ruling on a motion to dismiss for lack of standing, the court must accept as true all material allegations of the complaint and construe them in the Plaintiffs' favor. *Warth*, 422 U.S. at 501-02 (citations omitted). At the same time, it is within the court's power to consider by affidavits further particularized allegations of fact deemed supportive of plaintiff's standing to determine whether the plaintiff's standing adequately appears from all materials of record. *Id.* Here, the Court is able to refer both to the allegations of Plaintiffs' Amended Complaint and the declarations submitted by Plaintiffs in connection with their Motion for Preliminary Injunction.

## A.   Organizational Standing of Plaintiff Black Voters Matter Fund

Plaintiff BVMF asserts it has organizational standing.  (Am. Compl., Doc. 88 ¶ 13; Resp. to Def. Raffensperger's MTD, Doc. 84 at 28.)  BVMF does not assert associational standing, as it has no members. (Resp. to Def. Raffensperger's MTD, Doc. 84 at 28; Tr. of Apr. 28, 2020 Hg., Doc. 75 at 49:1-4.)

It is well established that an organization can establish standing to sue on its own behalf where it can show the defendant's acts resulted in an impediment to the organization's mission or diversion of its resources.  *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding that an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts); *Billups*, 554 F.3d at 1350 (holding that NAACP established an injury sufficient to confer standing to challenge voter ID statute where evidence showed that the NAACP "uses [its] resources to maximize the ability to mobilize voters and educate voters and register voters," and that the statute would impact the NAACP's voter registration efforts "because it would have to divert volunteers and resources from "getting [voters] to the polls" to helping them obtain acceptable photo identification"); *Browning*, 522 F.3d at 1158, 1164-66 (holding that organizations had standing to challenge a voting requirement in Florida because the organizations "reasonably anticipate[d] that they [would] have to divert personnel and time to educating volunteers and voters on compliance"

with the new voting requirements "and to resolving the problem of voters left off the registration rolls on election day").

Defendant Raffensperger asserts that Plaintiff BVMF cannot demonstrate organizational standing under a diversion of resources theory by claiming "it will have to divert resources from voter education and 'other efforts to facilitate voting by mail,' and towards making sure that voters know about postage when mailing an absentee ballot or absentee ballot application" because "[t]his is not diversion: educating voters about how to vote is voter education." (Def.'s Br. Supp. MTD, Doc. 67-1 at 15, citing Pls.' Am. Compl.)  Defendant Raffensperger implies that to establish this type of organizational standing, BVMF would have to allege the cessation of an established purpose of the organization and a redirection of resources to address the challenged action.  (*Id.*)  The DeKalb Defendants similarly assert that BVMF's allegation of harm is conclusory because it has failed to specify how it has diverted its resources and that it must show "more than simply a setback to the organization's abstract social interests. . . ." (Doc. 80 at 10) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

According the Plaintiffs' Amended Complaint, BVMF is a non-partisan civic organization "whose goal is to increase power in communities of color [that] often face barriers to voting that other communities do not." (Am. Compl., Doc. 88 ¶ 13.)  BVMF's work therefore focuses on "removing those barriers" and "increasing voter registration and turnout, advocating for policies to expand

voting rights and access" in communities in the "rural Black Belt of Georgia" which "tend to be the most neglected, and have higher rates of poverty than other places." (*Id.*)  Plaintiff BVMF alleges that it "must divert scarce resources away from voter education and away from other efforts to facilitate voting by mail, towards making sure that voters know about the postage requirement and how to obtain it especially for those with less resources." (*Id.*)

In addition to the complaint allegations, BVMF has offered two declarations from its Co-Founder and Executive Director, Cliff Albright in connection with its pending Motion for Preliminary Injunction.  In the first declaration, Mr. Albright explains in further detail the work of BVMF as including efforts to increase voter registration and turnout; advocating for policies to expand voting rights and access, such as expanded early voting; resisting voter ID; re-entry restoration of rights and strengthening the Voting Rights Act; and advocating for policies that intersect with race, gender, economic and other aspects of equity. (Albright Decl. ¶ 2, Doc. 2-2.) Due to the COVID-19 pandemic and the expected increase in the use of mail-in absentee voting, Albright attests that BVMF's "efforts will now focus almost exclusively on educating voters about the mail-in absentee ballot and application process, and helping voters cast mail-in absentee ballots this year." (*Id.* ¶ 4.)  BVMF intends to accomplish this new effort by "start[ing] a texting and phone banking initiative to reach out to registered voters who are wrongfully considered 'inactive' by the

State of Georgia,"[13] and to "educate voters about the mail-in absentee voting process, including how to obtain an absentee ballot application, how to fill it out, how to fill out the absentee ballot, and how to get postage stamps." (*Id.* ¶¶ 5-6.) According to Albright, "[m]any voters, especially lower-income voters, do not have postage stamps because they do not use them, or cannot afford to buy a book of stamps just for elections" and the work of assisting voters to obtain postage stamps "can be complicated and time-consuming because some voters do not have Internet access or credit cards to purchase them online," and many "cannot even travel to a post office or other public place because they do not have cars, there are no ride-sharing programs or public transportation in large parts of rural Georgia." (*Id.* ¶¶ 7-8.) Thus, Albright attests that dealing with the postage stamp issue requires a lot of time and resources, "impeding BVMF's mission to increase voter participation in rural Black communities." (*Id.* ¶ 10.) As a result, BVMF is diverting resources to the postage stamp issue that could be used for the organization's other activities including other issues related to helping voters navigate the absentee ballot process.  (*Id.* ¶ 11.)  Based on his experience, Albright expects the organization will receive an increase in the number of calls in connection with this election to deal with the postage requirement for submitting absentee ballots.  (*Id.* ¶ 14.)

---

[13] Albright explained that this first step was necessary because although the Secretary of State sent absentee ballot applications to registered "active" voters for the June primary, they did not send them to "inactive" voters. (*Id.* ¶ 5.)

As noted above, following the hearing on their preliminary injunction motion, Plaintiffs submitted a supplemental declaration from Albright to more specifically address the organization's expected diversion of resources to address Plaintiffs' claims in this case.  In his supplemental declaration, Albright attests that he anticipates that $200,000, or roughly 50% of its budget for activities in Georgia, will be diverted towards responding to the postage stamp requirement that would otherwise have been used for voter education and support for voting by mail in general, as opposed to addressing the postage requirement. (Albright Supp. Decl., Doc. 77 ¶ 1.)

According to Albright's Supplemental Declaration, BVMF has two principal operations relevant to this lawsuit: first, it "focuses on voter education, encouraging voter turnout by providing voting instructions and getting Black voters excited about voting," and second, it "provides grants to up to 40 partner organizations, who themselves engage in voter education and also on-the-ground efforts to increase voter participation."  (*Id.* ¶ 6.) BVMF only has three staff members focused on Georgia.  (*Id.* ¶ 15.)

Albright explains that before the onset of the COVID-19 pandemic, BVMF's primary focus was on in-person voting, including "voter education that informs voters about voter registration, election dates, how to find their polling place, how to get to a polling place if the voter has no realistic transportation options, instructions on how to vote in person (such as having photo identification, using the machine, etc.)," and providing grants to partner organizations that engage in

40

work like "arranging rides to the polls, door by door canvassing (to educate voters on how to vote in-person and encourage them to vote), Election Day canvassing that helps bring people to the polls on Election Day."  (*Id.* ¶¶ 18-19.)

With an expected drop in the number of people willing to expose themselves to in-person voting during the pandemic, BVMF's plans have changed to focus all of its resources on helping and encouraging people to vote by mail. (*Id.* ¶¶ 21-22.)   According to Albright, the postage stamp requirement has "quickly emerged as a major roadblock" to BVMF's efforts to increase voter participation through the vote by mail process.  (*Id.* ¶ 24.)   BVMF partner organizations are now using their grant funds from BVMF to engage in direct postage stamp distribution in Valdosta/Lowndes County, Macon-Bibb County, and Peach County.  (*Id.* ¶¶ 25-26.)   Albright attests that if the postage requirement is not enjoined, BVMF anticipates that resources that would be focused on assisting voters with obtaining an absentee ballot application, and properly completing absentee ballot applications, absentee ballots, and ballot return envelopes will be reduced and diverted toward assisting voters with submitting absentee ballot applications by email, or if by mail, with obtaining postage, and assisting voters with obtaining postage for mailing in their completed ballots in light of specific obstacles facing certain voters which include, COVID-19 exposure, physical disabilities, location related to post office, lack of transportation, lack of internet access to purchase stamps online, and economic hardships associated with cost of necessary postage for each ballot and each

election. (*Id.* ¶¶ 33-35.)   These efforts will include devoting $200,000 in resources to assist partner organizations with funding direct stamp distribution programs, text messaging, phone banks, and radio and social media ads to educate 400,000 black voters in rural Georgia specifically related to the postage issue. (*Id.* ¶¶ 37-54.)

The Court finds that Plaintiff BVMF's allegations and evidence are sufficient to establish injury to the organization under a diversion of resources theory.  Plaintiff BVMF has offered evidence that absent an injunction requiring the Secretary of State to provide pre-paid postage for mail in absentee ballots, BVMF's efforts to increase voting by mail in low-income communities of color has likely been adversely affected and will continue to be adversely affected. Moreover, BVMF has made a sufficient showing of an imminent concrete injury based on the evidence that it has already and reasonably anticipates having to further divert resources to assisting socially and economically vulnerable voters obtain postage (or find transportation to deposit absentee ballots in available drop boxes) to avoid having to expose themselves to the potential health dangers associated with in-person voting.  *See Browning*, 522 F.3d at 1161 ("Plaintiffs have averred that they intend to increase voter registration efforts and anticipate increased registration applications ahead of the upcoming presidential election. This is sufficient to meet the immediacy requirement.") Even if Mr. Albright's financial estimates are considered exaggerated by Defendant, the Eleventh Circuit has held that "an organization suffers an injury in fact when a statute

compels it to divert more resources to accomplishing its goals. . . . [T]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury." *Id.* at 1165 (internal citations and punctuation omitted).

It is not required that a plaintiff-organization be forced to completely cease an activity to establish standing, as Defendants argue, rather it is enough for the organization to demonstrate that such activities have been substantially curtailed or significantly impacted by the challenged action. *See Havens Realty Corp. v. Coleman*, 455 U.S. at 379 ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests."); *Hispanic Interest Coal. of Alabama v. Governor of Alabama*, 691 F.3d 1236, 1243–44 (11th Cir. 2012) ("Furthermore, the time and money expended on the planning and execution of these events has forced the organization to divert resources from other immigration policy work. According to Pickens, these endeavors 'will continue to be detrimentally impacted' as they will have to be 'substantially curtail[ed] or stop[ped].' These alleged injuries are sufficient under our precedent to confer standing on Alabama Appleseed."); *Browning*, 522 F.3d at 1166 (finding that the plaintiff-organization

43

made a sufficient showing that it would suffer a concrete injury based only on its "anticipat[ion] that it will expend many more hours than it otherwise would have conducting follow-up work with registration applicants because voters will have their applications denied due to matching failures"); *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, --- F. Supp. 3d ----, 1:20-CV-00912-SDG, 2020 WL 1031897, at *3 (N.D. Ga. Mar. 3, 2020) ("Plaintiffs here – all of which are organizations dedicated to increasing voter participation through advocacy and educating voters on election procedures – allege they will be directly harmed by being forced to divert their resources to other projects and initiatives to ensure voters are able to participate in the election. In particular, the Court credits the testimony of Helen Butler, the Executive Direction of the GCPA, who testified that her organization will be required to divert additional resources to transport voters to and from BORE headquarters, the sole polling location in Gwinnett County for the first week of the early voting period. This will, in turn, hinder GCPA's mission of promoting voter advocacy and turnout as a whole. This is sufficient for Plaintiffs to demonstrate an imminent and concrete injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1334 ("Defendants cite to no authority that an organizational plaintiff must explain exactly how its resources will be diverted from one endeavor to another before sufficient injury can be shown" at the pleading stage.)[14]

---

[14] The Eleventh Circuit recently addressed the diversion of resources theory of standing in *Jacobson*, holding that several organizations challenging a Florida statute regarding ballot

### B.      Standing of Individual Plaintiffs

Both Plaintiffs Meghan Gordon and Penelope Reid assert standing on their own behalf and as class representatives on behalf of a class of Georgia registered voters. (Am. Compl., Doc. 88 ¶¶ 14-16, 44-45.)

With respect to the individual Plaintiffs, Defendant Raffensperger challenges only the first two elements of standing,[15] asserting that: (1) Plaintiffs have neither a concrete injury nor an imminent one because their complaint lacks allegations that COVID-19 will be a legitimate concern in time for the upcoming elections or that voters are being compelled or advised to avoid voting in person due to the pandemic; and (2) Plaintiffs' injury is not traceable to any action by the Secretary of State because the Secretary does not mandate a particular method of voting and it is not the Secretary's requirement that a voter who chooses to vote

---

ordering failed to prove at trial that they suffered an injury in fact under a diversion of resources theory. 957 F.3d at 1206. The *Jacobson* Court concluded that the organizations' proof was insufficient because they failed to offer any evidence about "what activities [they] would divert resources away from in order to spend additional resources on combatting" the effect of Florida's ballot-order statute. *Id.* Unlike the organizations in *Jacobson*, Plaintiff BVMF here introduced evidence about how it is forced to divert resources and thus established an injury in fact.

[15] Secretary Raffensperger asserts two new arguments for the first time in his Reply.  First, Secretary Raffensperger asserts that "[c]ounty elections officials are responsible for the absentee balloting process, and their decision to not pay for voters' postage cannot be imputed to the Secretary." (Reply, Doc. 87 at 14.) And second, he now contends that "the relief Plaintiffs seek against the Secretary will not redress their injuries, because the Secretary does not control the mechanics of absentee ballots or postage." (*Id.* at 15.)  Generally, the Court will not consider new arguments raised for the first time in a Reply brief.  *E.g., Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'"); *Boring v. Pattillo Indus. Real Estate*, 426 F. Supp. 3d 1341, 1349 (N.D. Ga. 2019) ("[T]he Court will not consider new arguments made for the first time in the reply brief.")  However, the Court has addressed these points as rolled into the Secretary's original arguments because the governing statutory provisions apply to both contentions.

by mail must provide her own postage.  In addition, Defendant Raffensperger argues that Plaintiff Meghan Gordon lacks standing to assert the *Anderson-Burdick* claim in Count II because she is not compelled to vote by mail, does not claim it is a burden to purchase stamps, and her philosophical opposition to the postage requirement is an insufficient injury.  Therefore, Plaintiff Gordon lacks standing to represent the interests of a subclass of voters for whom in-person voting is at least materially burdensome or requires unreasonable effort because of the pandemic.  Defendant Raffensperger has not expressly addressed the standing of Plaintiff Penelope Reid who is in the high-risk category for COVID-19, having simply incorporated the arguments from his motion to dismiss the original complaint that did not include Reid.

The DeKalb Defendants similarly argue that "Plaintiffs' alleged injuries are not fairly traceable to any act of the DeKalb BRE. Georgia law permits, but does not require, that absentee applications and absentee ballots can be submitted by mail. The United States Postal Service, rather than the DeKalb BRE, imposes any requirement for postage to use the United States mail service to send absentee applications and absentee ballots." (Doc. 80 at 12-13.)

The Court will first address Defendants' general standing challenges.  First, the Court quickly disposes of Defendant Raffensperger's argument that Plaintiffs' alleged injuries are speculative, hypothetical, and that there is no imminent threat of harm associated with in-person voting because the pandemic might just go away in time for the elections. Plaintiffs' Amended Complaint alleges that

"[t]he number of confirmed COVID-19 cases in Georgia is growing exponentially." (Am. Compl., Doc. 88 ¶ 29.) Since the filing of Plaintiffs' complaints and the parties' briefs on the pending motions, the effects of the pandemic have dramatically worsened across the nation and specifically in Georgia. The Court takes judicial notice that the White House Coronavirus Task Force recently placed Georgia in the COVID-19 red-zone, indicating Georgia has more than 100 new coronavirus cases per 100,000 people and a positive diagnostic test rate of more than 10%.

Moving on to the second standing element, "to satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Florida Sec'y of State*, 957 F.3d 1193, 1207 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560 (alterations adopted)). Defendant's argument regarding traceability is two-fold. First, any alleged injury is not traceable to the Secretary of State but is the result of Plaintiffs' choice to vote by mail – a method that carries a direct cost – rather than in person – a method that does not. And second, the postage requirement is imposed not by the Secretary of State, but by the United States Postal Service. These arguments, in essence, mimic Defendant's arguments on the merits of the claims.

As an initial matter, the Court notes that the Secretary of State has both the authority and the power to oversee and implement the preparation and

transmission of absentee ballots for a statewide election as Secretary Raffensperger chose to do in connection with the June 9, 2020 primary election. As discussed, Secretary Raffensperger sent absentee ballot applications to all "active" registered voters and contracted with a vendor to prepare and mail out absentee ballots to voters in a form prescribed by Secretary Raffensperger.

According to Plaintiffs, Defendants are the ones with the power to impose requirements on voters and the power to condition the right to vote on paying a poll tax[16] such as postage for mail-in ballots. (*See* Am. Compl. ¶ 19) (alleging that "Defendant Brad Raffensperger, who is the Secretary of State and the chief elections official of the State, is responsible for enacting elections statutes and routinely issues guidance to the county election officials of all 159 counties on various elections procedures and requirements. County election officials follow the Secretary of State's guidance.")  Plaintiffs allege that no state law requires government officials to charge voters postage on absentee ballot applications, but "voters are required to affix their own postage when mailing in the absentee ballot, according to guidance issued by the Secretary of State."  (*Id.* ¶¶ 32, 34.) *See also Georgia Secretary of State, Elections Division, Absentee Voting, A Guide for Registered Voters* at 5 (providing instructions for "Submitting a Voted Absentee Ballot and stating "[i]f mailing, you <u>must</u> affix postage to the ballot

---

[16] The Secretary does not assert that the postage requirement itself is insufficient to establish an injury in fact as an unconstitutional poll tax.

envelope") (emphasis in original).[17] Under Georgia law, the Secretary of State is the chief election official. O.C.G.A. § 21-2-50(b) (referring to the Secretary as "the state's chief election official"). Georgia law confers primary authority on Georgia's Secretary of State to manage Georgia's electoral system. *See id.*; *see also* Ga. Op. Att'y Gen. No. 2005-3 (Apr. 15, 2005) ("[I]it is clear that under both the Constitution and the laws of the State the Secretary is the state official with the power, duty, and authority to manage the state's electoral system. . . ."). The Secretary of State and State Election Board also have significant statutory oversight authority to train local elections officials, set election standards, and investigate failures of local elections officials. *See* O.C.G.A. § 21-2-31; O.C.G.A. § 21-2-50(a)(11)). Section 21-2-50(a) of the Georgia election code prescribes the powers and duties of the Secretary of State and requires the Secretary to prepare the forms of ballots and furnish applications for absentee ballots, and envelopes and instruction sheets for absentee ballots. O.C.G.A. § 21-2-50(a)(5); *see also* O.C.G.A. § 21-2-384(b)(providing that "in addition to the mailing envelope addressed to the elector, the superintendent, board of registrars, or absentee ballot clerk shall provide two envelopes for each official absentee ballot, of such size and shape as shall be determined by the Secretary of State, in order to permit the placing of one within the other and both within the mailing envelope" and "[t]he mailing envelope addressed to the elector shall contain the two envelopes, the official absentee ballot, the uniform instructions for the manner of preparing

---

[17] Available at https://sos.ga.gov/admin/uploads/Absentee_Voting_Guide_20142.pdf.

and returning the ballot, in form and substance as provided by the Secretary of State, provisional absentee ballot information, . . ."); O.C.G.A. § 21-2-379.4(d) (providing that "[t]he form and arrangement of ballots shall be prescribed by the Secretary of State and prepared by the election superintendent.")

Thus, because Georgia's election code delegates authority to the Secretary of State to oversee the elections and prepare the form of the absentee ballots and envelopes, the Court finds that Plaintiffs' alleged injuries are fairly traceable to the Secretary of State's alleged failure or refusal to provide pre-paid return postage on all absentee ballots.[18]  At the motion to dismiss stage, Plaintiffs have demonstrated a causal connection, even if arguably indirectly, between Defendants' challenged conduct and the asserted injury to Plaintiffs' constitutional rights. *Focus on the Family v. Pinellas Suncoast Transit Auth*., 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action . . . ."); *Lewis v. Governor of Alab*ama, 944 F.3d 1287, 1301 (11th Cir. 2019) ("it must be the effect of the court's judgment on the defendant" – not an absent third party – "that redresses the plaintiff's injury, whether directly or indirectly").

---

[18] The DeKalb Defendants are in charge of the day-to-day operations of running elections in DeKalb County.  The Georgia election code tasks the local election superintendents, which would include the DeKalb Defendants, with the preparation and delivery of absentee ballots. Upon receipt of the form of the absentee ballot envelopes and instructions from the Secretary of State, the DeKalb Defendants also have the authority under Georgia law to prepare the envelopes with pre-paid return postage.

Finally, the Court need not address the Secretary's argument that Plaintiff Meghan Gordon, and the putative class, lack standing to assert the *Anderson-Burdick* claim under Count II.  The Court has already determined that Plaintiff BVMF has standing.  Only one named Plaintiff needs to have standing for each claim asserted in the complaint.  *E.g., Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124–25 (11th Cir. 2019) ("[I]f 'we have at least one individual plaintiff who has demonstrated standing,' we do not need to 'consider whether the other … plaintiffs have standing to maintain the suit.'") (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)).

Because the Court has determined that Plaintiffs have established standing to bring their claims for declaratory and injunctive relief without class certification, the Court need not take up Plaintiffs' request for class certification at this time.

## III.   Legal Standard for Preliminary Injunction

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). Instead, it must determine whether the evidence establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not be adverse to the public interest. *McDonald's Corp. v.*

*Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985 (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief . . . in order to assure the availability of permanent relief." *Levi Strauss & Co.*, 51 F.3d at 987; *Federal Trade Commission v. United States Oil and Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir. 1984) (holding that a district court may exercise its full range of equitable powers, including a preliminary asset freeze, to ensure that permanent equitable relief will be possible). However, a preliminary injunction "is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to the four prerequisites." *McDonald's Corp.*, 147 F.3d at 1306 (internal citations omitted).

"The first of the four prerequisites to temporary injunctive relief is generally the most important." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1232 (11th Cir. 2005). Indeed, if Plaintiffs are "unable to show a substantial likelihood of success on the merits, [the Court] need not consider the other requirements." *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)).

## IV.    Discussion: Poll Taxes[19]

Plaintiffs contend that requiring voters to buy postage in order to vote absentee by mail is a *de facto* poll tax because it a cost that is a prerequisite to voting. The Court first considers whether the requirement that voters pay for their own postage to submit absentee ballot applications and absentee ballots is *per se* impermissible as an actual or "de facto" poll tax under *Harman* or *Harper* and their progeny. The Court next considers whether it is an impermissible burden on the right to vote under *Anderson/Burdick*.

### A.    Twenty-Fourth Amendment — Poll Taxes for Federal Elections

The Court begins by surveying the applicable law. The Twenty-Fourth Amendment banned states from requiring voters in federal elections to pay poll taxes. The operative clause of the Twenty-Fourth Amendment states as follows:

> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV. The amendment was ratified in 1964, and the Supreme Court construed the amendment for the first time in *Harman v. Forssenius*, 380 U.S. 528, 529 (1965).

---

[19] For the purposes of this Order, the Court does not distinguish between Plaintiffs' as applied and facial challenges to the postage requirement under both Counts of the Amended Complaint, as it is ultimately not outcome determinative.

*Harman* involved a Virginia statute which provided that "in order to qualify to vote in federal elections one must either pay a poll tax or file a witnessed or notarized certificate of residence." *Id.* at 529. The certificate of residence, which could be completed in lieu of the annual $1.50 poll tax, had to be filed "no earlier than October 1 of the year immediately preceding that in which the voter desires to vote and not later than six months prior to the election." *Id.* at 530–31. The Supreme Court framed the issue as: "whether the State of Virginia may constitutionally confront the federal voter with a requirement that he either pay the customary poll taxes as required for state elections or file a certificate of residence." *Id.* at 538.

The Supreme Court explained by analogy to the Fifteenth Amendment that the plain language of the Twenty-Fourth Amendment "'nullifies sophisticated as well as simple-minded modes' of impairing the right guaranteed." *Id.* at 540–41 (quoting *Lane v. Wilson*, 307 U.S. 268, 275 (1939)). The Court elaborated that it "'hits onerous procedural requirements which effectively handicap exercise of the franchise' by those claiming the constitutional immunity." *Id.* at 541. The Court found that "a real obstacle to voting in federal elections" was posed by Virginia's pay or certify process, particularly because unlike the poll tax which could be submitted annually by mail, the certificate must be obtained from the county, notarized, and filed in person six months before the election, "plainly a cumbersome procedure." *Id.* But crucially, the Court held that "[t]he requirement imposed upon those who reject the poll tax method of qualifying would not be

54

saved *even if it could be said that it is no more onerous, or even somewhat less onerous*, than the poll tax." *Id.* at 542 (emphasis added). Because the certificate of residence constituted a "material requirement imposed upon the federal voter solely because of his refusal to waive the constitutional immunity" against poll taxes guaranteed by the Twenty-Fourth Amendment, the Court held that the Virginia scheme "must fall under its ban." *Id.*

### B.   Equal Protection Clause — Poll Taxes for State Elections

The Twenty-Fourth Amendment only applies to federal elections. In 1966, however, the Supreme Court prohibited states from charging their citizens fees to exercise the right to vote in state elections in *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966). That case also dealt the same $1.50 poll tax at issue in *Harman. Id.* at 664 n.1, 666 n.3. While the Supreme Court noted that the Constitution does not expressly provide for a right to vote in state elections, "once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." *Id.* at 665. The Court struck down the $1.50 poll tax, holding that "a State violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of any fee an electoral standard." *Id.* at 666. Thus, charging a fee to vote violates the Equal Protection Clause

> whether the citizen, otherwise qualified to vote, has $1.50 in his pocket or nothing at all, pays the fee or fails to pay it. The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a fee to vote or who fail to pay.

*Id.* at 668. The Court in *Harper* rejected the argument that "that if [the State] can demand from all an equal fee for a driver's license, it can demand from all an equal poll tax for voting." *Id.* The Court explained that under the Constitution "the interest of the State, when it comes to voting, is limited to the power to fix qualifications." *Id.* Because "[w]ealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process," a state may not limit the right to vote to those with the ability or willingness to pay a fee. *Id.* Thus, the Court essentially provided for strict scrutiny of any law that considered wealth or payment of a fee to the government as a voter qualification. *Id.* at 670 ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

### C. Postage Cases

Defendant Raffensperger cites two cases which held that postage does not constitute a poll tax. First, *Bruce v. City of Colorado Springs*, 971 P.2d 679, 681 (Colo. App. 1998) involved an election for approval of a city ordinance that was carried out solely by mail.[20] The plaintiff in that case argued that "requiring voters to affix a postage stamp to their ballots [was] an unconstitutional poll tax." *Id.* at 684. The court assumed for the purposes of the opinion that by "requiring voters to use a postage stamp in order to return their ballots, the state has imposed a tax." *Id.* The court stated that "[i]f a reasonable restraint on the right

---

[20] As the election was local, the Twenty-Fourth Amendment did not apply.

to vote is necessary to accomplish a permissible state policy, it will be upheld." *Id.* (citing *United States v. Texas*, 252 F. Supp. 234, 251 (W.D. Tex.), *aff'd* 384 U.S. 155 (1966)). Confusingly, the court also cited a 1910 Colorado Supreme Court decision for the proposition that "if a qualified voter is prevented from voting through the actions of another, there is no unconstitutional deprivation of the right to vote in the absence of a willful intent to impose a requirement for such purpose." *Id.* (citing *Colorado Midland Ry. Co.*, 48 Colo. 147, 149, 109 P. 430, 430 (1910). The court then upheld the law, explaining that the "plaintiff ha[d] not asserted that the use of a stamp is a requirement imposed in order to prevent people from voting. Rather, requiring voters to affix a stamp to their ballots is a reasonable requirement imposed for the purpose of efficiently conducting a mail ballot election. *Id.* at 684–85. The court did not address whether the postage requirement was related to voter qualifications or undertake any analysis of less restrictive alternatives. This lack of analysis combined with the apparent consideration of willfulness, which plays no role in the analysis under *Harman* or *Harper*, renders *Bruce* of limited persuasive value.

More recently, the U.S. District Court for the Southern District of Ohio decided *League of Women Voters of Ohio v. LaRose*, No. 2:20-cv-01638-MHW-EPD (S.D. Ohio Apr. 3, 2020) (courtesy copy Doc. 51-8).[21] Like this case, *LaRose* involved a challenge to election regulations in light of the COVID-19 pandemic.

---

[21] The Court discusses the facts of *LaRose* in further depth in the *Anderson–Burdick* section below.

*LaRose* was a wide-ranging attack on a number of different aspects of the elections. The issue of whether requiring postage to vote was an unconstitutional poll tax constituted "one sentence" of the plaintiffs' motion, was completely unaddressed by the defendants, and occupied less than a page of the 28 page slip opinion. *Id.* (Slip Op. at 25). The extent of the court's analysis is set forth below:

> Nevertheless, the Court has considered the issue and finds that, to the extent obtaining a stamp is a "restriction on the right to vote," it is not "unrelated to voter qualifications." *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189 (2008). Instead, it is the type of "evenhanded restriction[] that protect[s] the integrity and reliability of the electoral process itself" that satisfies *Harper. See id.* at 189–90 (quoting *Anderson*, 460 U.S. at 788, n.9); *see* LaRose Resp. 22, ECF No. 44 (citing R.C. 3505.18; 3509.03(B)(5) (explaining that a signature is needed to protect against voter fraud).

*Id.* While the court nominally invoked *Harper*, by citing to *Anderson*, the Court appeared to apply the *Anderson–Burdick* standard, which is a less strict standard than a claim under *Harman* or *Harper. See Crawford*, 553 U.S. at 189 (2008) ("[U]nder the standard applied in *Harper*, even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications."). The *LaRose* court does not offer any further explanation about why having a stamp has any relationship to voter qualifications.

Because the Court does not find either of these cases persuasive, and neither party has pointed to any other cases squarely on point, the Court next surveys cases involving costs related to voting more generally.

### D.  "De Facto" Poll Taxes

Both *Harman* and *Harper* dealt with literal poll taxes, that is a payment specifically required by the government in exchange for exercising the right to vote. However, a line of authority has developed around so called "constructive" or "de facto" poll taxes, which do not necessarily involve a literal tax assessed on voting, but which entail monetary burdens to voter qualification or the voting process. These cases typically involve some form of voter identification requirement.

For example, in *Common Cause/Georgia v. Billups*, Judge Murphy of this district considered whether a $20 to $35 fee for a photo ID necessary to vote in Georgia elections was a de facto poll tax in *Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1367 (N.D. Ga. 2005) (*Billups I*). In that case, the plaintiffs argued that Georgia could not get around the Twenty-Fourth Amendment "by labeling something as a 'fee' when, in reality, it is a tax on the right to vote." *Id.* at 1366. Although the fee was waivable in certain circumstances, the plaintiffs argued that the small number of persons eligible for the waiver made this option "illusory," and "that the possibility that a small number of voters can avoid paying the cost for a Photo ID card does not make the Photo ID scheme constitutionally permissible" because "it still places a burden on the right to vote." *Id.* at 1367.

Judge Murphy first held that the fee for the driver's license constituted a poll tax "[b]ecause, as a practical matter, most voters who do not possess other forms of Photo ID must obtain a Photo ID card to exercise their right to vote,

[and] even though those voters have no other need for a Photo ID card, requiring those voters to purchase a Photo ID card effectively places a cost on the right to vote." *Id.* at 1369. Next, he analogized the option of the fee waiver to the certificate of residency available in *Harman*, as obtaining the waiver also entailed appearing in person at a DDS office and carried the additional embarrassment of completing an affidavit of indigency. *Id.* at 1370 (citing *Harman*, 380 U.S. at 542).

Later, after Georgia made Voter IDs available without a fee for the cards themselves, the plaintiffs in *Billups* renewed their challenge to the law in *Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups*, 439 F. Supp. 2d 1294, 1352 (N.D. Ga. 2006) (*Billups II*). The plaintiffs argued "that voters who do not have an approved Photo ID must bear the costs of traveling to a registrar's office in order to [obtain] a Voter ID card, as well as the costs for obtaining any documents necessary to obtain a Voter ID card." *Id.* Judge Murphy acknowledged that the Photo ID requirement placed a burden on the right to vote "[b]ecause, as a practical matter, most voters who do not possess other forms of Photo ID must obtain a Voter ID card to exercise their right to vote." *Id.* at 1354. However, he noted that the burden was ameliorated by the fact that the "the Voter ID cards are available at no cost," and the fact that Georgia "eliminated the affidavit requirement for a fee waiver that [the court] previously found objectionable with respect to the 2005 Photo ID Act." *Id.* Judge Murphy also rejected the plaintiffs' arguments that the burden associated with arranging

for transportation to a registrar's office and successfully navigating the process of obtaining a voter ID card did not amount to a poll tax. *Id.* (agreeing with and quoting *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D.Ind. 2006) that "the cost of time and transportation cannot plausibly qualify as a prohibited poll tax because those same 'costs' also result from voter registration and in person voting requirements, which one would not reasonably construe as a poll tax"). In finding these burdens did not constitute a poll tax, he explained that "[e]lection laws will invariably impose some burden upon individual voters" but that "the imposition of tangential burdens does not transform a regulation into a poll tax." *Id.* at 1354–55 (quoting *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 827 (S.D. Ind. 2006), *aff'd sub nom. Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd,* 553 U.S. 181 (2008) (citing *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)) (alterations in original, internal quotations omitted)).

Finally, Judge Murphy considered the fee associated with obtaining a birth certificate, which voters could, in turn, use to obtain their voter ID card as "[t]he only incidental cost which might plausibly approach being a poll tax." *Id.* at 1355 (quoting *Rokita*, 458 F. Supp. 2d 775). However, Judge Murphy found that the plaintiffs' contention that some voters might be required to pay a fee to obtain a birth certificate in order to obtain a Voter ID card was "wholly speculative" and that they had failed to show that any particular voter would actually be required to incur that cost in order to vote. *Id.* In addition, because a birth certificate is

61

only one of many documents that the registrar may accept to issue a Voter ID card under the statute and State Election Board rules and regulations, Judge Murphy held that the plaintiffs had failed to demonstrate that "the cost of obtaining a birth certificate" was "sufficiently tied to the requirements of voting so as to constitute a poll tax." *Id.*; *see also Rokita,* 458 F. Supp. 2d at 827–28 ("Plaintiffs' argument overlooks the fact that a valid birth certificate is only one of the primary documents acceptable to the BMV; individuals can present various documents for that purpose, some of which are again issued by the federal government whose requirements and incidental fees are beyond the control of the State.")[22]

Two years later, a plurality of the Supreme Court essentially endorsed the *Billups II* rationale in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 186 (2008) (sustaining Indiana's Voter ID law and noting that "the State offers free photo identification to qualified voters able to establish their residence and identity"). The Supreme Court in *Crawford* did not explicitly consider whether the Voter ID requirement was a "de facto" poll tax, but the plurality did discuss financial burdens for voter identification briefly. The plurality noted that "if the

---

[22] The Missouri Supreme Court distinguished *Billups II* in *Weinschenk v. State*, 203 S.W.3d 201, 214 (Mo. 2006). *Weinschenk* was decided under the Missouri Constitution, but the Court extensively relied on *Harper* for its decision. 203 S.W.3d at 213–14. In that case, the law at issue providing for free Voter ID required either "a birth certificate or passport," which the court found that neither plaintiff possessed and which would cost the plaintiffs between $12 and $20 to obtain, depending on where the plaintiffs were born. *Id.* Without any other method of voting absent possessing a Voter ID, the Court struck down the Voter ID requirement as a poll tax "directly connected to Plaintiffs' exercise of the right to vote," even though it may involve payment of money to a state other than Missouri. *Id.*

State required voters to pay a tax or a fee to obtain a new photo identification," it would fall within *Harper's* prohibition. *Id.* at 198. However, the Court did not reach the question of whether a cost associated with supporting documentation like birth certificates would constitute a poll tax, noting that "[w]hile it is true that obtaining a birth certificate carries with it a financial cost, the record does not provide even a rough estimate of how many indigent voters lack copies of their birth certificates." *Id* at 203 n.20. Additionally, the law at issue in that case also allowed for "reasonable alternate documents" to birth certificates for proving identity. *Id.* at 199 n.18.

Several state courts have also addressed similar issues, both under the federal and state constitutions. *Milwaukee Branch of NAACP v. Walker*, 851 N.W.2d 262, 277, 279 (Wis. 2014) (holding the Voter ID law at issue in that case was a prima facie de facto poll tax because it required a "payment to a government agency" for documentary evidence and adopting a saving construction of state law to avoid issue); *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 740 N.W.2d 444, 451 (Mich. 2007) (upholding a Voter ID law where voters who lacked identification could vote on election day if they "sign[ed] an affidavit" that they lacked identification at the election site, subject to a potential challenge procedure); *City of Memphis v. Hargett*, 414 S.W.3d 88, 106 (Tenn. 2013) (upholding its law based on an exemption for an in-person voter who "is indigent and unable to obtain proof of identification without payment of a fee," which the court construed as "including

any fee associated with the documentation necessary to obtain a 'free' photo ID card.").

Two circuit court decisions rejected the notion that costs for documents necessary to obtain voter identification constitute poll taxes. First, the Ninth Circuit held that "[a]lthough obtaining the identification required under [Arizona law] may have a cost, it is neither a poll tax itself (that is, it is not a fee imposed on voters as a prerequisite for voting), nor is it a burden imposed on voters who refuse to pay a poll tax." *Gonzalez v. Arizona*, 677 F.3d 383, 407 (9th Cir. 2012) (en banc), *aff'd on other grounds sub nom. Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013). Further, the Court held that *Harper* was inapplicable because "[r]equiring voters to provide documents proving their identity is not an invidious classification based on impermissible standards of wealth or affluence, even if some individuals have to pay to obtain the documents." *Id.* at 409. The Court noted in a footnote that "[v]oters who use an early ballot to vote do not even have to show identification." *Id.* at 408 n.37.

The Fifth Circuit reached a narrower issue in *Veasey v. Abbott*, 830 F.3d 216, 266 (5th Cir. 2016) (en banc). In that case, the State of Texas did not charge a fee for obtaining birth certificates, but the plaintiffs contended that out of state voters would be financially burdened with the cost of obtaining their birth certificate. *Id.* The Court noted that *Crawford* "implied that requiring voters to obtain photo identification and charging a fee for the required underlying documentation would not qualify as a poll tax" and the Fifth Circuit explicitly so

held, following *Gonzalez*. *Id.* (citing *Crawford*, 553 U.S. at 198 & n.17; *Gonzalez*, 677 F.3d at 407–10). However, it appears that as in *Gonzalez*, the only plaintiff who "showed that he was unable to obtain an out-of-state birth certificate due to its cost . . . was able to vote by mail." *Id.* at 266 n.64.

### E.   Application of the Law to the Facts

These "de facto" poll tax cases appear to stand for the narrow proposition that payments to the government 'in connection' with voting can be considered poll taxes under *Harper* and *Harman* even if not designated as such. *Cf. Crawford*, 553 U.S. at 198 ("The fact that most voters already possess a valid driver's license, or some other form of acceptable identification, would not save the statute under our reasoning in *Harper*, if the State required voters to pay a tax or a fee to obtain a new photo identification"). Further, incidental payments to a government agency may in some circumstances be sufficiently "connected" with voting if such payments are a necessary condition of accessing the polls generally applicable to all voters, such as payments for required documentation in order to establish eligibility to vote. *Compare Weinschenk*, 203 S.W.3d at 214 (holding that the requirement of obtaining a birth certificate or passport was "directly connected to Plaintiffs' exercise of the right to vote" where there were apparently no other options for documentation), *with Billups II*, 439 F. Supp. 2d at 1352, 1355 (holding that "the cost of obtaining a birth certificate" was not "sufficiently tied to the requirements of voting" where there were other options for documentation).

Plaintiffs contend that requiring voters to buy postage in order to vote absentee by mail is a *de facto* poll tax.[23] (Pls.' Br. at 9–10, Doc. 2-1.) Plaintiffs' argument is relatively straightforward: "Because voters must purchase a prerequisite to voting (i.e., postage), Defendants have imposed an unconstitutional de facto poll tax. The same holds true for absentee ballot applications, which also require postage when mailed." This is so regardless of the de minimis cost of one stamp, (Br. at 12, Doc. 2-1, citing *Harper*, 383 U.S. at 666), though Plaintiffs presented evidence that most people are unable to purchase just one stamp, and the cost of a stamp book can be burdensome. (Tr. at 39:21-40:10.)

Plaintiffs concede that Georgia voters can vote in person without purchasing a stamp, but Plaintiffs contend this means of voting presents a "material burden," both in light of the COVID-19 pandemic and for the elderly, disabled, or those out-of-town, for which absentee voting is alleged to be the "only meaningful option." (Pls.' Br. at 15, Doc. 2-1.) In support of this argument, Plaintiffs rely on the reports of Drs. Reingold and Barreto, summarized in the background section above.

The Secretary, in response, argues that "Plaintiffs' 'de facto poll tax' argument, however, fails because voters are not required to purchase a stamp as a 'condition to obtaining a ballot.'" (Resp. at 21, Doc. 51) (citing *Harper*, 383 U.S. at 668.) The Secretary contends that voters have the choice to use other methods

---

[23] Plaintiffs do not appear to contend that the postage requirement is a literal poll tax.

of voting, including voting in person, or assuming voting in person is not a safe option, applying for a ballot by mail or email and dropping off the ballot in a secure drop box. The Secretary further asserts that voters have the option of putting the absentee ballot in the mail without postage and relying on the postal service to deliver the election mail to the local registrar's office. Thus, stamps are more akin to other incidental costs for voting, "such as transportation costs, time away from work, child care, and parking" which do not constitute a *de facto* poll tax or invidious wealth discrimination. (*Id.* at 23–24.)

According to the evidence in the record, secure drop boxes were not, at least as of the June 2020 election, available in all counties, though they were available in most counties, including DeKalb and Gwinnett counties where the named individual plaintiffs live. (Doc. 130); *see also* Ex. AA Wright Declaration (closest drop box 20 mile roundtrip). As to the mail without postage option, the Court heard argument that the United States Postal Service has a policy that it will deliver absentee ballots without postage and bill the relevant municipality. (Sec'y Resp. Br. at 15-16, Doc. 51, citing *Postal Bulletin 22391 2014 Election and Political Mail Update*, United States Postal Service (June 12, 2014), https://about.usps.com/postal-bulletin/2014/pb22391/html/front_cvr.htm). The Court was not presented with a certified copy of this policy, the Court did not receive any evidence about the statewide compliance rate with this policy, and the Court heard credible testimony that Plaintiff Black Voters Matter Fund was concerned that presenting this option to voters would run the risk of confusion or

otherwise harm its credibility. (Tr. at 47:13-21, Doc. 75.) At least one declarant testified that he was told that the Hancock County post office would not deliver absentee ballots without postage.  (Warren Decl. ¶ 8, Doc. 124-4.)

However, even if the Court were to take the policy as a given, the potential existence of the "stamp free" option cuts both ways. On the one hand, it appears to undercut the 'connection' or 'tie' with voting recognized by cases like *Billups II*, as it is not a payment generally required for all voters in a literal sense. On the other hand, the fact that the municipality will ultimately bear the cost of each ballot with insufficient postage means that instructing voters to purchase stamps defrays costs to the municipality, rendering the cost of a stamp more akin to a tax than gas money or bus fare which is not similarly backstopped.

The Court ultimately need not determine the effect of these "stamp free" absentee ballot options (i.e., mailing a ballot without postage or utilizing a drop box), as Plaintiffs' poll tax claim fails for a more basic reason.  The fact that any registered voter may vote in Georgia on election day without purchasing a stamp, and without undertaking any "extra steps" besides showing up at the voting precinct and complying with generally applicable election regulations, necessitates a conclusion that stamps are not poll taxes under the Twenty-Fourth Amendment prism. In-person voting theoretically remains an option for voters in Georgia, though potentially a difficult one for many voters, particularly during a pandemic.  The Court recognizes that voting in person is materially burdensome for a sizable segment of the population, both due to the COVID-19 pandemic and

for the elderly, disabled, or those out-of-town. But these concerns — while completely justifiable and pragmatically solvable — are not the specific evils the Twenty-Fourth Amendment was meant to address.

Instead, Plaintiffs' concerns about the current public health crisis and the potential dangers associated with in-person voting for a large portion of Georgia's population are better addressed in connection with Plaintiffs' claim in Count II under *Anderson–Burdick*. Otherwise, accepting Plaintiffs' argument under *Harman* and *Harper* would necessitate ruling that the postage requirement on absentee ballots in Georgia *is now and has always been* a poll tax, even before the pandemic, because voting in person presents a material burden for some segment of the population. The Court is not prepared under these circumstances to make such a ruling under the Twenty-Fourth Amendment framework.[24]

For the foregoing reasons, Plaintiffs have not shown a substantial likelihood of success on the merits as to their poll tax claim, and Plaintiffs' Motion for Preliminary Injunction is **DENIED** as to Count I of the Amended Complaint. Furthermore, for the same reasons, the Secretary's Motion to Dismiss Amended Complaint (Doc. 90) is **GRANTED** as to Count I of the Amended Complaint.

---

[24] This ruling is based on the current circumstances, as pled by the Amended Complaint. In the event circumstances surrounding methods of voting radically change, the ruling may be revisited. *See* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment. . . .").

## V.   Discussion: *Anderson–Burdick*

The Court next turns to Plaintiffs' alternative claim, that the postage requirement is an unconstitutional burden on the right to vote. The Constitution gives states primary responsibility for establishing the "Times, Places and Manner of holding Elections for Senators and Representatives," subject to congressional modification. U.S. Const. Art. I, § 4, Cl. 1; *see also id.* Art. II, § 1, Cls. 2, 4. However, the Supreme Court has found that in certain circumstances, state election regulations are constrained by the First and Fourteenth Amendments. *See Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428, (1992). The Court has described these constraints as follows:

> When deciding whether a state election law violates the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).
>
> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Voting is, indisputably, a right "'of the most fundamental significance under our constitutional structure.'" *Burdick*, 504 U.S. at 433 (quoting *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).

*Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270, 1292 (N.D. Ga. 2018).

In the first step of the *Anderson–Burdick* framework, the Court must "weigh the character and magnitude of the burden the State's rule imposes."

*Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1336 (N.D. Ga. 2019) (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)); *see also Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1319; *Stein v. Ala. Sec. of State*, 774 F.3d 689, 694 (11th Cir. 2014) ("[T]he level of the scrutiny to which election laws are subject varies with the burden they impose on constitutionally protected rights — "[l]esser burdens trigger less exacting review.").

A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434; *Lee*, 915 F.3d at 1318. But "reasonable, nondiscriminatory restrictions" that impose a minimal burden may be warranted by "the State's important regulatory interests." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson*, 460 U.S. at 788). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318-19; *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009).

In the following section, the Court examines two lines of *Anderson–Burdick* cases that are particularly on point as to Plaintiff's claims: (1) other COVID-19 voting rights cases, and (2) other natural disaster cases.

## A.    COVID-19 Cases

The Court begins, most logically, with what other courts have done to address voting rights during the pandemic; this Court is not the first to address

election regulations during the COVID-19 outbreak. As the following cases illustrate, district courts around the country have been quick to react to what they determine to be inadequate state pandemic-related voting accommodations, but have been stymied by appellate courts, including the Supreme Court.

### 1.    Wisconsin

The first notable case addressing pandemic-related voting concerns came with a challenge to Wisconsin's absentee voting scheme in *Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *3 (W.D. Wis. Apr. 2, 2020). The uptick in demand for absentee ballots as a result of the pandemic overwhelmed election officials, leading one city clerk to admit that "[t]here [was] no practical way that a person submitting a request for an absentee ballot on the deadline for submitting the request . . . [would] have the time to receive, vote and return their ballot by Election Day," and that the "8:00 p.m. election day deadline for receipt of absentee ballots [was] completely unworkable." *Id.* at *5. The plaintiffs in that case sought an injunction postponing the election entirely as well as prohibiting enforcement of several aspects of Wisconsin election regulations, including: (1) the requirement that "absentee ballots must be received by 8:00 p.m. on election day to be counted"; (2) the requirement that that "absentee ballot requests must be received by April 2, 2020"; and (3) the requirement of providing photo ID for voter registration and in-person witness certification for ballots. *Id.* at *2. The plaintiffs sought extensions of the relevant deadlines and accommodations for the Photo ID and

in-person witness requirements for those who could not safely comply because of the pandemic. *Id.*

The district court recognized that "the rapidly approaching election date in the midst of the COVID-19 pandemic means that citizens will face serious, and arguably unprecedented, burdens in exercising their right to vote in person." *Id.* at *13. The court noted that in-person early voting and registration had been limited or even eliminated, poll workers had cancelled their shifts, and polling sites had been ordered to close. *Id.* And the extent of the burden was not limited to in-person voting, because of the aforementioned backlog of absentee requests. The result was that "voters who did not or could not vote absentee" were "forced on election day to choose between exercising their franchise and venturing into public spaces, contrary to the public message to 'stay home' delivered by countless public officials during the course of this pandemic." *Id.* at *13.

The court conceded that the state's interests in maintaining order in the election process, preventing ambiguity and confusion, and permitting states to enforce their own laws were "strong." *Id.* at *13 (citations omitted). Nonetheless, the court held that they were not "so compelling as to overcome the severe burdens that voters [were] sure to face in the upcoming election." *Id.*

Having found a likelihood of success, the district court turned to the remaining factors for injunctive relief for each of the requested injunctions. The court found that an injunction postponing the election was not justified, but that providing additional time for receipt of absentee ballots and absentee ballot

requests would allow the election officials to catch up with the backlog. *Id.* at *16–18. The court did not impose a requirement of a postmarked-by date, explaining that it was "simply moving the statutory absentee receipt deadline" and that doing so would be "more generally in the public interest, which 'favors permitting as many qualified voters to vote as possible.'" *Id.* at *18 (citing *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)). The court permitted voters who could not comply with the witness requirement due to the pandemic to submit a statement so affirming, but did not modify the Photo ID requirement in light of a recent state supreme court decision adopting a limiting construction. *Id.* at *20 (citing *Jefferson v. Dane County*, No. 2020AP557-OA (Wisc. March 31, 2020). The Seventh Circuit stayed the ruling excusing the witness requirement, but otherwise left in place the injunction. No. 20-1538, 2020 WL 3619499, at *2 (7th Cir. Apr. 3, 2020)

On further application for a stay of the injunction, the Supreme Court granted a partial stay of the district court's injunction a day before the election. *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1206 (April 6, 2020) (per curiam).[25] The Court primarily took issue with the fact that the district court did not impose a requirement that ballots be postmarked by the election date, framing that decision as "[e]xtending the date by which ballots may be cast by voters . . fundamentally alter[ing] the nature of the election." *Id.* at

---

[25] No party challenged the additional time for the election officials to receive and process the absentee ballots. 140 S. Ct. at 1206.

1207. The Court made much hay of the fact that "plaintiffs themselves did not even ask for that relief in their preliminary injunction motions," a point with which the dissent took issue. *Id.* at 1207, 1210 (Ginsburg, J., dissenting). The Court dismissed concerns that the result of the postmarked-by date requirement would be that voters may not actually receive absentee ballots in time to vote them as a result of the backlog. *Id.* at 1207 (majority opinion). The Court noted pointedly that "even in an ordinary election, voters who request an absentee ballot at the deadline for requesting ballots . . . will usually receive their ballots on the day before or day of the election" and faulted the plaintiffs for "put[ting] forward no probative evidence in the District Court that these voters here would be in a substantially different position from late-requesting voters in other Wisconsin elections with respect to the timing of their receipt of absentee ballots." *Id.*

Justice Ginsburg dissented. In her opinion, joined by three colleagues, she expressed her concern that the majority's order would "result in massive disenfranchisement," and remarked that the "Court's suggestion that the current situation is not 'substantially different' from 'an ordinary election' boggles the mind." *Id.* at *Id.* at 1209-10 (Ginsburg, J., dissenting). Justice Ginsburg had noted that as of that Sunday morning, "12,000 ballots reportedly had not yet been mailed out . . . [and that i]t is therefore likely that ballots mailed in recent days will not reach voters by tomorrow," the election day. *Id.* These voters, she concluded, will either "have to brave the polls, endangering their own and others'

safety,"[26] *id.* at 1211, "[o]r they will lose their right to vote, through no fault of their own." *Id.*

### 2. Alabama

Several aspects of Alabama's voting procedure were challenged as unconstitutional in light of the pandemic in *People First of Alabama v. Merrill*, No. 2:20-CV-00619-AKK, 2020 WL 3207824, at *1 (N.D. Ala. June 15, 2020).[27] The challengers in that case argued "that Alabama's election laws—specifically, the requirement that a notary or two witnesses must sign absentee ballots, the requirement that absentee voters must submit a copy of their photo ID, and the state's de facto ban on curbside voting—run afoul of the fundamental right to vote and violate federal law in light of the COVID-19 pandemic." *Id.*

Turning first to the witness or notary requirement, the court held that the challenger's concerns that complying with that requirement were justified, writing that "it is clear that the plaintiffs are rightly concerned about the risk of COVID-19 and minimizing their potential exposure to the virus." *Id.* at *15 However, the Court did not find the challenged requirements to be a severe burden subject to strict scrutiny, but rather one subject to *Anderson–Burdick* balancing: "[S]atisfying the witness requirement presents some risk of COVID-19

---

[26] According to an Associated Press report, more than 50 people who voted in person or worked the polls in the Wisconsin elections tested positive for COVID-19. Scott Bauer, *52 who worked or voted in Wisconsin election have COVID-19*, AP News, April 29, 2020, https://apnews.com/6428674bc2668ebd2db3c482f7f703c1.

[27] Of note, the challengers sought an injunction as to "all the coming 2020 elections," but the court "consider[ed] only whether to grant the preliminary injunction for the [primary] election on July 14." No. 2:20-CV-00619-AKK, 2020 WL 3207824, at 5.

exposure to voters who do not regularly come into contact with at least two adults simultaneously, even if these voters follow social-distancing guidelines." *Id.*

The court agreed that the state's "interest in preventing voter fraud" was "legitimate," but held that it did not outweigh the burden of potential COVID-19 exposure. *Id.* at *16. In so holding, the court discounted the role that the requirement played in furthering the state's interest, noting that the "witness does not even attest that the voter is who she says she is" but just "that they watched this person—who may or may not be known to them, and who may or may not be the same person who completed the ballot—sign the affidavit." *Id.*

The court likewise determined the requirement that applicants include a photocopy of their ID with an application to be likely unconstitutional under the circumstances, explaining that "there is no guarantee that each of those plaintiffs will be able to find a person to help make a copy for them, and requiring a vulnerable voter to find a person willing to help at the risk of potential exposure to COVID-19 is itself a burden." *Id.* at *18. Finally, the court granted the challengers' request for "an order preventing the state from prohibiting local election officials from providing curbside voting" in a manner consistent with state law. *Id.* at *19 (N.D. Ala. June 15, 2020).

On application by the state for stay to the Eleventh Circuit, the motion panel unanimously denied a stay. *People First of Alabama v. Sec'y of State for Alabama*, No. 20-12184, 2020 WL 3478093 (11th Cir. June 25, 2020). Judges Robin Rosenbaum and Jill Pryor filed a joint concurring opinion. The judges

concluded that the district court "did not abuse its discretion by concluding that the 'significant' burdens imposed on high-risk Alabamian voters by the witness and photo ID requirements outweigh the considerations set forth by Appellants." *Id.* at *7 (Rosenbaum and Jull Pryor, JJ., concurring). The judges explained that as to the COVID-19 risk, "[t]he science is clear and undisputed," and that "[t]he photo ID and the witness requirements force at least some Alabamians, including the individual plaintiffs here, to increase their risk of contracting COVID-19 by foregoing nationwide and statewide social distancing and self-isolation rules and recommendations to apply for and successfully vote absentee." *Id.* While agreeing that "combatting voter fraud" is "legitimate," they determined that the state's "interest for maintaining the photo ID and witness requirements do not outweigh the significant, if not severe, burdens faced by high-risk Alabamian voters." *Id.* As to the curbside voting, the judges wrote that "[t]he injunction does not require anything. Instead, it just prohibits the Secretary from prohibiting counties from choosing to implement curbside voting procedures "that otherwise comply with state election law." *Id.* at *6.

Lastly, the judges addressed the potential issues posed by the proximity of the district court's order the pending election. *Id.* at 8 (citing *Purcell*, 549 U.S. at 5). The judges noted that "to the extent any *Purcell* problems exist, the district court's injunction requires the defendants to accept absentee ballot applications and absentee ballots under relatively minor expanded circumstances," and that "at most," the state would have 'to provide additional training to ballot workers—

78

a feat hardly impossible in the allotted time." *Id.* "*Purcell*," the court noted, "is not a magic wand that defendants can wave to make any unconstitutional election restriction disappear so long as an impending election exists." *Id.*

Judge Britt Grant, concurred "reluctantly," largely on the grounds of "uncertain[ty] that the proper parties have appealed." *Id.* at *9–10 (Grant, J., concurring). Judge Grant was more concerned than the other panel members by the potential *Purcell* issues, explaining that "[t]he Supreme Court has emphasized time and time again that federal courts should not jump in to change the rules on the eve of an election." *Id.* at *9 (citing *RNC v. DNC*, 140 S. Ct. at 1205; *Purcell*, 549 U.S. at 4). "And a dangerous virus," she wrote, "does not give the federal courts unbridled authority to second-guess and interfere with a State's election rules." *Id.*

On further application for stay to the Supreme Court, the Court voted 5–4 to grant a stay of the injunction pending appeal with no explanation. *Merrill v. People First of Alabama*, No. 19A1063, 2020 WL 3604049, at *1 (U.S. July 2, 2020)

### 3.    Texas

The Texas Democratic Party challenged Texas's law limiting absentee ballots to "absentees (those who will be away from home for all of early voting and on election day), voters age sixty-five or older, and those with a 'disability' which prevents them from voting in person" in *Texas Democratic Party v.*

79

*Abbott*, No. CV SA-20-CA-438-FB, 2020 WL 2541971, at *2 (W.D. Tex. May 19, 2020).

As in other states, Texas "raise[d] the specter of widespread voter fraud if mail ballots are employed," which the court found did not justify the regulation, noting that "[b]etween 2005 to 2018, there were 73 prosecutions out of millions of votes cast." *Id.* at *4. Instead, the court found "the Grim Reaper's scepter of pandemic disease and death is far more serious than an unsupported fear of voter fraud in this sui generis experience." *Id.* Thus, applying *Anderson-Burdick*, the district court held the age and disability restrictions to be likely unconstitutional and preliminarily enjoined their enforcement. The court characterized the burden as "severe," explaining that "voters face the choice between casting their ballot and paying the price of criminal prosecution." *Id.* at *29. Indeed, the court found that the state's protection of "the health safety of mail ballots for those 65 years of age and older but not those 64 years, 364 days and younger" has "no rational basis," and thus likely failed *Anderson–Burdick* under any standard. *Id.* at *5. The court also held that the age restriction was unconstitutional age discrimination and thus "also violates the clear text of the Twenty-Sixth Amendment under a strict scrutiny analysis." *Id.*

On application for stay to the Fifth Circuit, the motions panel unanimously granted a stay of the injunction. The panel severely criticized the district court's opinion, observing that the district court improperly "rejected Texas's asserted interests in giving older citizens special protection and in guarding against

election fraud." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 402 (5th Cir. 2020). The panel held that rational basis review would probably apply to an absentee ballot voter classification that does not 'absolutely prohibit' some group from voting, citing the Supreme Court's decision in *McDonald v. Board of Election Commissioners of Chicago*, 394 U.S. 802 (1969). *Id.* at 403. It acknowledged that COVID-19, "to be sure, increases the risks of interacting in public," but characterized *McDonald* as standing for the proposition that "a state's refusal to provide a mail-in ballot does not violate equal protection unless—again—the state has 'in fact absolutely prohibited' the plaintiff from voting." *Id.* at 404. The panel held that the restriction was thus likely to survive a rational basis review. *Id.* at 406. For similar reasons, it held that the Twenty-Sixth Amendment did not apply.

The Texas Democratic Party's application to vacate the stay to the Supreme Court was denied without any noted dissent, although Justice Sotomayor noted that the case raised "weighty but seemingly novel questions regarding the Twenty-Sixth Amendment" and expressed a hope that the Fifth Circuit would reach the merits "well in advance of the November election." *Texas Democratic Party v. Abbott*, 140 S. Ct. 2015 (2020).

### 4. Ohio

This Court briefly examined the decision in *LaRose* in the section on poll taxes above, but the case primarily involved an *Anderson–Burdick* claim. No. 2:20-cv-01638-MHW-EPD. *LaRose* involved a series of post-COVID election

regulations passed by the Ohio General Assembly and signed by the governor on March 27, 2020 in response to state court litigation. *Id.* (Slip Op. at 3). The regulations set a voter registration deadline of February 18, 2020, extended the absentee ballot request deadline to April 25, permitted the counting of absentee ballots postmarked by April 27 and received by May 8, and required the Secretary of State to send out postcards to registered voters with instructions on how to apply for a ballot. *Id.* The plaintiffs in that case waged a wide-ranging challenge under both the National Voter Registration Act of 1993 and the First and Fourteenth Amendments. *Id.* (Slip Op. at 4–5).

The plaintiffs contended that the law constituted a burden on the right to vote because it provided insufficient time to effectively conduct voting, considering that voters needed to purchase postage, obtain an application, mail the application, receive back a ballot, and mail the ballot back within a month. *Id.* (Slip Op. at 15). The court characterized the burden as "at most modest," noting that some voters were already able to early vote in person or absentee before the new law was passed, that there were still some limited options to vote in person, and that voters could submit an absentee ballot request on their own sheet of paper. *Id.* (Slip Op. at 16–18). Further, it noted that the requirement that voters affix a stamp to the ballot application was "no more than a minimal burden" where stamps were "available at multiple locations that remain[ed] open during the Governor's stay-at-home order, including grocery stores," and "[t]hose who

[did] not wish to leave their homes to purchase stamps [could] purchase them online." *Id.* (Slip Op. at 17).

The court held the minimal burden was justified by the state's interest in curbing the pandemic and administrative efficiency. *Id.* (Slip Op. at 18–20). Additionally, it noted that extending the deadline further may have resulted in the state political parties being unable to send delegates to their national conventions. *Id.* (Slip Op. at 21). Finally, the court distinguished the Hurricane Matthew Cases (discussed next) on the grounds that the Ohio law did not involve a categorical denial of the right to vote. *Id.* (Slip Op. at 23–34).

## B.   Natural Disaster Cases

The Court next considers cases involving Hurricane Matthew's impact on the 2016 General Election. On October 6, 2016, Hurricane Matthew, "a Category 4 storm with winds of at least 140 miles per hour" menaced Central Florida after devastating Haiti. *Hurricane Matthew Approaches Florida; Governor Urges 1.5 Million to Flee*, New York Times (Oct. 6, 2016), https://www.nytimes.com/2016/10/06/us/hurricane-matthew-us.html. Florida Governor Rick Scott ordered 1.5 million people to evacuate. *Id.*

Meanwhile, the nation was in the midst of a bitterly divisive presidential election. Florida's voter registration deadline was set for Tuesday, October 11, 2016, less than a week after the evacuation order. *Fla. Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1254 (N.D. Fla. 2016). The Plaintiffs in *Scott* sought an injunction against enforcement of the deadline in light of the evacuation. *Id.* The

court recognized that "[l]iterally, in excess of a hundred thousand aspiring eligible Florida voters were likely to have registered to vote in the final week of voter registration," and that "Hurricane Matthew not only forced many of those voters to evacuate the state, but also foreclosed the only methods of registering to vote: in person or by mail," as many county offices had closed and the postal service had suspended operations. *Id.* at 1257. The court held that Florida's statutory registration framework "completely disenfranchise[d] thousands of voters," and characterized the burden as "severe," and therefore subject to strict scrutiny. *Id.* (citing *Burdick*, 504 U.S. at 434).

On the other hand, the court found any prospective burden on the State of Florida for having to extend the voter registration deadline "at best de minimis." *Id.* The court held that even if rational basis applied, the state's interest would still fail to justify the burden because it was "wholly irrational . . . for Florida to refuse to extend the voter registration deadline when the state already allows the Governor to suspend or move the election date due to an unforeseen emergency." *Id.* (citing Fla. Stat. § 101.733). The court granted the injunction. *Id.* at 1258–59.

Likewise, in Chatham County, Georgia, as a result of the hurricane, the Board of Elections office "was closed from October 6 to October 12, 2016," despite a voter registration deadline of October 11, 2016. *Georgia Coal. for the Peoples' Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345 (S.D. Ga. 2016). South Georgia also experienced "mandatory evacuations" and "post office closures and the suspension of mail service during this period." *Id.* at 1344–35. Georgia contended

that the hurricane did not prevent voters from registering electronically on the one hand, and that extending the deadline would cause early voting to overlap with registration, presenting "significant administrative burdens." *Id.* at 1345. The court rejected this argument, noting that "those administrative hurdles pale in comparison to the physical, emotional, and financial strain Chatham County residents faced in the aftermath of Hurricane Matthew." *Id.*

### C.   Application of the Law to the Facts

The Court returns now to the present circumstances. Plaintiffs contend that "[d]ue to the pandemic, voting by mail is now the only meaningful option for the vast majority of Georgia voters for exercising their right to vote. Under these circumstances, the state's imposition of a postage requirement effectively imposes an unavoidable monetary burden on the franchise." (Br. at 15–16, Doc. 2-1.) Plaintiffs argue the burden, regardless of whether characterized as slight or severe, is not outweighed by the state's interest in saving money. (*Id.* at 16.)

The Secretary argues in response that he has taken action to protect Georgia voters from the pandemic, such as pushing back election dates, voluntarily sending out absentee ballot applications to all active voters in the June 2020 primary election,[28] providing funding to polling sites for additional hygiene measures, and overseeing election regulations and grant allocations to

---

[28] The Court takes judicial notice that the Secretary has publicly made clear that his office will not continue this practice of mass transmission of absentee ballot applications in connection with elections post-June 2020. *See, e.g.,* https://www.ajc.com/news/state--regional-govt--politics/absentee-voting-program-embraced-georgia-voters-then-abandoned/hkNttNsgXlaYZXjUatnvjK/.

enable counties to establish secure drop boxes for absentee ballots and permit the distribution of stamps without fear of prosecution. And, while the Secretary cannot truly take credit for it, the Court heard evidence about the U.S. Postal Service's purported policy of delivering absentee ballots with insufficient postage.[29]

Plaintiffs point out that for many voters, potential alternatives such as drop boxes simply do not present a viable option. It is also clear that many counties did not set up drop boxes for absentee ballots, and Plaintiffs argue that those counties that did provide boxes did not provide enough based on guidelines issued by the Department of Homeland Security. (Mot. to Supp., Doc. 136.) Plaintiff BVMF argues that advising voters to submit ballots by mail without postage risks  loss of its credibility, and contends that it is harmed by having to divert funding to pay for and distribute postage. And the Court certainly credits, for present purposes, Plaintiffs arguments that purchasing stamps can be more burdensome for some groups than others, both based on cost and location. (Albright Testimony, *Tr.* at 39:21-24; Barreto Decl. ¶¶ 42–43, 74, 86, 89–90, 92.)

However, the Court notes that the restrictions upheld in Alabama (witness requirement) and Texas (prohibiting much of the population from voting absentee entirely) were arguably more onerous, and generated more risk of

---

[29] The Court also heard evidence, though hearsay within hearsay, that the Hancock County post office would not deliver absentee ballots without postage.  (Warren Decl. ¶ 8, Doc. 124-4.)

COVID-19 exposure, than the postage requirement.[30] In light of these appellate decisions, and the potential alternatives to purchasing stamps available to many (though not all) voters, the Court cannot say the burden of obtaining postage is severe, and instead characterizes it as moderate for present purposes. Thus, the next step is examining the State's interest in the postage requirement.

The Parties agree that the state's interest at issue is "financial." (Sec'y Resp. at 51.) Plaintiffs contend that that State's interest is "minimal" because it "already know[s] how to prepare prepaid postage," and further that "the government's interest in saving money does not justify [Plaintiffs' burden], regardless of how small the amount." (Pls.' Br. at 2-1 (citing *Harman*, 380 U.S. at 544)). However, the Secretary is correct that "[f]iscal responsibility, even if only incrementally served, is undeniably a legitimate and reasonable legislative purpose." *Husted*, 834 F.3d at 635. The State has a limited amount of resources (particularly during a state of emergency), and has already allocated substantial funds to addressing burdens on the right to vote, including $3 million to send absentee ballot

---

[30] The Court is somewhat bewildered by the Supreme Court's approach to COVID-19 cases. One possible explanation is a longstanding reluctance of courts to modify election rules close to the date of elections following the Supreme Court's admonition in *Purcell*, 549 U. S. at 1. However, a hard-and-fast rule against modifying election regulations close to an election would seem inherently incompatible with emergencies, which by definition arise unexpectedly and may jeopardize fundamental voting processes.  This leads the Court to the next observation. A second possible explanation for these outcomes is a general deference to states to deal with emergencies, including unexpected threats to the safety of voters. States theoretically have more expertise than courts in responding to crises. However, the unfortunate politicization of COVID-19 responses across the nation may have led to voter disenfranchisement, which would not be brooked by a court outside of a pandemic scenario. And as the Hurricane Matthew cases demonstrate, a court may properly step in to clear obstacles to voting presented by emergencies where a state has completely failed to take any action, or where obstacles have been maintained that effectively preclude a significant swath of citizens from casting votes.

applications to registered voters, (Tr. at 90:3-7), providing funding for polling site sanitization, and creating grants for secure drop boxes. Mr. Rayburn estimated the cost of providing prepaid postage for Plaintiffs' requested relief at between $450,000 to $4.2 million per election, depending on voter participation, at a time where the budget is already strained as a result of the pandemic. (Aff. Rayburn ¶ 17.) The Supreme Court appears to have signaled that in light of the COVID-19 pandemic, where the state has taken concrete and constructive action to protect the right to vote, the Court must be cautious in second guessing this action.[31] *See e.g., Republican Nat'l Comm.*, 140 S. Ct. at 1207–08 (April 6, 2020) ("[T]he dissent's rhetoric is entirely misplaced and completely overlooks the fact that the deadline for receiving ballots was already extended to accommodate Wisconsin voters, from April 7 to April 13."); *see also Little v. Reclaim Idaho*, No. 20A18, 2020 WL 4360897, at *2 (U.S. July 30, 2020) ("The Governor and Secretary of State here, for example, have suspended some limits on absentee voting and processed requests for absentee ballots through online channels."). What constitutes sufficient action to satisfy such a standard under the circumstances of a given case is a whole other question.

---

[31] The Court leaves for another day the question of when a state's interests, including financial interests, are outweighed by a moderate or even minimal burden on the right to vote where the state has completely failed to take any concrete and constructive action to protect the right to vote during an emergency such as a pandemic, or where the record evidence is greater than what was established by Plaintiffs in this specific case. *Cf. Scott*, 215 F. Supp. 3d at 1254; *Deal*, 214 F. Supp. 3d at 1345.

Moreover, Plaintiffs have failed to present sufficient evidence at this time to show their burden outweighs the State's interest. Plaintiffs presented: (1) only one declaration from a voter who could not afford a stamp and was forced to vote in person, though that voter is not a named plaintiff (Bryant Supp. Decl. ¶ 2, Doc. 124-1); and (2) not a single declaration from a voter who wanted to vote by drop box but was unable to. The Court finds that in light of the alternatives to purchasing a postage stamp discussed above, Plaintiffs have not, at least on the existing record in this specific case, demonstrated a substantial likelihood of success on their argument that the burden of the postage requirement outweighs the cost to the state of the requested relief. Because a showing of substantial likelihood of success on the merits "is generally the most important" factor, *Schiavo*, 403 F.3d at 1232, and because the Court has held that Plaintiff was "unable to show a substantial likelihood of success on the merits, [the Court] need not consider the other requirements" for injunctive relief. *Bloedorn*, 631 F.3d at 1229. The Court cautions once again though, that the evidentiary record and framing of claims related to the absentee ballot voting process may differ in other cases and therefore yield different results.

As to the Secretary's Motion to Dismiss, the Court finds that Plaintiffs have at the very least stated a claim that a burden exists on the right to vote under the *Anderson–Burdick* line of cases. The Court's denial of the preliminary injunction is based on the expedited record as it exists at this time, but discovery and factual

development may potentially fortify Plaintiffs' claims for permanent injunctive relief.

The Court has reviewed the Secretary's other arguments for dismissal of Count II. The Secretary contends that the matter is not ripe as to future elections, noting that

> the need for additional factual development in this matter is obvious. Hopefully, the public health emergency will be over by August or November, and Plaintiffs have not alleged anything specific to the contrary.  But, if this Court decides that Plaintiffs have shown an imminent injury, deciding to require postage now and for all future elections places the cart before the horse.

(Doc. 67-1 at 19.) The Court agrees that additional factual development is prudent, but does not agree that this renders the matter unripe, or that the public health emergency, most unfortunately, is likely over. Lastly, the Court has reviewed the Secretary's two-page federalism argument. (Doc. 61-1 at 22–23.) The Court disagrees that a dispute over whether the postage requirement constitutes a burden on the right to vote is "directly contrary to the separation of powers between state and federal governments," simply because the potential result could end up costing the State money or implicate the Secretary's envelope design or where ballots are sent. (*Id.*).

## VI.    Conclusion

Plaintiffs presented compelling evidence that the state's handling of the June 2020 election was plagued with difficulties, including many instances of voters not receiving their absentee ballots, and as a result being unnecessarily exposed to the virus. (*See supra*, *Post-June 2020 Election Voter Affidavits*.)

However, the Court agrees with the Secretary that these important issues are beyond the scope of this litigation, which is focused on the postage requirement for absentee voting. Other courts in this district are considering more direct challenges to Georgia's handling of the elections in general during the pandemic.[32] Variations in the evidence and issues presented in cases may always lead to a different record, resulting in different outcomes. The narrow ruling in this case is certainly not likely the final word on absentee balloting issues or the implementation of the absentee ballot process in Georgia.

Plaintiffs' Motion to Supplement [Doc. 136] is **GRANTED**. The Motion for a Preliminary Injunction [Doc. 2] is **DENIED**. The Secretary's Motion to Dismiss Plaintiffs' Amended Complaint [Doc. 90] is **GRANTED** as to Count I, and **DENIED** as to Count II. Any amendments to the Parties' Joint Preliminary Report and Discovery Plan [Doc. 116] must be filed no later than 14 days from the date of entry of this Order.

**IT IS SO ORDERED** this 11th day of August, 2020.

**Amy Totenberg**
**United States District Judge**

---

[32] *See, e.g.,* cases cited *supra* in footnote 2.